No. 24-60649

# In the United States Court of Appeals for the Fifth Circuit

STARBUCKS CORPORATION,

*Petitioner/Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

*On appeal from a decision of the National Labor Relations Board, Nos. 03-CA-296757, 03-CA-299016, 03-CA-302451*

## BRIEF OF PETITIONER/CROSS-RESPONDENT STARBUCKS CORPORATION

JEFFREY S. HILLER
LITTLER MENDELSON, P.C.
  41 S. High St., Ste. 3250
  Columbus, OH 43215

JONATHAN O. LEVINE
LITTLER MENDELSON, P.C.
  1111 E. Kilbourn Ave., Ste. 1000
  Milwaukee, WI 53202

LISA S. BLATT
  *Counsel of Record*
AMY MASON SAHARIA
CLAIRE R. CAHILL
JASON HOWELL CLAYTON
WILLIAMS & CONNOLLY LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  lblatt@wc.com

*Counsel for Petitioner/Cross-Respondent*

## CERTIFICATE OF INTERESTED PERSONS

### Case No. 24-60649

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Petitioner/Cross-Respondent:**

- Starbucks Corporation

**Respondent/Cross-Petitioner:**

- National Labor Relations Board

**Intervenor:**

- Workers United, affiliated with the Service Employees International Union

**Counsel for Petitioner/Cross-Respondent:**

- Lisa S. Blatt
  Amy Mason Saharia
  Claire R. Cahill
  Jason Howell Clayton
  Williams & Connolly LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  lblatt@wc.com
  asaharia@wc.com
  ccahill@wc.com
  jclayton@wc.com
- Jeffrey S. Hiller
  Littler Mendelson, P.C.

41 S. High St., Ste. 3250
Columbus, OH 43215
(614) 463-4230
jhiller@littler.com

- Jonathan O. Levine
  Littler Mendelson, P.C.
  1111 E. Kilbourn Ave., Ste. 1000
  Milwaukee, WI 53202
  (414) 291-5526
  jlevine@littler.com

**Counsel for Respondent/Cross-Petitioner:**

- Ruth E. Burdick
  Usha Dheenan
  Gregoire Sauter
  National Labor Relations Board
  1015 Half Street, S.E.
  Washington, DC 20570
  (202) 273-2960
  appellatecourt@nlrb.gov
  usha.dheenan@nlrb.gov
  gregoire.sauter@nlrb.gov
- M. Kathleen McKinney
  National Labor Relations Board
  600 S. Maestri Place, 7th Floor
  New Orleans, LA 70130
  (504) 589-6361

**Counsel for Intervenor:**

- Manuel Alfonso Quinto-Pozos
  Deats Durst & Owen, P.L.L.C.
  8140 N. Mopac Expy., Ste. 250
  Austin, TX 78759
  (512) 474-7896
  mqp@ddollaw.com

Counsel further certifies that Starbucks Corporation has no parent company and that no public company owns 10% or more of its shares.

/s/ Lisa S. Blatt
LISA S. BLATT
*Attorney of Record for*
*Petitioner/Cross-Respondent*

## STATEMENT REGARDING ORAL ARGUMENT

Petitioner Starbucks Corporation requests oral argument pursuant to Fifth Circuit Rule 28.2.3. This case presents significant questions regarding whether the National Labor Relations Board's Order violates the substantial evidence standard, whether the Board's use of discovery sanctions to enforce a subpoena exceeds the Board's statutory authority, and whether the Board's compensatory damages remedy exceeds the Board's statutory authority and violates the Constitution. Oral argument will assist the Court in resolving these important issues.

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ................................................1
STATEMENT OF THE ISSUES ...................................................1
INTRODUCTION ..........................................................................2
STATEMENT OF THE CASE ......................................................6
    A.    Factual History ...............................................................6
    B.    Procedural History .......................................................13
SUMMARY OF ARGUMENT......................................................22
STANDARD OF REVIEW ...........................................................25
ARGUMENT .................................................................................26
I.    Starbucks Lawfully Terminated Schenk's Employment.......26
    A.    The Board Erred in Concluding that Anti-Union
        Motivated Schenk's Discipline at the First *Wright Line*
        Step ................................................................................27
    B.    The Board Ignored Evidence of Schenk's Repeated Policy
        Violations at the Second *Wright Line* Step .................30
        1.    *The June 27 final written warning* .....................31
        2.    *The July 18 memorialized coaching* ...................34
        3.    *The August 31 termination* .................................36
        4.    *The Board's improper adverse inferences*............40
II.    Starbucks Did Not Create an Unlawful Impression of
    Surveillance..............................................................................45
    A.    Starbucks Did Not Create an Unlawful Impression of
        Surveillance When It Confronted Schenk with His
        Offensive Chat Messages ..............................................47
    B.    Starbucks Did Not Create an Unlawful Impression of
        Surveillance When It Increased Management Presence at
        the Stuyvesant Store .....................................................51
III.    The Board's Ordered Remedy Is Unlawful ...........................54
    A.    The Board's *Thryv* Remedy Unlawfully Awarded
        Compensatory Damages .................................................54
    B.    Extraordinary Circumstances Justify Reaching the *Thryv*
        Issue...............................................................................61
CONCLUSION..............................................................................64

# TABLE OF AUTHORITIES

Page

## CASES

*6 W. Ltd. v. NLRB*, 237 F.3d 767 (7th Cir. 2001) ...................................... *passim*

*3484, Inc. v. NLRB*, 137 F.4th 1093 (10th Cir. 2025) ................................. 55, 63

*Advoc. S. Suburban Hosp. v. NLRB*, 468 F.3d 1038 (7th Cir. 2006) .............. 44

*Airgas USA, LLC*, 373 NLRB No. 102, slip op. (Sept. 18, 2024) .................... 62

*Albemarle Paper Co. v. Moody*, 422 U.S. 405 (1975) ..................................... 58

*Apple Inc. v. NLRB*, --- F.4th ---, 2025 WL 1862823 (5th Cir. 2025) ........... 1, 25

*Atlantic Steel Co.*, 245 NLRB 814 (1979) ....................................................... 15

*Blanca Tel. Co. v. FCC*, 991 F.3d 1097 (10th Cir. 2021) ................................. 44

*Brown & Root, Inc. v. NLRB*, 333 F.3d 628 (5th Cir. 2003) ............................ 25

*Bruce Packing Co. v. NLRB*, 795 F.3d 18 (D.C. Cir. 2015) ............................. 33

*Bufco Corp. v. NLRB*, 147 F.3d 964 (D.C. Cir. 1998) ..................................... 44

*Calcutt v. FDIC*, 598 U.S. 623 (2023) ............................................................. 15

*Califano v. Sanders*, 430 U.S. 99 (1977) ....................................................... 63

*Carroll Coll., Inc. v. NLRB*, 558 F.3d 568 (D.C. Cir. 2009) ........................... 63

*Cemex Constr. Materials Pac., LLC*,
    372 NLRB No. 157, slip op. (Nov. 13, 2023) ............................................. 62

*Centre Prop. Mgmt. v. NLRB*, 807 F.2d 1264 (5th Cir. 1987) .................... 32, 38

*Curtis v. Loether*, 415 U.S. 189 (1974) ........................................................... 57

*Delchamps, Inc. v. NLRB*, 585 F.2d 91 (5th Cir. 1978) ................................... 49

*DirecTV Holdings, L.L.C. v. NLRB*, 650 F. App'x 846 (5th Cir. 2016) ........... 31

*Dresser-Rand Co. v. NLRB*, 838 F.3d 512 (5th Cir. 2016) .............................. 25

*Ex parte Lennon*, 166 U.S. 548 (1897) ........................................................... 57

*Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245 (5th Cir. 1978) ...................... 49

*Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203 (1964) ...................... 58

*Golden State Bottling Co. v. NLRB*, 414 U.S. 168 (1973) ............................... 58

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989) .................................... 59

*Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204 (2002) .............. 55

*Greater Omaha Packing Co. v. NLRB*,
    790 F.3d 816 (8th Cir. 2015) .................................................... 45, 46, 51

*HHS Aviation, LLC*, 2024 WL 4165108 (NLRB Sep. 11, 2024) ...................... 62

*Indep. Elec. Contractors of Hous., Inc. v. NLRB*,
    720 F.3d 543 (5th Cir. 2013) ............................................................. 61, 63

*Int'l Union of Operating Eng'rs v. NLRB*,
    127 F.4th 58 (9th Cir. 2025) ........................................................ 56, 58, 59

vi

Page

Cases—continued:

*Intertape Polymer Corp. v. NLRB*,
    801 F.3d 224 (4th Cir. 2015)............................................45, 47, 51
*Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351 (6th Cir. 1983) ...........................61
*Lion Elastomers, LLC*, 372 NLRB No. 83 (May 1, 2023)................................15
*Lion Elastomers v. NLRB*, 108 F.4th 252 (5th Cir. 2024) ..............................15
*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) .................................25
*Los Robles Reg'l Med. Ctr.*, 2023 WL 6902298 (NLRB Sept. 18, 2023) ..........62
*Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993) ............................................55
*NCRNC, LLC v. NLRB*, 94 F.4th 67 (D.C. Cir. 2024) ............................52, 54
*NLRB v. AllService Plumbing & Maint., Inc.*,
    138 F.4th 889 (5th Cir. 2025) ........................................25, 38, 53, 61
*NLRB v. Borden Co.*, 392 F.2d 412 (5th Cir. 1968)........................................49
*NLRB v. Brookshire Grocery Co.*, 919 F.2d 359 (5th Cir. 1990)...............36, 37
*NLRB v. C.H. Sprague & Son Co.*, 428 F.2d 938 (1st Cir. 1970) .....................42
*NLRB v. Chester Valley, Inc.*, 652 F.2d 263 (2d Cir. 1981) .............................43
*NLRB v. Detroit Newspapers*, 185 F.3d 602 (6th Cir. 1999)...........................41
*NLRB v. IBEW, Loc. 340*, 481 U.S. 573 (1987) .....................................46, 47
*NLRB v. Int'l Medication Sys., Ltd.*, 640 F.2d 1110 (9th Cir. 1981)...............41
*NLRB v. Interbake Foods, LLC*, 637 F.3d 492 (4th Cir. 2011) .................40, 41
*NLRB v. Mass. Mach. & Stamping, Inc.*, 578 F.2d 15 (1st Cir. 1978)...........44
*NLRB v. McCullough Env't Servs., Inc.*, 5 F.3d 923 (5th Cir. 1993) .............49
*NLRB v. Mueller Brass Co.*, 509 F.2d 704 (5th Cir. 1975) ...............................45
*NLRB v. Red Top Cab & Baggage Co.*, 383 F.2d 547 (5th Cir. 1967).............31
*NLRB v. Ryder/P.I.E. Nationwide, Inc.*, 810 F.2d 502 (5th Cir. 1987)....34, 35
*NLRB v. Soft Water Laundry, Inc.*, 346 F.2d 930 (5th Cir. 1965)...................32
*NLRB v. Starbucks Corp.*, 125 F.4th 78 (3d Cir. 2024) .........................55, 57, 58
*Oil States Energy Servs. v. Greene's Energy Grp.*, 584 U.S. 325 (2018).........60
*Power Plant Div., Brown & Root, Inc. v. OSHRC*,
    673 F.2d 111 (5th Cir. 1982)..................................................................61
*Regal Knitwear Co. v. NLRB*, 324 U.S. 9 (1945) .................................................58
*Rockingham Machine-Lunex Co. v. NLRB*,
    665 F.2d 303 (8th Cir. 1981)...........................................................39, 44
*SEC v. Jarkesy*, 603 U.S. 109 (2024).............................................................59, 60
*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408 (2003) .................56
*Stern Produce Co. v. NLRB*, 97 F.4th 1 (D.C. Cir. 2024) ........................*passim*

Page

Cases—continued:

*Stern v. Marshall*, 564 U.S. 462 (2011)............................................................59, 60
*Syncro Corp. v. NLRB*, 597 F.2d 922 (5th Cir. 1979) ........................................33
*Tellepsen Pipeline Servs. Co. v. NLRB*, 320 F.3d 554 (5th Cir. 2003) ...........27
*Tesla, Inc. v. NLRB*, 120 F.4th 433 (5th Cir. 2024) (en banc) ........................27
*Tex. World Serv. Co. v. NLRB*, 928 F.2d 1426 (5th Cir. 1991) .......................26
*Thryv, Inc.*, 372 NLRB No. 22 (Dec. 13, 2022)............................................*passim*
*Thryv, Inc. v. NLRB*, 102 F.4th 727 (5th Cir. 2024) ................................*passim*
*Time Warner Cable of N.Y.C. LLC v. NLRB*,
    982 F.3d 126 (2d Cir. 2020) ..........................................................................50
*Troutbrook Co.*, 373 NLRB No. 125, slip op. (Sept. 30, 2024) .........................62
*UAW v. NLRB*, 459 F.2d 1329 (D.C. Cir. 1972).........................................41, 43
*Underwriters Lab'ys Inc. v. NLRB*, 147 F.3d 1048 (9th Cir. 1998)................43
*United States v. Burke*, 504 U.S. 229 (1992)......................................................58
*Valmont Indus., Inc. v. NLRB*, 244 F.3d 454 (5th Cir. 2001) ...................25, 29
*W&M Props., Inc. v. NLRB*, 514 F.3d 1341 (D.C. Cir. 2008)..........................61
*Wright Line*, 251 NLRB 1083 (1980)............................................................*passim*

## CONSTITUTION AND STATUTES

U.S. Const.
    art. III .......................................................................................................*passim*
    amend. VII................................................................................................*passim*
29 U.S.C.
    § 160............................................................................................................*passim*
    § 161............................................................................................................40, 41
    § 187................................................................................................................58
    § 2617..............................................................................................................58

## OTHER AUTHORITIES

Samuel L. Bray, *The System of Equitable Remedies*,
    63 UCLA L. Rev. 530 (2016).........................................................................57
Dan B. Dobbs, 1 Law of Remedies 280 (2d. ed. 1993) ......................................57
NLRB, *Casehandling Manual, Part 3, Compliance Proceedings*
    (Oct. 19, 2020), https://tinyurl.com/ycketcuj..............................................56
Howard Schultz, *Statement Before the Senate Committee on Health,
    Education, Labor, and Pensions* (Mar. 29, 2023),
    https://tinyurl.com/ydh7phk7 ......................................................................6, 7

Page

Other Authorities—continued:

Starbucks, *Culture of Connection*, https://tinyurl.com/2trtbaam ...................... 6

Starbucks, *Our Long-Standing Efforts to Put Our Partners First*
(Mar. 13, 2023), https://tinyurl.com/m8yfj48d ................................................ 6

## JURISDICTIONAL STATEMENT

The National Labor Relations Board (Board) issued its Decision and Order on December 16, 2024.  Starbucks petitioned for this Court's review on December 24, 2024.  The Board applied for enforcement of its Decision and Order on January 22, 2025.  This Court has jurisdiction because the Decision and Order is a final order, and venue is proper in this Circuit because Starbucks transacts business within this Circuit.  *See* 29 U.S.C. § 160(e), (f); *Apple Inc. v. NLRB*, --- F.4th ---, 2025 WL 1862823, at *3 (5th Cir. 2025).  The petition and cross-application are timely because the National Labor Relations Act (NLRA) imposes no time limit for such filings.  *Apple*, 2025 WL 1862823, at *3.

## STATEMENT OF THE ISSUES

1.    Whether the Board erred in concluding that Starbucks committed unfair labor practices by disciplining James Schenk and later terminating his employment, notwithstanding Schenk's repeated violations of company policy.

2.    Whether the Board erred in concluding that Starbucks committed unfair labor practices by creating the impression of surveillance of union activities when it (1) showed Schenk photographs of his offensive text messages about a coworker and supervisor that led to his discipline and (2)

increased management presence at a store whose newly promoted manager was away on vacation.

3.    Whether the Board exceeded its statutory authority and violated Article III and the Seventh Amendment in ordering compensatory damages.

## INTRODUCTION

The NLRA does not shield union organizers from discipline or discharge no matter how offensive or egregious their conduct. The NLRA prohibits employers from disciplining or discharging employees *because of* their union activity. Employers remain free to discharge union organizers who disparage their colleagues on the basis of sex or medical condition, fail to do their jobs, or open their employer's official mail under false pretenses.

This case centers on Starbucks' termination of James Schenk, a shift supervisor at a Starbucks store in Latham, New York. Starbucks terminated Schenk's employment after a series of incidents during summer 2022.

First, Starbucks learned that Schenk directed a misogynistic and discriminatory tirade toward colleagues in an employee group chat. Schenk called his female coworker, who had an accommodation for a documented medical condition preventing her from working with certain cleaning products, "[t]he dumb fuc[k]ing bitch who can't even use cleaners" and "useless fucking

[name]"; and called his male store manager a "fucking cock[]sucker" and "[f]ucking [p]ussy" who "can suck my fucking dick." In response, Starbucks issued Schenk a final written warning.

Second, Starbucks cited Schenk for failing to complete four mandatory tasks before the end of his shift and issued him an extremely mild form of discipline called a "memorialized coaching."

Finally, when the store manager was not present, Schenk opened a letter delivered by U.S. Mail, addressed to "Starbucks Corporation" from the National Labor Relations Board, labeled "Official Business." Schenk told his store manager that, as "Union liaison," he believed he was entitled to read any correspondence to Starbucks from the Board. This was the straw that broke the camel's back. Starbucks terminated Schenk's employment and issued Schenk a letter of separation citing all three incidents.

An Administrative Law Judge (ALJ) sensibly concluded that all three disciplinary actions were lawful because Starbucks would have disciplined any employee who committed the same infractions. But the Board disagreed and concluded that Starbucks had disciplined Schenk for his labor organizing, not his blatant violations. The Board also concluded that Starbucks unlawfully created an impression of surveillance at the Latham store, by showing Schenk

photographs of his offensive messages without disclosing how Starbucks had obtained them; and at another nearby store, by increasing management presence during a union organizing campaign.

The Board's conclusion that Starbucks engaged in unfair labor practices by disciplining and discharging Schenk cannot stand. The Board improperly ignored Schenk's supervisory position and minimized the fact that Schenk's diatribes were both grossly offensive and angrily directed at a coworker, instead describing them as mere "profanity" for which another employee might not have been disciplined. The Board ignored evidence that Schenk had left more tasks undone in a single shift than any other supervisor. And the Board inappropriately faulted Starbucks for not having a written policy expressly prohibiting employees from opening Starbucks' official mail and relied on Schenk's assertion that employees were permitted to open mail— despite the fact that, as the ALJ who observed Schenk's testimony noted, Schenk initially defended his actions by pointing to his *union* role, not his employee status. Additionally, the Board improperly premised its conclusion on inferences drawn against Starbucks, for claiming documents as privileged and failing to call one witness, that exceeded the Board's statutory authority and lack record support.

Equally unsupported is the Board's conclusion that Starbucks unlawfully created an impression of surveillance at two stores. In neither instance did the Board find that Starbucks actually surveilled any union activities. Nor did the Board find that Starbucks' conduct actually coerced employees. As to the Latham store, the Board absurdly found that a reasonable employee could have believed that Starbucks was surreptitiously surveilling union activities when Starbucks declined to tell Schenk how it obtained his text messages, even though the explanation was perfectly obvious to all—another coworker who was part of the group chat (and whose own messages were labeled "Me" in the photographs shown to Schenk) provided the messages to store management. As to the second store, the Board implausibly found that Starbucks created an unlawful impression of surveillance by increasing its managerial presence at a store whose new manager requested additional support while he learned the ropes and then was away on vacation. That conclusion improperly interferes with Starbucks' reasonable operational decisions. The Court should deny enforcement.

Lastly, the Board's order directing Starbucks to compensate Schenk for all "direct or foreseeable pecuniary harms" he experienced is legally untenable. Imposing a compensatory damages remedy exceeds the Board's

statutory authority under the NLRA and violates the Constitution. As the Third Circuit has held, the Board lacks statutory authority to order compensatory damages. Section 10(c) confines the Board to *equitable* relief. Compensatory damages are quintessential *legal* relief. The Board's contrary view would violate Article III and the Seventh Amendment.

## STATEMENT OF THE CASE

### A.    Factual History

1. Starbucks is America's largest coffee purveyor. In the United States alone, Starbucks employs some 235,000 people, who are "partners," reflecting Starbucks' conviction that its people—along with its coffee—lie at the heart of its business. Starbucks, *Culture of Connection*, https://tinyurl.com/2trtbaam; *see also* Starbucks, *Our Long-Standing Efforts to Put Our Partners First* (Mar. 13, 2023), https://tinyurl.com/m8yfj48d.

To that end, Starbucks offers its partners opportunities to develop their careers, promoting many baristas to management and paying up to 100% of partners' college tuition. Howard Schultz, *Statement Before the Senate Committee on Health, Education, Labor, and Pensions* 2 (Mar. 29, 2023), https://tinyurl.com/ydh7phk7. Starbucks also offers "industry-leading

benefits," ranging from comprehensive health care and stock ownership to student loan assistance, paid sick leave, and backup childcare. *Id.*

Nevertheless, as the policies in Starbucks' Partner Guide specify, partners who fall below Starbucks' expectations and fail to deliver top-level customer service are let go. That Guide articulates Starbucks' policies for taking "corrective action" or "separat[ing]" partners. ROA.790. Among other policies, the Guide's "Commitment to a Respectful Workplace" section outlines Starbucks' "Anti-Discrimination" and "Anti-Harassment" policies. ROA.790.

2. This case primarily involves Starbucks' progressive discipline and eventual discharge of partner James Schenk, who worked at a Starbucks in Latham, New York, from December 2016 until August 2022. At all relevant times, Schenk was a shift supervisor—someone who both functions as a barista and also provides "respectful coaching and feedback to partners" and "set[s] a positive example for the shift team." ROA.778-781.

Before 2022, Schenk had already been disciplined twice. First, in 2018, before any union activity at the store, Starbucks issued Schenk a documented coaching for failing to respond appropriately to partners' use of "obscene" and "potentially offensive or harassing" insults about a coworker. ROA.792-793. Second, in 2021, Starbucks issued Schenk a written warning for failing to

provide proper notice that he was going to miss a shift. ROA.783-784. The General Counsel did not allege that either form of discipline was unlawful.

From June to August 2022, Starbucks made three additional decisions disciplining Schenk and eventually terminating his employment, each of which the Board held to violate the NLRA.

*First*, Starbucks issued Schenk a final written warning for offensive statements made on May 24 in a partner group chat. In the chat, Schenk attacked store manager Nick Cain and a coworker named Temera, who had an accommodation for a documented medical condition preventing her from working with cleaning products at the store. ROA.283-284. Schenk's comments included:

> Nick can suck my fucking dick. Closing with 2 people and still have to do clean play.
> …
> Leaves me with useless fucking [T]emera for CLEAN PLAY
> WHAT THE FUCK CAN SHE CLEA[N] ARE YOU FUCKING SER[I]OUS
> Safe money is fucked too
> …
> Nick can suck my dick
> …
> Un fucking believable
> Especially when I told that fucking cock[]sucker to close at 2 when we had people
> If you're too fucking chicken shit to stand up to [Starbucks district manager Beate Kuhnle-Hambster] when she "makes" you stay open then you can say by[e] to going above and beyond

Fucking [p]ussy
…
Sick ass
Get to do clean play solo with temera
The dumb fuc[k]ing bitch who can't even use cleaners
…
I d[on']t give a fuck
DON'T FUCKING OPEN IF YOU AREN[']T FUCKING STA[FF]ED
What kind of lizard brain fucking stupidity does [i]t take to convince himself it's okay to ask me to come in and do 3 fucking people[']s jobs

ROA.796-797, 799.

On May 26, Jessica Mahoney, another partner and participant in the group chat, informed store manager Cain of Schenk's messages and later shared photographs of them with the district manager, Kuhnle-Hambster. ROA.376-377, 795-799. In the photographs, Schenk's messages are labeled "James," and Mahoney's own messages are labeled "Me." ROA.796-797, 799.

On June 16, Cain and Kuhnle-Hambster met with Schenk and showed him Mahoney's photographs of Schenk's messages. ROA.92-93. Schenk confirmed that the messages were his and asked how Cain and Kuhnle-Hambster had obtained the photographs. ROA.93-94. Kuhnle-Hambster did not reveal that Mahoney had provided the photographs, ROA.92-94, 101, although it was obvious from the names of the participants in the photographs that Mahoney was the source.

On June 27, Starbucks issued Schenk a final written warning, which recounted some of the language Schenk had used. ROA.742-743. The warning also cited Starbucks' "How We Communicate" policy, which states that partners "are expected to communicate with other partners and customers in a professional and respectful manner at all times. The use of vulgar or profane language is not acceptable." ROA.742-743, 788. Kuhnle-Hambster told Schenk that the warning was based on the severity of Schenk's language. ROA.105-106.

*Second*, Starbucks issued a memorialized coaching—essentially a record of a disciplinary conversation—to Schenk on July 18 for leaving four tasks undone at the end of a closing shift. ROA.745.

*Third*, Starbucks fired Schenk after he opened mail addressed to Starbucks on August 12. ROA.749. While Cain was absent, Schenk opened a letter delivered by U.S. Mail, addressed to "Starbucks Corporation," labeled "Official Business," and listing the return addressee as "United States Government National Labor Relations Board." ROA.143-144, 802. Schenk examined the letter's contents, shared them with other partners, and then placed the letter back in its envelope. ROA.143-144.

The next day, Cain asked Schenk who had opened the letter, and Schenk responded that he had done so. ROA.151. Cain told Schenk that this was inappropriate, and Schenk retorted that he was "the Union liaison with the store" and that he did not trust Starbucks to pass the NLRB communication along to him "if I need it." ROA.151. Cain called Kuhnle-Hambster to report the incident. ROA.391-392.

On August 31, Schenk received a notice of separation from Starbucks. ROA.749. The notice cited the final written warning from June and the memorialized coaching from July. It also stated that Schenk's decision to open the mail was inconsistent with Starbucks' "Mission and Values" and could have been a crime, which in turn would violate Schenk's "responsibilities under the Standards of Business Conduct." ROA.749.

3. This case also involves another Starbucks store in nearby Albany at the Stuyvesant Plaza mall. This store was within the same district managed by Kuhnle-Hambster. ROA.354. The Stuyvesant store manager, Gerrard Hedge, had performance issues, was disciplined in March 2022, and resigned May 2, effective May 15. ROA.807, 809. His replacement as store manager, Jacob Barkman, was new to both the position and the Stuyvesant store and requested that Kuhnle-Hambster be present in the store while he learned the

11

ropes and developed a rapport with partners. ROA.324-327, 363-364. Kuhnle-Hambster did so, frequently checking in with both Barkman and the other partners at the Stuyvesant store. ROA.326-327, 363-366.

Shortly thereafter, on May 30, Barkman left for a previously planned vacation until June 5, leaving the Stuyvesant store without a manager. ROA.327-329. Kuhnle-Hambster and a neighboring store's manager both increased their visits to the store to help manage it during Barkman's absence. ROA.327-329. When Barkman was absent for his wedding in April 2023, Kuhnle-Hambster again increased her presence at the Stuyvesant store. ROA.329.

4. These events occurred while the Lathan and Stuyvesant stores were engaged in unionization efforts. In March 2022, Schenk, Mahoney, and other Latham partners identified themselves as members of a union organizing committee in a letter to Starbucks' CEO posted on social media. ROA.83-84, 728-29. On May 17, 2022, the Latham store voted to be represented by Starbucks Workers United (the Union). ROA.35.

Meanwhile, partners at the Stuyvesant store announced their union campaign in April 2022 and voted to be represented by the Union on June 7. ROA.35.

### B.    Procedural History

1. ***The NLRB complaint***.  The Union filed a series of unfair labor practice charges against Starbucks relating to the Latham and Stuyvesant stores.  ROA.438-446.  In December 2022, the NLRB issued a consolidated complaint alleging unfair labor practices in violation of Sections 8(a)(1) and (3) of the NLRA.  ROA.468-476.  As relevant here, the complaint alleged that Starbucks retaliated against Schenk for engaging in union activities.  ROA.471.  It also alleged that Starbucks unlawfully created an impression of surveillance at the Latham store, by showing Schenk photographs of his offensive messages without divulging their source; and at the Stuyvesant store, by increasing Kuhnle-Hambster's presence at the store in the weeks leading up to the union election.  ROA.470.

2. ***The subpoena***.  In February 2023, the General Counsel served Starbucks with a subpoena for documents.  ROA.812.  Starbucks produced some of the requested documents but determined that others were protected by attorney-client privilege and produced a privilege log.  ROA.15.  The General Counsel contended that the privilege log was insufficiently detailed and asked the ALJ to inspect the documents in camera.  ROA.310.  The ALJ asked Starbucks to produce the privileged documents for in camera review,

and Starbucks declined, contending that only an Article III court can enforce NLRB subpoenas under NLRA Section 11.  ROA.310-313.

In its brief to the ALJ, the General Counsel requested that the ALJ draw a "general adverse inference" from Starbucks' refusal to provide the privileged documents for in camera review.  Record Excerpts (RE) 13 n.1. When asked by the ALJ to elaborate, the General Counsel did not identify specific requests or specific matters about which adverse inferences should be drawn.  ROA.314; RE13 n.1.

3. ***The ALJ's decision***.  After a two-day hearing, the ALJ concluded that Starbucks did not discriminate against Schenk with respect to any of the three disciplinary actions and that Starbucks did not unlawfully create an impression of surveillance by showing Schenk photographs of his offensive messages.  However, the ALJ concluded that Starbucks unlawfully created an impression of surveillance by increasing its managerial presence at the Stuyvesant store.

*First*, with respect to Schenk's termination, the ALJ employed the well-established *Wright Line* framework, under which the General Counsel must first show that the employer's adverse action was motivated, at least in part,

by the employee's protected union or concerted activity.[1]  *See* 251 NLRB 1083, 1087 (1980).  Then, the burden shifts to the employer to show it would have taken the same action even absent the protected activity.  *Id.*

The ALJ found that the General Counsel had shown anti-union animus but concluded that Starbucks would have disciplined Schenk even absent his protected activities.

As to the final written warning, the ALJ found that Schenk's messages "included a torrent of unusually offensive insults, some invoking sex acts, directed at other members of the staff," and some "referencing the medically-

---

[1] The ALJ alternatively concluded that Schenk's text messages about working conditions were "protected concerted activity" under Section 8(a)(1) but that the offensive messages were so egregious as to forfeit the NLRA's protections under the Board's *Atlantic Steel* multifactor test.  RE22-23.  *See Atlantic Steel Co.*, 245 NLRB 814 (1979); *Lion Elastomers, LLC*, 372 NLRB No. 83 (May 1, 2023) (reinstating *Atlantic Steel*), *vacated and remanded*, 108 F.4th 252 (5th Cir. 2024).  Here, the General Counsel argued to the Board that a *different* multifactor test was more appropriate.  In dicta, the Board indicated its agreement with the General Counsel as to the proper test but found it "unnecessary" to address the issue given its conclusion under the *Wright Line* test.  Chairman McFerran stated, also in dicta, that she would have found that Schenk's conduct lost the protection of the NLRA.  RE7 n.34.  Under any test, Schenk's misogynistic, discriminatory tirade forfeited the NLRA's protections.  Regardless, because the Board did not reach this issue, it cannot serve as an alternative ground to sustain the Board's decision.  *See Calcutt v. FDIC*, 598 U.S. 623, 628-29 (2023) (court cannot "affirm the administrative action by substituting what it considers to be a more adequate or proper basis" (citation omitted)).

imposed limitations of an employee whose work Schenk was responsible for directing." RE22-23. The ALJ added that Schenk had previously been disciplined for reasons related to potentially offensive or harassing comments directed at another store partner—long before Schenk's protected activity. RE23-24. Although the General Counsel contended that Starbucks tolerated profanity at the Latham store, the ALJ found no evidence that Starbucks had previously tolerated "highly offensive insults" "direct[ed]" at "other members of the staff." RE24. "Tellingly," the ALJ observed, "the General Counsel avoids repeating any of Schenk's highly offensive insults, but rather refers to them simply as profanity, as if all uses of profanity in the workplace are the same. They are not." RE23-24.

As to the memorialized coaching, the ALJ emphasized that Schenk had left four mandatory closing tasks undone. The ALJ acknowledged evidence that other shift supervisors sometimes failed to complete a closing task but found no evidence that any other shift supervisor "had ever left so many tasks undone on a single shift." RE24.

Finally, as to Starbucks' decision to terminate Schenk's employment, the ALJ found that Schenk's decision to open mail labeled "Official Business" and addressed to "Starbucks Corporation" was "a brazen intrusion into

management's prerogatives." RE24. Even though Starbucks had no formal policy expressly prohibiting partners from opening mail, and "on relatively rare occasions" shift supervisors opened packages containing work supplies, the ALJ found no evidence that shift supervisors had ever been authorized to open Starbucks' official mail. RE19. The ALJ thus found that Schenk "violated a common sense understanding" of Starbucks' policies. RE24-25. Moreover, the ALJ observed that the General Counsel's argument—that partners were generally permitted to open mail—was at odds with *Schenk's* contemporaneous justification that he was entitled to open the letter by virtue of his union role. RE19. The ALJ accordingly found it "not credible, facially or on the record here, that Schenk had, or honestly believed he had, the right as either a shift supervisor or a union liaison to open" Starbucks' official mail. RE19.

*Second*, the ALJ concluded that district manager Kuhnle-Hambster did not unlawfully create an impression of surveillance by showing Schenk photographs of his offensive messages without revealing how she obtained them. RE20. Given that Schenk shared his messages in a chat with four other partners, the ALJ found that the "obvious explanation" was that another partner had shared the photographs with Kuhnle-Hambster. RE20. The ALJ

acknowledged the "open possibility" that Starbucks management had somehow infiltrated the chat but reiterated that a "reasonable employee would not believe that surveillance was the source" of the photographs.  RE20.

However, the ALJ concluded that Kuhnle-Hambster's increased presence at the Stuyvesant store began after the union campaign launched in April 2022, was "far out of the ordinary," and "would reasonably tend to restrain employees' exercise of their" rights under the NLRA.  RE20.  The ALJ rejected Kuhnle-Hambster's explanation that she had increased her presence to support store managers Hedge and Barkman on the grounds that Kuhnle-Hambster's testimony was vague, that she had increased her presence "immediately after" the union campaign began rather than when Barkman started, and that Kuhnle-Hambster spent time observing customers and partners rather than interacting with Barkman.  RE14, 20.[2]

*Finally*, the ALJ suggested that Starbucks' refusal to produce documents for in camera review was "sanctionable" but that the General Counsel's request for a "general adverse inference" was "unworkably vague,"

---

[2] The ALJ also relied on this conclusion of unlawful impression of surveillance as evidence of Starbucks' anti-union animus when addressing Schenk's discipline.  RE23.

particularly given the General Counsel's refusal to elaborate on its request. RE13 n.1.

4.   ***The Board's decision***.   In December 2024, the Board issued a decision adopting the ALJ's conclusion that Starbucks unlawfully created an impression of surveillance at the Stuyvesant store but otherwise rejecting the ALJ's conclusions.  RE1 & n.2.

The Board first concluded that Starbucks' "true motive for issuing" Schenk a final written warning was not Schenk's offensive messages but his union activity.  RE3-7.  The Board agreed with the ALJ that the NLRB had met its initial burden to show anti-union animus.  RE4.  But the Board reasoned that Schenk, Cain, and other Latham partners had routinely used profanity without discipline, and that one other partner testified that Schenk's messages did not bother her.  RE5-6.

The Board buttressed this conclusion with two adverse inferences not drawn by the ALJ.  First, the Board noted that Cain did not testify and inferred that his testimony would have indicated that Starbucks had tolerated profanity by Schenk and others at the Latham store.  RE5.  Second, the Board drew an adverse inference from Starbucks' decision not to produce its privileged documents for in camera inspection.  RE5-6.  Although the ALJ

noted that the General Counsel did not specify the requested adverse inference, the Board inferred that the withheld documents would have shown that "comparable profanity was common and tolerated." RE5.

As to the memorialized coaching, the Board concluded that other shift supervisors had made "similar mistakes" without discipline and faulted Starbucks for failing to show that Schenk's four mistakes in a single shift "went beyond those ordinarily tolerated." RE7-8. The Board also relied on store manager Cain's statement to Schenk that he believed that Schenk's mistakes were "one-offs." RE7-8. Lastly, the Board emphasized that the memorialized coaching expressly relied on the final written warning, which the Board had already deemed unlawful. RE8.

As to Schenk's discharge, the Board credited Schenk's testimony that shift supervisors were generally permitted to open mail and another partner's testimony that she had seen shift supervisors, on occasion, open mail (even though she could not remember to whom that mail had been addressed). RE8-9. The Board also faulted Starbucks' lack of a formal written policy expressly prohibiting partners from opening mail. RE9. The Board also drew yet another inference—that shift supervisors *were* authorized to open mail—from Starbucks' failure to call Cain. RE9. Lastly, it again emphasized that Schenk's

termination notice cited the final written warning and memorialized coaching, both of which the Board had already declared unlawful. RE9. The Board did not address Schenk's contemporaneous justification for opening the letter—that he was entitled to open mail by virtue of his union role—finding it "not relevant." RE8 n.41.

With respect to surveillance, the Board concluded that Kuhnle-Hambster's "unexplained access" to photographs of Schenk's offensive messages "implies the possibility of access to" other messages and thereby created a reasonable inference that Starbucks was monitoring partners' union discussions in the chat. RE3.

Finally, having rejected the ALJ's conclusion that Starbucks' discipline of Schenk was lawful, the Board amended the remedy. The Board ordered that Starbucks reinstate Schenk and give him compensatory damages, RE10, citing the Board's 3-2 decision in *Thryv, Inc.*, 372 NLRB No. 22 (Dec. 13, 2022), *vacated in part on other grounds*, 102 F.4th 727 (5th Cir. 2024). The Board thus compelled Starbucks to compensate Schenk for any "direct or foreseeable pecuniary harms incurred as a result of" his termination. RE10.

## SUMMARY OF ARGUMENT

I.     The NLRA does not endow union organizers with special protection from discipline or discharge. The Act only prohibits employers from disciplining or discharging employees because of union activity. Under the *Wright Line* framework, the General Counsel bears the burden to prove that a discharge was motivated by anti-union animus. If the General Counsel makes that showing, an employer still may avoid liability by showing it would have discharged the employee anyway. The Board overreached at each step.

*First*, the Board's implausible conclusion that anti-union animus motivated Schenk's discipline ignored conflicting record evidence. The Board ignored that Kuhnle-Hambster suggested terminating Schenk's employment only *after* discovering Schenk's offensive messages. The Board twisted Cain's expression of sympathy with Schenk's situation into a confession that Starbucks was somehow targeting Schenk. And the Board buttressed its animus finding with its conclusion of unlawful surveillance that, as discussed below, was equally unsupported.

*Second*, in any event, there can be no doubt that Starbucks would have disciplined Schenk for his repeated and egregious policy violations. The Board rejected Starbucks' legitimate business justifications only by minimizing the

severity of Schenk's offensive messages; ignoring uncontested evidence that Schenk had left more tasks undone in a single shift than any other supervisor; and crediting Schenk's testimony about why he opened correspondence from the NLRB despite the ALJ's finding that Schenk's contemporaneous, implausible excuse for his misconduct undercut this testimony. And the Board improperly drew inferences against Starbucks that the General Counsel did not even request before the ALJ and that exceeded the Board's statutory authority. Even accepting those adverse inferences, Schenk's myriad and serious infractions amply explain Schenk's discipline independent of any protected labor activity.

II.    The Board's conclusions of unlawful surveillance strain credulity, and the Board never found the essential element of coercion. The Board speculated that Starbucks' access to photographs of Schenk's offensive messages could suggest that Starbucks surreptitiously accessed the entire group chat. This is preposterous conjecture compared to the obvious (and correct) alternative:  a partner who was offended by Schenk's messages reported the messages. And the Board's finding that Starbucks' increased managerial presence at the Stuyvesant store aligned with the start of the union campaign rather than with Starbucks' legitimate business reasons lacks

record support, and the Board ignored evidence that Starbucks similarly increased its managerial presence, for the same legitimate reasons, on another occasion.

III.    Finally, and alternatively, this Court should vacate the Board's order because the Board's new *Thryv* remedy would require Starbucks to pay Schenk for all "direct or foreseeable pecuniary harms" of the termination of his employment.   RE10.   That remedy amounts to compensatory damages— money paid to Schenk to remedy economic injuries he allegedly suffered as a result of Starbucks' actions.   But NLRA Section 10(c) does not authorize compensatory damages.   That provision only authorizes the Board to order employers to cease unfair labor practices and take "affirmative action … as will effectuate the policies of" the NLRA.   As the Third Circuit has held, that language limits the Board to traditional *equitable* remedies; it does not authorize *legal* remedies like compensatory damages.   Reading Section 10(c) to allow compensatory damages would infringe Article III and the Seventh Amendment, which both require federal courts and juries to adjudicate cases involving private rights.

## STANDARD OF REVIEW

This Court reviews the Board's legal conclusions de novo. *Dresser-Rand Co. v. NLRB*, 838 F.3d 512, 516 (5th Cir. 2016); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403-05 (2024). The Court reviews the Board's "findings … with respect to questions of fact" for substantial evidence. 29 U.S.C. § 160(e). "A reviewing court will uphold the Board's decision if it is reasonable and supported by substantial evidence on the record considered as a whole." *Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 463 (5th Cir. 2001).

Substantial evidence review is not a rubber stamp: "Because the Court is not left merely to accept the Board's conclusions, the Court must be able to conscientiously conclude that the evidence supporting the Board's determination is substantial." *Brown & Root, Inc. v. NLRB*, 333 F.3d 628, 633 (5th Cir. 2003) (quotation marks omitted). This Court must reject the Board's order where it "fails to grapple with countervailing portions of the record." *NLRB v. AllService Plumbing & Maint., Inc.*, 138 F.4th 889, 900-01 (5th Cir. 2025) (cleaned up); *see also Apple Inc. v. NLRB*, --- F.4th ---, 2025 WL 1862823, at *6 (5th Cir. 2025) (denying enforcement where Board failed to account for evidence that "fairly detracts" from its conclusion (citation omitted)).

When the Board reverses the ALJ, this Court "examines the evidence and findings of the Board more critically than it would have done had the Board agreed with the ALJ." *Tex. World Serv. Co. v. NLRB*, 928 F.2d 1426, 1430 (5th Cir. 1991).

## ARGUMENT

### I.    Starbucks Lawfully Terminated Schenk's Employment

The Board erred in holding that Starbucks violated Sections 8(a)(1) and 8(a)(3) when it disciplined and discharged Schenk. The Board's finding of anti-union animus ignored conflicting evidence. Worse, the Board's conclusion that Starbucks would not have disciplined Schenk absent his protected activities minimized his grossly offensive conduct, brushed aside uncontested evidence of his repeated violations, and ignored the ALJ's credibility findings.

If allowed to stand, the Board's order will prevent employers from disciplining any employees who happen to be union organizers, no matter how egregious the employee's conduct, and will require employers to turn a blind eye to union organizers' misogynistic and discriminatory attacks on their colleagues. Such a ruling would undermine the purposes of the NLRA.

### A.     The Board Erred in Concluding that Anti-Union Animus Motivated Schenk's Discipline at the First *Wright Line* Step

An employer that retaliates against an employee because of the employee's protected union activities violates NLRA Section 8(a)(1), which prohibits interference with employees in the exercise of their statutory rights, and Section 8(a)(3), which prohibits discrimination on the basis of union activity.  Under the *Wright Line* framework, the General Counsel bears the initial burden to prove that discipline or discharge was motivated by anti-union animus.  *Tellepsen Pipeline Servs. Co. v. NLRB*, 320 F.3d 554, 565 (5th Cir. 2003).  This burden requires more than just "an inference that protected conduct is a motivating factor in the employer's decision."  *Tesla, Inc. v. NLRB*, 120 F.4th 433, 440-41 (5th Cir. 2024) (en banc) (citation omitted).

As to all three instances of discipline, the Board agreed with the ALJ that Starbucks' decision to discipline Schenk was motivated at least in part by anti-union animus.  In support, the ALJ cited supposed evidence that (1) Kuhnle-Hambster had previously inquired about terminating Schenk's employment for emailing a bargaining request to her during his shift; (2) Cain agreed with Schenk that Kuhnle-Hambster was targeting Schenk; and (3) Kuhnle-Hambster unlawfully created an impression of surveillance at the nearby Stuyvesant store.  RE23.  None supports the animus finding.

1.  After Schenk sent a bargaining request during his shift on June 16, 2022, Kuhnle-Hambster contacted Starbucks' Human Resources team requesting a "separation consultation" regarding Schenk.  ROA.751-752, 754-755.  Human Resources declined, noting that it was unclear whether Schenk was on break when he sent the email.  ROA.754-55.  Kuhnle-Hambster's initial inquiry was a reasonable one, focused on Schenk's engagement in non-work activity on work time, and when provided with a reasonable explanation for Schenk's email, she did not impose any discipline on Schenk for the email.

Moreover, Kuhnle-Hambster's request to Human Resources noted that there were "several other cases" concerning Schenk, which undoubtedly referred to his offensive messages from late May.[3]  ROA.754.  That Kuhnle-Hambster, *after* learning of both Schenk's offensive messages and another suspected (albeit ultimately unsupported) violation, was considering firing Schenk is not evidence that anti-union animus motivated any discipline for

---

[3] Kuhnle-Hambster sent the request to Human Resources on June 23, one week after she and Cain delivered the final written warning to Schenk. ROA.754.  The request states that Human Resources employee Althea Williams was assigned to the other case involving Schenk.  ROA.754.  Cain sent Williams the photographs of Schenk's offensive messages, ROA.795, and Kuhnle-Hambster testified regarding a discussion with Williams about the messages, ROA.410.

those same offensive messages—particularly given that Kuhnle-Hambster and others suggested terminating Schenk's employment in response to his offensive messages on June 14, *before* he sent the bargaining request. ROA.757-758; *see Valmont Indus., Inc. v. NLRB*, 244 F.3d 454, 466 (5th Cir. 2001) (a finding that a reason for discipline was pretextual is not also a finding of animus).

2.    Nor can Cain's after-the-fact conversation with Schenk bear the weight the Board placed on it.  On August 1, long after Schenk was disciplined for his offensive messages, he met with Cain to discuss his failure to complete tasks on July 18.    ROA.123, 126-127.    During the conversation, Schenk expressed his belief that Kuhnle-Hambster was targeting him and other union organizers. ROA.126-127. Cain responded, "Trust me, I know." ROA.127. In context, Cain was attempting to reassure Schenk that *Cain* was not targeting him by acknowledging that Schenk was under "stress" that "makes you miss little things and [] makes you create little mistakes."  ROA.128.  That, when Schenk said he felt targeted by Kuhnle-Hambster, Cain's response was sympathetic rather than defensive is evidence only of Cain's attempt to keep Schenk from quitting.    ROA.126-127; *see also* ROA.138 ("Don't do that [quitting].").

3. Finally, the supposed "impression" of surveillance created by Kuhnle-Hambster is not evidence of anti-union animus for the simple reason that, as discussed *infra* pp. 51-54, no such impression was created. Should the Court agree that Kuhnle-Hambster's presence at the Stuyvesant store did not unlawfully create an impression of surveillance, it should also vacate the Board's related finding of anti-union animus.

## B.    The Board Ignored Evidence of Schenk's Repeated Policy Violations at the Second *Wright Line* Step

Reversing the ALJ's decision, the Board concluded that Starbucks would not have disciplined Schenk or terminated his employment but for his labor organizing. That conclusion defies common sense. Schenk spewed misogynistic and offensive insults at his colleagues, failed to perform his tasks, and opened official mail from the NLRB on the false pretense that his role as a union liaison allowed him to open it. Any responsible employer would have taken the same actions on these facts. The uncontroverted evidence shows that Starbucks imposed each form of discipline because of Schenk's repeated and egregious policy violations. And the Board's attempt to compensate for this evidence by drawing inferences against Starbucks exceeds the Board's statutory authority, lacks record support, and does nothing to remedy the deficiencies in the Board's conclusion.

### 1.    *The June 27 final written warning*

The Board concluded that, because other Starbucks partners used profanity, Starbucks would not have disciplined Schenk for calling a coworker with a medical condition "useless fucking [name]" and "[t]he dumb fuc[k]ing bitch who can't even use cleaners," and calling his supervisor a "[f]ucking [p]ussy" and "fucking cock[]sucker" who "can suck my fucking dick," if not for his protected activities. This reasoning flunks the substantial evidence test.

The ALJ's opinion predicted, and explained the flaws in, the Board's conclusion in just two sentences. The ALJ stated that "the General Counsel avoids repeating any of Schenk's highly offensive insults, but rather refers to them simply as profanity, as if all uses of profanity in the workplace are the same. They are not." RE23. As this Court has explained, there is a difference between "profanity" and "profanity … used in vituperation and abuse of the employer or other employees." *See NLRB v. Red Top Cab & Baggage Co.*, 383 F.2d 547, 555 n.11 (5th Cir. 1967). The mere fact that "profanity was somewhat commonplace in the workplace" does not excuse a targeted, offensive outburst. *See DirecTV Holdings, L.L.C. v. NLRB*, 650 F. App'x 846, 852 (5th Cir. 2016). Starbucks was not required to ignore Schenk's "indecent, vulgar, repulsive,

31

opprobrious and obscene language." *NLRB v. Soft Water Laundry, Inc.*, 346 F.2d 930, 935 (5th Cir. 1965).

Every aspect of the Board's conclusion depends on its conflation of ordinary profanity with Schenk's egregious comments. The Board relied on testimony that Schenk, Cain, and other partners "used profanity daily" at the store and that Cain had joked about Schenk's use of profanity in the past, and it also drew inferences that Cain's testimony and the documents Starbucks claimed as privileged would have shown that profanity was widespread and tolerated. RE5-6; *see infra* pp. 40-45. But *none* of this evidence shows that Starbucks had tolerated anything remotely similar to Schenk's grossly offensive insults targeting a coworker on the basis of her sex and medical condition and targeting his supervisor by describing obscene sex acts.

The only witness who even arguably suggested that the at-issue insults were common at the store was Schenk himself, whom the ALJ found "not credible," "melodramatic," and with "a financial interest in the outcome of this litigation." RE14 n.4, 19. The Board never addressed this aspect of the ALJ's decision and, in fact, stated that it was *not* reversing any of the ALJ's credibility findings. RE1 n.1. *See Centre Prop. Mgmt. v. NLRB*, 807 F.2d 1264, 1268-69 (5th Cir. 1987) (vacating where Board failed to give proper

weight to ALJ's credibility findings); *Syncro Corp. v. NLRB*, 597 F.2d 922, 924-26 (5th Cir. 1979) (similar).

The ALJ also recognized that, because Schenk was a shift supervisor, his offensive and misogynistic tirade was directed at a more junior colleague over whom Schenk exercised authority.  RE22.  The Board ignored this uniquely harmful aspect of Schenk's conduct.  Worse, by failing to appreciate the importance of Schenk's supervisory role, the Board wrongly dismissed the relevance of Schenk's 2018 discipline for failing, *as a shift supervisor*, to take appropriate action when witnessing other partners' offensive conduct. ROA.792-793.

The Board lastly relied on the testimony of another partner that she, personally, was not offended by Schenk's messages.  RE5.  This is irrelevant. As the Board itself recognized, the question is not whether other partners, the ALJ, or the Board personally believed Schenk's conduct was offensive enough to warrant discipline but whether *Starbucks* would have disciplined Schenk absent his protected activities.  RE4; *Bruce Packing Co. v. NLRB*, 795 F.3d 18, 23 (D.C. Cir. 2015).  In any event, another partner, Mahoney, obviously found the messages sufficiently offensive to report to management.

Absent evidence that conduct comparably offensive to Schenk's was "widespread or condoned," the absence of discipline does not prove Starbucks would have "overlooked" Schenk's misconduct but for his protected activities. *NLRB v. Ryder/P.I.E. Nationwide, Inc.*, 810 F.2d 502, 508-09 (5th Cir. 1987); *see also Stern Produce Co. v. NLRB*, 97 F.4th 1, 15 (D.C. Cir. 2024) ("failing to adjudicate [employee's] case perfectly in line with" other incidents was insufficient to show "a deviation from an otherwise consistently observed norm"). The Board's analogy to ordinary profanity is "not only misplaced legally, but divorced from the real world, and an example of skewed and position-oriented decision-making without the application of logical reasoning and common sense." *6 W. Ltd. v. NLRB*, 237 F.3d 767, 778 (7th Cir. 2001).

### 2.    *The July 18 memorialized coaching*

The Board concluded that Starbucks would not have issued Schenk a memorialized coaching but for his protected activities because the "types of shortcomings" Schenk committed were "not uncommon" in the Latham store and because Starbucks failed "to show that Schenk's mistakes went beyond those ordinarily tolerated." RE7. The evidence shows otherwise.

The Board itself acknowledged the uncontested evidence that no other shift supervisor had left as many closing tasks undone on a single shift as

Schenk had. Even if Schenk's misconduct was similar in *kind* to others', it was more serious in *degree*. Again, if Schenk's conduct was different from others', then the fact that his discipline was also different is no evidence of pretext. *Ryder/P.I.E.*, 810 F.2d at 508-09; *Stern*, 97 F.4th at 15.

Cain's comment that he, personally, thought Schenk's failings were "one-offs" was not contemporaneous with Schenk's documented coaching on July 18 but rather made weeks later, on August 1, and in the context of expressing sympathy with the "stress" Schenk was under. ROA.123-125, 128. This later-expressed reassurance to a stressed-out partner cannot sustain a conclusion that Starbucks would not have given Schenk this mild form of discipline absent his protected activities.

Lastly, the Board emphasized that the memorialized coaching also stated that it was based on the June 27 final written warning, which the Board had concluded was unlawful. RE8; ROA.745. But that fact cuts the opposite way: the written warning, issued just three weeks earlier for Schenk's grossly offensive messages, further undermines the Board's reasoning because no other partner failed to complete tasks *while on final written warning*. If anything, that Starbucks passed up the first opportunity to terminate Schenk's employment even after placing him on a final written warning shows

that Starbucks intended to give Schenk a chance to improve, not that Starbucks harbored anti-union animus. At a minimum, because the Board's conclusion regarding the memorialized coaching is intertwined with its erroneous conclusion regarding the final written warning, a denial of enforcement as to the final written warning would likewise require denying enforcement as to the memorialized coaching.

### 3.    *The August 31 termination*

Finally, the Board's conclusion that Starbucks would not have terminated Schenk's employment for opening official mail addressed to the company absent his protected activities is utterly without support.

The ALJ correctly recognized that opening mail addressed to "Starbucks Corporation," from a federal agency, and labeled "Official Business," was "a brazen intrusion into management's prerogatives." RE24. "Quite simply," this Court has explained, an attempt to "wrongfully obtain[] information … is not a protected activity." *NLRB v. Brookshire Grocery Co.*, 919 F.2d 359, 363 (5th Cir. 1990). In *Brookshire*, an employee was fired after obtaining and disseminating confidential wage information, in violation of a company's policy preventing employees from discussing that information. *Id.* at 361. This Court held that, even though the policy prohibiting discussion was

unlawful, the employee's termination was still lawful because the employee was not entitled to surreptitiously steal that information. *Id.* at 361-62.

That is essentially what Schenk did here: by his own words, he believed that, as "Union liaison," he was entitled to open Starbucks' mail to obtain information that he did not believe the company would otherwise share with its partners. ROA.151. Starbucks has the right "to protect its private information by discharging employees who abuse positions of trust and take information that they know is rightfully off-limits." *Brookshire*, 919 F.2d at 365; *see also 6 W. Ltd.*, 237 F.3d at 778 (it is "obvious that companies must be able to discharge a thief").

The Board's contrary conclusion ignores the record and the ALJ's credibility findings. The Board relied primarily on Schenk's testimony that shift supervisors routinely opened mail on behalf of Starbucks and on the concededly "uncertain[]" testimony of another partner that she had seen shift supervisors open mail at work but could not remember to whom that mail had been addressed. RE8-9; ROA.306. But the Board did not discuss at all the ALJ's finding that this testimony *flatly contradicted* Schenk's initial justification, when confronted by Cain, that he had opened the mail because he was involved with the Union and wanted to learn information he believed

Starbucks would not share with him. RE24. Even putting the inconsistency aside, any notion that Schenk honestly and mistakenly believed that he was authorized to open Starbucks' mail is belied by the evidence that, when Cain asked Schenk not to open Starbucks' mail going forward, Schenk stubbornly maintained his asserted "Union liaison" right to do so. RE24.

The Board's reason for dismissing this crucial piece of evidence? That "no party argues that opening the letter was protected union conduct." RE8 n.41. This excuse is staggering. Schenk's contemporaneous justification is relevant not because it provides him an additional layer of protection from discipline but because it demonstrates that Schenk's later testimony that shift supervisors were permitted to open Starbucks' official mail was a pretextual post-hoc rationale. The Board's failure to consider this evidence—particularly given its unexplained rejection of the ALJ's finding that Schenk's justification was "not credible, facially or on the record here," RE19—alone requires vacatur. *NLRB v. AllService Plumbing & Maint., Inc.*, 138 F.4th 889, 900-01 (5th Cir. 2025); *Centre Prop. Mgmt.*, 807 F.2d at 1268-69.

The Board also faulted Starbucks for not having a written policy expressly prohibiting partners from opening its official mail. RE9. But "[n]o company needs to have a set procedure for what action it will take when

adjudicating every single employee problem." *6 W. Ltd.*, 237 F.3d at 778. "It is also obvious that, at a bare minimum, companies must be able to trust their employees." *Id.* The Board's "reliance on the absence of any formal policy" requiring Starbucks partners not to open its official mail is "divorced from the real world … and common sense." *Id.*

The Board next drew *another* adverse inference from Cain's failure to testify, this time inferring that shift supervisors were authorized to open mail of any kind. RE9. As discussed *infra* pp. 42-45, no such inference was warranted. But even assuming that Cain would have, as a general matter, given testimony unfavorable to Starbucks, there is *no* support in the record for the Board's conclusion that Cain specifically would have testified that partners were permitted to open mail from government agencies to "Starbucks Corporation" and labeled "Official Business." *See, e.g.*, *Rockingham Machine-Lunex Co. v. NLRB*, 665 F.2d 303, 305 (8th Cir. 1981) (rule permitting adverse inferences does not "reach[]" so far as "to resolve all issues with respect to which" the absent witness "may have testified").

Finally, the Board again emphasized that Schenk's termination notice cited and relied on his final written warning and memorialized coaching from earlier that summer. RE9; ROA.749. But, as the ALJ found, these prior

instances of discipline further prove that Starbucks would have terminated Schenk's employment even absent his protected activities. RE24. And, because the Board's conclusion that the termination notice was unlawful rested at least in part on its conclusions as to the final written warning and memorialized coaching, if this Court concludes that the Board erred with respect to either form of discipline, it should deny enforcement here, too.

### 4.    *The Board's improper adverse inferences*

As discussed above, none of the adverse inferences drawn by the Board—for Starbucks' withholding of privileged documents and for Cain's failure to testify—provides substantial evidence that Starbucks tolerated conduct remotely comparable to Schenk's offensive, misogynistic tirade or his asserted "Union liaison" right to open Starbucks' official mail. Such inferences also exceeded the Board's statutory authority and were unwarranted.

*First*, with respect to the withheld documents, the Board had no authority to impose sanctions to enforce the subpoena. The Board has the authority to *issue* subpoenas. 29 U.S.C. § 161(1). "But when all is said, the NLRA carefully recognizes the appropriate divide between the administrative authority to conduct hearings and issue orders and the exclusively judicial power of Article III judges to enforce such orders." *NLRB v. Interbake*

*Foods, LLC*, 637 F.3d 492, 497 (4th Cir. 2011). The NLRA confers on "any district court of the United States" the "jurisdiction to issue … an order requiring" compliance with a subpoena or to punish "failure to obey such order of the court." 29 U.S.C. § 161(2). Accordingly, only an Article III court can enforce an NLRB subpoena, issue sanctions for noncompliance, or "*require the production* of documents for *in camera* review." *Interbake Foods*, 637 F.3d at 499; *accord NLRB v. Int'l Medication Sys., Ltd.*, 640 F.2d 1110, 1114-16 (9th Cir. 1981); *NLRB v. Detroit Newspapers*, 185 F.3d 602, 604-06 (6th Cir. 1999). Once Starbucks claimed privilege, the General Counsel was required to seek enforcement in the district court—yet it did not, despite the ALJ's asking whether it intended to do so. ROA.432.

Even if an adverse inference were statutorily permitted, it was not warranted here. Courts that have permitted the Board to draw adverse inferences to enforce subpoenas have done so under far more extreme circumstances. In the case cited by the Board below, for example, the D.C. Circuit held that sanctions were appropriate where a party defied a subpoena for *seven years* without justification. *UAW v. NLRB*, 459 F.2d 1329, 1332 (D.C. Cir. 1972). Such "deliberate footdragging," *id.* at 1347, is a far cry from this case, in which Starbucks produced many documents but withheld "a few

dozen[]" that it sincerely believed were privileged, ROA.15. *See also NLRB v. C.H. Sprague & Son Co.*, 428 F.2d 938, 942 (1st Cir. 1970) (company "offered no justification for its failure to comply with" the subpoena and court "might agree" sanctions were unavailable had the company offered argument).

Any adverse inference was particularly inappropriate here given the General Counsel's refusal, even when asked by the ALJ, to identify specific matters on which an adverse inference was appropriate. RE13 n.1. In this situation, the Board's decision nonetheless to penalize Starbucks on the specific issue of profanity at the Latham store reeks of a post-hoc effort to bolster the Board's irrational conclusion on that issue.

*Second*, as to Cain's refusal to testify, the inferences drawn by the Board were not warranted given the General Counsel's failure to request such inferences before the ALJ and given that Cain was available to both sides. Even if a general inference was warranted, nothing supports the Board's *specific* inferences regarding profanity and opening mail.

The ALJ did not discuss whether these adverse inferences should be drawn from Cain's absence at the hearing because the General Counsel did not make such a request until its exceptions brief, *after it already lost before*

*the ALJ.*[4]    Where available, adverse inferences are "within the sound discretion of the trier of fact." *Underwriters Lab'ys Inc. v. NLRB*, 147 F.3d 1048, 1054 (9th Cir. 1998). The ALJ was tasked with evaluating the parties' evidence and determining whether the absence of certain testimony rendered certain issues unclear—and, if so, whether a party should be penalized for failing to offer such testimony.

Where the ALJ made no such findings—indeed, was not even requested to make such findings—the Board cannot later tip the scales in favor of the party that lost below by declaring that more testimony was needed. Without notice of the specific topics on which Cain's testimony was allegedly needed, Starbucks had "good reason to believe that its opponent ha[d] failed to meet its burden of proof" and that there was "no need to offer further evidence," so "no inference can properly be drawn." *NLRB v. Chester Valley, Inc.*, 652 F.2d 263, 271 (2d Cir. 1981); *accord UAW*, 459 F.2d at 1338. Additionally, the Board's decision to penalize Starbucks for failing to call Cain only *after* the

---

[4] The General Counsel argued to the ALJ, after the close of evidence, that Cain's failure to testify was a reason to discredit Kuhnle-Hambster's testimony and elsewhere asserted that certain testimony had gone unrebutted. But the General Counsel did not specifically urge the ALJ to draw adverse inferences from Cain's absence.

close of evidence raises due process concerns. *See Blanca Tel. Co. v. FCC*, 991 F.3d 1097, 1118 (10th Cir. 2021) ("It is undoubtedly inappropriate for agencies to create liability by advancing novel interpretations during administrative proceedings.").

Moreover, either side could have called Cain. The General Counsel "had the power to compel testimony," so Cain was not "peculiarly in the power of [Starbucks] to produce" and no inference was appropriate. *Advoc. S. Suburban Hosp. v. NLRB*, 468 F.3d 1038, 1049 (7th Cir. 2006) (citation omitted); *accord Bufco Corp. v. NLRB*, 147 F.3d 964, 971 (D.C. Cir. 1998). Under the Board's reasoning, "it would be as logical to draw an inference adverse to" the General Counsel for not calling Cain. *NLRB v. Mass. Mach. & Stamping, Inc.*, 578 F.2d 15, 20 (1st Cir. 1978).

Even assuming that the Board could have drawn an adverse inference that Cain's testimony would have been generally harmful to Starbucks, it could not use Cain's absence to fill all the gaps in the General Counsel's case. The failure to call Cain does not "resolve all issues with respect to which" Cain "may have testified" or "create a conclusive presumption against the party failing to call" him on "every conceivable issue relevant." *Rockingham*, 665 F.2d at 305. Here, the Board assumed that, just because Cain would

presumably favor Starbucks, he specifically would have testified that partners were permitted to open official mail and call coworkers and supervisors "dumb fuc[k]ing bitch[es]" and "fucking cock[]sucker[s]" without punishment. Nothing supports such an outlandish inference.

## II.    Starbucks Did Not Create an Unlawful Impression of Surveillance

The Board's conclusions that Starbucks unlawfully created an impression of surveillance when Kuhnle-Hambster confronted Schenk with photographs of his offensive messages without disclosing their source and when Kuhnle-Hambster increased her presence at the Stuyvesant store during the same period as that store's union campaign are entirely unfounded and unlawfully intrude on Starbucks' reasonable management decisions.

"Section 8(a)(1) of the [NLRA] does not proscribe all surveillance of employee activities by the employer," only that which "tends to interfere with, restrain, or coerce Union activities." *NLRB v. Mueller Brass Co.*, 509 F.2d 704, 708 (5th Cir. 1975). But as multiple courts of appeals have recognized, many of the Board's recent orders have "seemed to ignore this critical coercion element." *Greater Omaha Packing Co. v. NLRB*, 790 F.3d 816, 823 (8th Cir. 2015); *Intertape Polymer Corp. v. NLRB*, 801 F.3d 224, 239 (4th Cir. 2015); *Stern*, 97 F.4th at 10.

Instead, the Board, in the guise of regulating coercive surveillance, has created a series of tests that stack on top of each other to punish noncoercive employer conduct. "The Board extended the [NLRA]'s prohibition on 'coerc[ing]' employees to first reach acts that 'reasonably tend[]' to coerce," then to "acts that create an impression of surveillance," and then to "'out of the ordinary' actual or perceived surveillance." *Stern*, 97 F.4th at 11 (cleaned up). "Relying on that logical progression" can lead to absurd results, even if each step, taken alone, "appeared a reasonable step in relation to that which preceded it." *Id.* (quoting *NLRB v. IBEW, Loc. 340*, 481 U.S. 573, 598 (1987) (Scalia, J., concurring in judgment)).

It is thus no surprise that courts of appeals have denied enforcement where the Board found an unlawful impression of surveillance on similar facts without finding the critical element of coercion. For example, where the Board found unlawful surveillance because an employer failed to disclose the source of information used to confront an employee, the Eighth Circuit denied enforcement because the Board failed to "explicitly find the requisite coercion" and it was "not apparent … from the record." *Greater Omaha Packing*, 790 F.3d at 824-25. And where an employer engaged in "'out-of-the-ordinary' conduct in an area where employees can be seen," the Fourth Circuit denied

enforcement because "the [NLRA] requires more." *Intertape Polymer*, 801 F.3d at 238-39.

### A. Starbucks Did Not Create an Unlawful Impression of Surveillance When It Confronted Schenk with His Offensive Chat Messages

The Board first concluded, contrary to the ALJ, that Starbucks unlawfully created an impression of surveillance because Kuhnle-Hambster did not tell Schenk how Starbucks obtained the photographs of his offensive messages. RE3. This conclusion "is one that would never have been seriously considered in the first instance" if not for the Board's increasing drift "further and further from the meaning of the statute." *IBEW*, 481 U.S. at 598 (Scalia, J., concurring in judgment) (citation omitted).

The Board concluded that Starbucks' access to Schenk's offensive messages reasonably implied that it had access to the rest of the group chat, including messages that (unlike these ones) discussed union activity. RE3. No reasonable employee could have come to this conclusion. As the ALJ explained, the "obvious explanation" is what actually happened: another member of the group chat shared the offensive messages with Starbucks. RE20. The person who shared the photographs with Starbucks—Mahoney— was interacting with Schenk throughout his offensive tirade. Her messages

are clearly labeled as "Me" in the photographs.  ROA.796-797, 799.  No reasonable employee could have believed that Starbucks instead had secretly hacked the chat.  Moreover, at no point did Kuhnle-Hambster or Cain suggest any knowledge of other messages in the chat, let alone those discussing union activities.

The Board next concluded that Schenk may have reasonably believed that Mahoney's motives for sharing the offensive messages "involve[d] employer monitoring"—in other words, that Mahoney was secretly helping Starbucks spy on union activity in the group chat.  RE3.  Again, the key word is "reasonable."  The Board's interpretation is simply unreasonable when compared to the alternative explanation that Mahoney was offended by Schenk's offensive messages and reported them.  This is particularly so given that Mahoney was, like Schenk, a member of the Union organizing committee.  ROA.728-729.

Lastly, the Board relied on the testimony of one other partner that she and others stopped using the group chat after Schenk was disciplined out of fear of similar discipline.  RE3; ROA.287.  That fact says nothing about a fear that Starbucks would take action *because of union activity*.  The partner never suggested that she feared that Starbucks was specifically surveilling union

48

activity or even that Starbucks was secretly monitoring its employees' chats, as opposed to fearing that colleagues would report other offensive messages to management. It is not coercion for employees to refrain from misconduct because they believe such misconduct will be reported or disciplined.

In short, the only impression of surveillance was "in the mind of" the Board, "without any adequate support in the record as a whole," and its decision "was the result of suspicious speculation and surmise" and must be rejected. *Federal-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1252 (5th Cir. 1978).

When this Court has previously found unlawful surveillance or the impression thereof, it has generally been in cases where an employer asks an employee about their previously undisclosed union activities or states that the company is keeping a list of employees who are involved in a union. *See, e.g.*, *NLRB v. Borden Co.*, 392 F.2d 412, 414 & n.3 (5th Cir. 1968) (supervisor remarks identifying who had signed union cards and threatening reprisal); *Delchamps, Inc. v. NLRB*, 585 F.2d 91, 93-94 (5th Cir. 1978) (supervisors stating that union meetings were being monitored by a company spy); *NLRB v. McCullough Env't Servs., Inc.*, 5 F.3d 923, 928-29 (5th Cir. 1993) (supervisor asserting knowledge of lead union organizer's identity and calling another employee, whose union support was not public, "union man").

Here, by contrast, it is undisputed that Starbucks did not surveil the Union or confront Schenk about the Union. Rather, the Board reasoned that the mere fact that Schenk's tirade included complaints about management and that Starbucks did not tell Schenk that one of his coworkers had reported his offensive conduct was sufficient to establish a violation of federal labor law. The Board's approach, if permitted to stand, will prevent employers from investigating serious allegations of workplace misconduct—voluntarily provided by employees—if such misconduct has even the slightest connection to workplace topics.

The Board's approach is contrary to its own precedents, which respect an employer's right to investigate unprotected misconduct even if intertwined with protected activities. *See Time Warner Cable of N.Y.C. LLC v. NLRB*, 982 F.3d 126, 135-37 (2d Cir. 2020) (collecting Board decisions permitting employers to question employees regarding "unprotected harassment" and vacating where Board "barred Time Warner from seeking information of very high pertinence to its investigation" into unprotected conduct). The Board's decision also would harm employees targeted by misconduct in the workplace and "send the wrong message to employers." *6 W. Ltd.*, 237 F.3d at 779. This Court should deny enforcement.

**B.**    **Starbucks Did Not Create an Unlawful Impression of Surveillance When It Increased Management Presence at the Stuyvesant Store**

The Board's conclusion that Starbucks unlawfully created an impression of surveillance when Kuhnle-Hambster increased her presence at the Stuyvesant store is equally unsupported.

Kuhnle-Hambster increased her presence at the Stuyvesant store in spring 2022, which overlapped with the union campaign that ran from April 20 or 21 to June 7. But again the Board overlooked the "critical coercion element." *Greater Omaha Packing*, 790 F.3d at 823. "[N]ot every 'out of the ordinary' activity by an employer can be deemed, *a fortiori*, coercive or threatening in nature." *Intertape Polymer*, 801 F.3d at 239. Rather, the key question remains "the employer's reason for being in a particular place at a particular time." *Id.* There must be "indicia of coercion or intimidation," *id.*, because even "observing [] employees on company property during union activities … in close proximity to [those] employees, is not a *per se* violation" of the NLRA, *id.* at 235.

The Board improperly dismissed Starbucks' legitimate business reasons for increasing managerial presence at the Stuyvesant store and incorrectly assumed that such presence was inherently coercive.

1. The uncontested evidence showed that the manager of the Stuyvesant store, Hedge, had been disciplined in March, suddenly resigned on May 2, and was replaced by Barkman on May 16. Barkman, in turn, specifically requested Kuhnle-Hambster's presence as he learned his new role and then went on vacation just two weeks after starting and did not return until two days before the union election. ROA.324-326, 363-366, 807, 809.

Kuhnle-Hambster's increased presence, although out of the ordinary, was therefore not "unexplained" or "unjustified." *See NCRNC, LLC v. NLRB*, 94 F.4th 67, 75 (D.C. Cir. 2024). Indeed, it "would send the wrong message to employers" to discourage Starbucks from supporting a store whose manager was new, struggling, or absent. *6 W. Ltd.*, 237 F.3d at 779.

The ALJ and Board rejected this argument because Kuhnle-Hambster could not remember precisely when she increased her presence, and other witnesses testified that the increase was "immediately after the April 20 or 21 announcement of the [union] campaign." RE14. This finding misconstrues the record in two ways. First, the record does not show an "immediate" increase in Kuhnle-Hambster's presence. The General Counsel asked two partners how often Kuhnle-Hambster was at the Stuyvesant store before and after the campaign began. ROA.51-52, 268-69. On direct examination, the partners

drew only a vague comparison between "before" and "after" the announcement. One partner, who had been absent from January through mid-April, confusingly suggested on cross-examination both that Kuhnle-Hambster's presence increased "right after" the April 20 or 21 announcement but also that it was in May, "after" the announcement. ROA. 272, 275-276. The Board did not reconcile this inconsistency. Such vague testimony is insufficient to prove a specific, sharp increase immediately after April 20 or 21, particularly given that Hedge announced his resignation less than two weeks after the union announcement, on May 2. ROA.809.

Second, neither the ALJ nor the Board addressed the evidence that Kuhnle-Hambster again increased her presence in April 2023—long after the union campaign concluded—when Barkman was again absent. ROA.329. The Board's failure to address this conflicting evidence alone requires vacatur. *AllService*, 138 F.4th at 900-01.

2. The Board also erred in treating Kuhnle-Hambster's mere presence as inherently coercive. The only evidence suggesting a risk of coercion was the testimony of two partners (after being prompted by counsel) that they felt "uncomfortable" discussing the Union with coworkers while Kuhnle-Hambster was present. ROA.53, 270; RE14. But that is not evidence that

Starbucks was coercing its employees to refrain from protected activity. "If a union wishes to organize in public it cannot demand that management must hide," *NCRNC*, 94 F.4th at 73 (citation omitted), and the mere fact of the union campaign "cannot automatically render suspect any interaction between [employees] and management in perpetuity," *Stern*, 97 F.4th at 10. Neither partner testified that Kuhnle-Hambster engaged in any suspicious or untoward conduct, nor provided specific evidence justifying their discomfort. Absent such evidence, the Board's conclusion cannot stand.

## III. The Board's Ordered Remedy Is Unlawful

Finally, this Court should vacate the Board's remedial order because the Board's broad *Thryv* compensatory damages remedy exceeds the Board's powers and violates the Constitution.

### A.    The    Board's    *Thryv*    Remedy    Unlawfully    Awarded Compensatory Damages

This Court should vacate the Board's award of compensatory damages to Schenk. In *Thryv, Inc.*, the Board asserted authority to award employees compensation "for all direct or foreseeable pecuniary harms." 372 NLRB No. 22, slip op. at 1 (Dec. 13, 2022), *vacated in part on other grounds*, 102 F.4th 727 (5th Cir. 2024). Below, the Board awarded the same remedy, compelling

Starbucks to compensate Schenk for any "direct or foreseeable pecuniary harms incurred as a result of" the employment termination.  RE10.

That broad remedy exceeds the Board's powers.[5]  Section 10(c) confines the Board to traditional equitable remedies, *i.e.*, ordering the cessation of unfair labor practices or "affirmative action … as will effectuate the policies of" the NLRA.  29 U.S.C. § 160(c).  Yet in *Thryv*, the Board asserted authority to authorize compensatory damages—"the classic form of *legal* relief."  *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993); *see also Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002).  That position finds no support in the statute and raises grave constitutional concerns.

This Court has already deemed the Board's *Thryv* remedy "a novel, consequential-damages-like labor law remedy."  *Thryv*, 102 F.4th at 737.  Other courts and judges agree.  *See NLRB v. Starbucks Corp.*, 125 F.4th 78, 96-97 (3d Cir. 2024) (holding that the *Thryv* remedy is an award of "compensatory damages" that "exceeds the Board's authority under the NLRA"); *3484, Inc. v. NLRB*, 137 F.4th 1093, 1121-27 (10th Cir. 2025) (Eid, J.,

---

[5] Starbucks has raised this argument in other pending Fifth Circuit appeals. *See* No. 24-60651 (opening brief filed June 16, 2025) and No. 24-60650 (opening brief filed July 16, 2025).

concurring in part and dissenting in part) (similar). Of the circuits to have reached the question, only the Ninth Circuit has upheld the Board's *Thryv* remedy, over a vigorous dissent. *Int'l Union of Operating Eng'rs v. NLRB*, 127 F.4th 58, 79-88 (9th Cir. 2025); *but see id.* at 88-99 (Bumatay, J., dissenting). This Court should confirm that neither the NLRA nor the Constitution permits the Board to award compensatory damages.

1. The Board ordered Starbucks to make Schenk "whole for any loss of earnings and other benefits, and for any other direct or foreseeable pecuniary harms suffered as a result of the discrimination against him." RE10. This includes a stunning array of damages such as credit card debt, withdrawals from retirement accounts, car loans, mortgage payments, childcare, immigration expenses, and medical expenses. *Thryv*, 372 NLRB No. 22, slip op. at 15. *Thryv* damages are a classic compensatory damages remedy, because they "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (citation omitted); *see also Thryv*, 102 F.4th at 737. The Board's own manual confirms that certain expenses, "such as the loss of a car or house due to the discriminatee's inability to make monthly payments" are "compensable damages." NLRB,

*Casehandling Manual, Part 3, Compliance Proceedings* § 10536.1 (Oct. 19, 2020), https://tinyurl.com/ycketcuj.

2.  The NLRA does not authorize compensatory damages.  The statute's text, context, and history all confirm that the NLRA "limits the Board's remedial authority to equitable, not legal, relief." *Starbucks*, 125 F.4th at 95.

Start with the text.  Section 10(c) allows the Board to order employers to "take … affirmative action," such as "reinstatement … with or without back pay," or to compel inaction, *i.e.*, to "cease and desist."  29 U.S.C. § 160(c).  That remedial power captures equity to a T:  Equity "compel[s] action or inaction." Samuel L. Bray, *The System of Equitable Remedies*, 63 UCLA L. Rev. 530, 553 (2016); *Ex parte Lennon*, 166 U.S. 548, 556 (1897) (explaining that courts of equity could order "restraint of a contemplated or threatened action" and "even require affirmative action").

Likewise, although Section 10(c) authorizes the Board to award monetary relief in the form of "back pay," such relief "is based on what an employer has wrongfully withheld," and thus qualifies as "an equitable remedy, a form of restitution." *Starbucks*, 125 F.4th at 96 (quoting *Curtis v. Loether*, 415 U.S. 189, 197 (1974)); *see also* Dan B. Dobbs, 1 Law of Remedies 280 (2d. ed. 1993) ("To measure restitution, courts look at the defendant's gain

or benefit."). The Supreme Court has repeatedly described the Board's Section 10(c) authority in purely equitable terms. *See, e.g.*, *Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14 (1945); *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 177-78 & n.4 (1973); *see also Starbucks*, 125 F.4th at 95-96 (discussing additional precedents).

Statutory context and history confirm the point. Congress "modeled" Title VII's remedial provision—Section 706(g)—on NLRA Section 10(c). *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 419 (1975). And the Supreme Court has already held that Section 706(g) "does not allow awards for compensatory … damages." *United States v. Burke*, 504 U.S. 229, 238 (1992); *accord Int'l Union*, 127 F.4th at 94-95 (Bumatay, J., dissenting). When Congress wants to authorize compensatory damages, Congress says so directly and ensures that a court—not an agency—decides the case. *See, e.g.*, 29 U.S.C. § 187(b) (Labor Management Relations Act); 29 U.S.C. § 2617(a)(1)(A)(i)(II) (Family and Medical Leave Act).

Reading Section 10(c) to authorize compensatory damages would create serious anomalies. In 1947, Congress amended Section 10(c) to prohibit the Board from ordering reinstatement or back pay where the employee "was suspended or discharged for cause." *See Fibreboard Paper Prods. Corp. v.*

*NLRB*, 379 U.S. 203, 217 (1964).  But that restriction would make no sense if the Board could order compensatory damages—the Board "would be precluded from awarding back pay when the employee commits misconduct, but it may still grant the same employee foreseeable or consequential damages." *Int'l Union*, 127 F.4th at 93 (Bumatay, J., dissenting).

3.  The Board's contrary interpretation would infringe Article III and the Seventh Amendment.

Article III and the Seventh Amendment reserve the power of adjudicating private damages suits to courts and juries.  Under Article III, claims involving private rights—that is, rights involving "the liability of one individual to another"—must be decided by "Article III judges in Article III courts." *Stern v. Marshall*, 564 U.S. 462, 484, 489 (2011) (citation omitted).  Likewise, under the Seventh Amendment's jury-trial guarantee, cases involving private rights must also include the "right to a jury trial whenever the cause of action is legal in nature." *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 53 (1989); *see also SEC v. Jarkesy*, 603 U.S. 109, 122-23 (2024) (the Seventh Amendment guarantees the right to a jury trial for claims involving "money damages").  Together, these rights ensure that only courts—not

agencies—adjudicate private rights, and that juries—not agencies—award common-law remedies.

The Board's interpretation would violate both constitutional guarantees by arrogating to the agency the power to impose compensatory damages. Claims for compensatory damages involve "the liability of one individual to another" akin to tort and contract claims—classic private rights that courts must adjudicate. *Stern*, 564 U.S. at 489-90 (citation omitted). And allowing the Board to issue such awards improperly hands an agency instead of a jury the right to impose a "prototypical common law remedy." *Jarkesy*, 603 U.S. at 123.

Nor can such concerns be shrugged off by suggesting that the *Thryv* remedy involves only "public rights." Congressionally created rights are not exempt from the Seventh Amendment. Courts must still examine the "nature" of the proceeding to determine whether agencies are impermissibly adjudicating private rights. *See Oil States Energy Servs. v. Greene's Energy Grp.*, 584 U.S. 325, 340 (2018) (citation omitted). *Thryv* damages squarely implicate private rights.

### B.    Extraordinary Circumstances Justify Reaching the *Thryv* Issue

Starbucks did not challenge the *Thryv* remedy before the NLRB.  But "extraordinary circumstances" justify reaching Starbucks' challenge to the remedy on appeal.  29 U.S.C. § 160(e); *see AllService*, 138 F.4th at 899.  Extraordinary circumstances exist because any *Thryv* challenge before the NLRB would have been futile and because the Board exceeded its statutory authority.

*First*, futility is a recognized "extraordinary circumstance." *Indep. Elec. Contractors of Hous., Inc. v. NLRB*, 720 F.3d 543, 551-52 (5th Cir. 2013).  Although "probable futility" may not justify failure to raise an issue, *Power Plant Div., Brown & Root, Inc. v. OSHRC*, 673 F.2d 111, 114-15 (5th Cir. 1982), "patent futility" does, *W&M Props., Inc. v. NLRB*, 514 F.3d 1341, 1346 (D.C. Cir. 2008).  Patent futility can be established by pointing to instances where the Board has repeatedly rejected the contested position in other proceedings.  *Id.*; *accord Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351, 358 (6th Cir. 1983) ("[W]e see no reason to require the petitioner to ask the Board to abandon a position which it has steadfastly maintained despite a decidedly cool reception by the courts of appeal; such an objection would amount, in this instance, to an exercise in futility.").

Any objection to *Thryv* would have been patently futile. By the time the Board imposed *Thryv* damages in this case, it had already denied motions to reconsider *Thryv* filed in other cases.[6] The Board also has rejected all related constitutional challenges.[7] Even after this Court called the *Thryv* remedy "draconian" and suspiciously "consequential-damages-like," *Thryv*, 102 F.4th at 733, 737, the Board refused to engage in introspection. Instead, the Board declared, "[e]ven if the Fifth Circuit had specifically rejected the Board's rationale for … *Thryv* … the Board's decision there would remain valid Board precedent under the Board's long-established policy of nonacquiescence in adverse appellate court decisions." *Airgas USA, LLC*, 373 NLRB No. 102, slip op. at 1 n.2 (Sept. 18, 2024); *see also* RE10 n.47 ("[T]he Board's decision in

---

[6] *See, e.g.*, *Cemex Constr. Materials Pac., LLC*, 372 NLRB No. 157, slip op. at 1 n.1 (Nov. 13, 2023); *Los Robles Reg'l Med. Ctr.*, 2023 WL 6902298, at *1 (NLRB Sept. 18, 2023).

[7] *Thryv* itself shows the Board has a preconceived position that the Seventh Amendment does not apply here. *See* 372 NLRB No. 22, slip op. at 16 ("[W]e find that our amended make-whole remedy is grounded squarely in our statutory authority, and does not implicate the Seventh Amendment."). Subsequent Seventh Amendment challenges to *Thryv* have failed. *See, e.g.*, *Cemex*, 372 NLRB No. 157, slip op. at 1 n.1; *HHS Aviation, LLC*, 2024 WL 4165108, at *1 n.2 (NLRB Sep. 11, 2024); *Troutbrook Co.*, 373 NLRB No. 125, slip op. at 3 (Sept. 30, 2024).

*Thryv* remains valid precedent."). There was no reason to think the Board would change its mind in this case.

The Board's demonstrated unwillingness to reconsider its *Thryv* remedy illustrates why such questions about the Board's statutory authority, particularly when they implicate "[c]onstitutional questions," "obviously are unsuited to resolution in administrative hearing procedures and, therefore, access to the courts is essential to the decision of such questions." *See Califano v. Sanders*, 430 U.S. 99, 109 (1977).

*Second*, this Court can address arguments where "the Board has patently traveled outside the orbit of its authority." *Indep. Elec. Contractors*, 720 F.3d at 559 (cleaned up). "A court can always invalidate Board action that is patently beyond the Board's jurisdiction, even if the jurisdictional challenge was never presented to the Board." *Carroll Coll., Inc. v. NLRB*, 558 F.3d 568, 574 (D.C. Cir. 2009) (citation omitted).

Here, the Board plainly exceeded its statutory authority by ordering the *Thryv* remedy. Thus, even if Starbucks did not "adequately raise its objection to the Board's remedy," this Court still can and should "review that argument" because "the remedy exceeded the Board's statutory authority." *3484, Inc.*, 137 F.4th at 1119-21 (Eid, J., concurring in part and dissenting in part).

## CONCLUSION

This Court should set aside the NLRB's order and deny the NLRB's application for enforcement.


Dated: July 21, 2025                    Respectfully submitted,

JEFFREY S. HILLER                       */s/ Lisa S. Blatt*
LITTLER MENDELSON, P.C.                 LISA S. BLATT
  *41 S. High St., Ste. 3250*      AMY MASON SAHARIA
  *Columbus, OH 43215*              CLAIRE R. CAHILL
                                        JASON HOWELL CLAYTON
JONATHAN O. LEVINE                      WILLIAMS & CONNOLLY LLP
LITTLER MENDELSON, P.C.                   *680 Maine Avenue, S.W.*
  *1111 E. Kilbourn Ave., Ste. 1000*     *Washington, DC 20024*
  *Milwaukee, WI 53202*              *(202) 434-5000*
                                          *lblatt@wc.com*

                                        *Counsel for Petitioner/Cross-*
                                        *Respondent*

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the Fifth Circuit by using the appellate NextGen system.  I certify that all participants in the case are registered NextGen users and that service will be accomplished by the appellate NextGen system.

Dated:  July 21, 2025                    /s/ *Lisa S. Blatt*
                                         LISA S. BLATT

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure, that the attached Brief of Petitioner/Cross-Respondent contains 12,697 words and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2019, in 14-point CenturyExpd BT.

Dated:  July 21, 2025                    /s/ *Lisa S. Blatt*

                                         LISA S. BLATT