# No. 24-60649

## UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### STARBUCKS CORPORATION,

Petitioner/Cross-Respondent

v.

### NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner

_____

## ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

_____

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD

_____

**USHA DHEENAN**
*Supervisory Attorney*

**GREGOIRE SAUTER**
*Attorney*

**JARED ODESSKY**
*Attorney*

**WILLIAM B. COWEN**
*Acting General Counsel*
**STEPHANIE CAHN**
*Acting Deputy General Counsel*
**PETER SUNG OHR**
*Associate General Counsel*
**RUTH E. BURDICK**
*Deputy Associate General Counsel*
**MEREDITH JASON**
*Assistant General Counsel*

**National Labor Relations Board**
**1015 Half Street SE**
**Washington, DC 20570-0001**
**(202) 273-2948**
**(202) 273-1714**
**(202) 273-1937**

**National Labor Relations Board**

## STATEMENT REGARDING ORAL ARGUMENT

The National Labor Relations Board believes that oral argument would assist the Court in clarifying and resolving the issues in this appeal.

# **TABLE OF CONTENTS**

**Headings**                                                                  **Page(s)**

Statement regarding oral argument ........................................................ i

Table of contents............................................................................ ii

Table of authorities ........................................................................v

Jurisdictional statement....................................................................1

Statement of issues..........................................................................2

Statement of the case ......................................................................3

   I.    Statement of relevant findings of fact ........................................3

       A.   Background ....................................................................3

       B.   Kuhnle-Hambster dramatically increases her presence during
            Stuyvesant's campaign ..........................................................4

       C.   Kuhnle-Hambster refuses to state how she obtained photos of
            employees' private messages; Schenk requests bargaining;
            Schenk's June 27 final written warning ...................................4

       D.   Schenk's July 18 memorialized coaching ............................7

       E.   Schenk's August 31 discharge ..........................................8

  II.   Procedural history.......................................................9

  II.   The Board's conclusions and Order ..........................................10

Summary of argument......................................................................11

Standard of review ........................................................................14

# TABLE OF CONTENTS (cont'd)

**Headings**                                                                                       **Page(s)**

Argument ......................................................................................................15

I.  Substantial evidence supports the Board's finding that Starbucks violated
    Section 8(a)(1) of the Act by creating the impression of surveillance .........15

    A.  Kuhnle-Hambster's increased presence at Stuyvesant after the
    campaign announcement ....................................................................16

    B.  Kuhnle-Hambster's refusal to disclose how she obtained Schenk's
    Snapchat messages ............................................................................19

II. Substantial evidence supports the Board's finding that Schenk's
    disciplines and discharge violated Section 8(a)(3) and (1) of the Act..........22

    A.  The Board reasonably found that Schenk's union activity was
    a motivating factor in Starbucks's decisions to discipline and
    discharge him .....................................................................................24

    B.  The Board's reasonably found that Starbucks failed to prove its
    affirmative defense .............................................................................25

        1.  Starbucks failed to show that it would have given Schenk
    a final written warning absent his union activity ..........................26

            a.  The Board did not abuse its discretion in drawing an
    adverse inference from Starbucks's failure to call Cain ...........29

            b.  The Board did not abuse its discretion in drawing an
    adverse inference from Starbucks's refusal to supply
    unredacted versions of subpoenaed documents.....................31

        2.  Starbucks failed to show that it would have given Schenk
    a memorialized coaching absent his union activity ......................35

3.    Starbucks failed to show that it would have terminated Schenk absent his union activity ...................................................38

III.   The Board acted within its broad remedial discretion by ordering Starbucks to make Schenk whole for all direct or foreseeable pecuniary harms..........................................................................................41

A.    Section 10(e) of the Act precludes the Court from considering Starbucks's challenges to the make-whole remedy .............................43

B.    The Board's remedy effectuates the policies of the Act........................46

C.    Starbucks's attempt to redefine the Board's statutory remedial authority is unfounded ...........................................................................48

D.    In any event, the make-whole remedy is equitable .............................51

E.    Controlling precedent forecloses Starbucks's Article III and Seventh Amendment claim....................................................................56

1.    The public-rights exception applies ............................................56

2.    The underlying claim is not legal in nature ................................58

Conclusion.........................................................................................................60

Certificate of service .........................................................................................61

Certificate of compliance ..................................................................................62

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*6 West Ltd. v. NLRB,*
    237 F.3d 767 (7th Cir. 2001) ......................................................................39, 40

*800 River Road Operating Co. v. NLRB,*
    784 F.3d 902 (3d Cir. 2015) ...............................................................................20

*3484, Inc. v. NLRB,*
    137 F.4th 1093 (10th Cir. 2025) ................................................................. 44-45

*Adams & Associates, Inc. v. NLRB,*
    871 F.3d 358 (5th Cir. 2017) ..............................................................................22

*Agwilines, Inc. v. NLRB,*
    87 F.2d 146 (5th Cir. 1936).........................................................53, 54, 55, 57

*Airgas USA, LLC v. NLRB,*
    760 F. App'x 413 (6th Cir. 2019).......................................................................25

*Amalgamated Utility Workers v. Consolidated Edison Co.,*
    309 U.S. 261 (1940)..............................................................................................55

*Atlantic Richfield Co. v. DOE,*
    769 F.2d 771 (D.C. Cir. 1984)................................................................32, 33, 34

*Atlas Roofing Co. v. OSHRC,*
    430 U.S. 442 (1977)........................................................................................52, 59

*Bill Johnson's Restaurants v. NLRB,*
    461 U.S. 731 (1983) ...................................................................................... 47-48

*Brown & Root, Inc. v. OSHRC,*
    673 F.2d 111 (5th Cir. 1982).......................................................................43, 44

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                                    **Page(s)**

*Brown v. Apfel*,
   192 F.3d 492 (5th Cir. 1999) ...........................................................................14

*Cadbury Beverages, Inc. v. NLRB*,
   160 F.3d 24 (D.C. Cir. 1998) ..........................................................................26

*Caterpillar Logistics, Inc. v. NLRB*,
   835 F.3d 536 (6th Cir. 2016) ..........................................................................22

*Charter Communications, LLC*, 366 NLRB No. 46, 2018 WL 1522489 (2018),
   *enforced*, 939 F.3d 798 (6th Cir. 2019). ..........................................................19

*Community Hospitals of Central California v. NLRB*,
   335 F.3d 1079 (D.C. Cir. 2003)...............................................................34, 35

*Contemporary Cars, Inc. v. NLRB*,
   814 F.3d 859 (7th Cir. 2016) ..........................................................................18

*Cordua Restaurants, Inc. v. NLRB*,
   985 F.3d 415 (5th Cir. 2021) ...........................................................15, 16, 23

*Curtis v. Loether*,
   415 U.S. 189 (1974).......................................................................................58

*D.R. Horton, Inc. v. NLRB*,
   737 F.3d 344 (5th Cir. 2013) ..........................................................................45

*Dean Transp., Inc. v. NLRB*,
   551 F.3d 1055 (D.C. Cir. 2009).....................................................................21

*Delchamps, Inc. v. NLRB*,
   585 F.2d 91 (5th Cir. 1978)............................................................................15

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                    **Page(s)**

*Detroit Edison Co. v. NLRB*,
    440 U.S. 301 (1979).................................................................44

*District Hospital Partners, LP v. NLRB*,
    141 F.4th 1279 (D.C. Cir. 2025).........................................46

*El Paso Electric Co. v. NLRB*,
    681 F.3d 651 (5th Cir. 2012)...............................................14

*Electronic Data Systems Corp. v. NLRB*,
    985 F.2d 801 (5th Cir. 1993)...............................................50

*Fibreboard Paper Products v. NLRB*,
    379 U.S. 203 (1964).................................................................46

*Flex Frac Logistics, LLC v. NLRB*,
    746 F.3d 205 (5th Cir. 2014)...............................................14

*Fortuna Enterprises, LP v. NLRB*,
    665 F.3d 1295 (D.C. Cir. 2011)..........................................40

*Frontier Telephone of Rochester, Inc.*, 344 NLRB 1270 (2005),
    *enforced mem.*, 181 F. App'x 85 (2d Cir. 2006)...............15

*Granfinanciera, S.A. v. Nordberg*,
    492 U.S. 33 (1989)...................................................................58

*Greater Omaha Packing Co. v. NLRB*,
    790 F.3d 816 (8th Cir. 2015)...............................................19

*Great-West Life & Annuity Insurance Co. v. Knudson*,
    534 U.S. 204 (2002).................................................................48

## TABLE OF AUTHORITIES (cont'd)

**Cases** **Page(s)**

*Halstead Metal Products v. NLRB,*
  940 F.2d 66 (4th Cir. 1991)..............................................................23

*Hendrix Manufacturing Co. v. NLRB,*
  321 F.2d 100 (5th Cir. 1963)...........................................................21

*Hospital Cristo Redentor, Inc. v. NLRB,*
  488 F.3d 513 (1st Cir. 2007) ....................................................23, 25

*Hudson Institute of Process Research Inc. v. NLRB,*
  117 F.4th 692 (5th Cir. 2024)..........................................................46

*Independent Electrical Contractors of Houston, Inc. v. NLRB,*
  720 F.3d 543 (5th Cir. 2013)...........................................................44

*In-N-Out Burger, Inc. v. NLRB,*
  894 F.3d 707 (5th Cir. 2018)...........................................................14

*International Union, United Automobile, Aerospace & Agricultural Implement
  Workers of America v. NLRB*, 459 F.2d 1329 (D.C. Cir. 1972)..29, 31, 32, 33-34

*International Union, United Automobile, Aerospace & Agricultural Implement
  Workers of America v. Russell*, 356 U.S. 634 (1958).........................................55

*Intertape Polymer Corp. v. NLRB,*
  801 F.3d 224 (4th Cir. 2015)...........................................................19

*IUOE, Stationary Engineers, Loc. 39 v. NLRB,*
  127 F.4th 58 (9th Cir. 2025)................................... 45, 47, 53, 54, 55

*J.P. Stevens & Co. v. NLRB,*
  417 F.2d 533 (5th Cir. 1969)...........................................................46

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                            **Page(s)**

*Kiewit Power Constructors Co. v. NLRB*,
   652 F.3d 22 (D.C. Cir. 2011) ............................................................30

*King Soopers, Inc.*, 364 NLRB 1153 (2016),
   *enforced in relevant part*, 859 F.3d 23 (D.C. Cir. 2017)...................47

*Kitchen Fresh, Inc. v. NLRB*,
   716 F.2d 351 (6th Cir. 1983) ............................................................44

*Loper Bright Enterprises v. Raimondo*,
   603 U.S. 369 (2024).........................................................................46

*Mallory v. Norfolk Southern Railway Co.*,
   600 U.S. 122 (2023).........................................................................58

*Mertens v. Hewitt Associates*,
   508 U.S. 248 (1993).........................................................................49

*Mid-South Bottling Co. v. NLRB*,
   876 F.2d 458 (5th Cir. 1989).............................................................46

*Mitchell v. Robert DeMario Jewelry, Inc.*,
   361 U.S. 288 (1960).........................................................................52

*National Football League*,
   309 NLRB 78 (1992) ........................................................................33

*National Licorice Co. v. NLRB*,
   309 U.S. 350 (1940).........................................................................57

*NCRNC, LLC v. NLRB*,
   94 F.4th 67 (D.C. Cir. 2024) .....................................................17, 19

ix

# TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                 **Page(s)**

*New York Party Shuttle, LLC v. NLRB*,
  18 F.4th 753 (5th Cir. 2021) .......................................................50, 54

*NLRB v. American Art Industries, Inc.*,
  415 F.2d 1223 (5th Cir. 1969) ...............................................................34

*NLRB v. Armstrong Tire & Rubber Co.*,
  263 F.2d 680 (5th Cir. 1959) .................................................................53

*NLRB v. Bannum Place of Saginaw, LLC*,
  97 F.4th 351 (6th Cir. 2024) .................................................................29

*NLRB v. Brookshire Grocery Co.*,
  919 F.2d 359 (5th Cir. 1990) .................................................................39

*NLRB v. Chester Valley, Inc.*,
  652 F.2d 263 (2d Cir. 1981) ..................................................................30

*NLRB v. Children's Baptist Home of Southern California*,
  576 F.2d 256 (9th Cir. 1978) .................................................................44

*NLRB v. Curtin Matheson Scientific, Inc.*,
  494 U.S. 775 (1990) .............................................................................46

*NLRB v. Detroit Newspapers*,
  185 F.3d 602 (6th Cir. 1999) .................................................................33

*NLRB v. Fant Milling Co.*,
  360 U.S. 301 (1959) .............................................................................57

*NLRB v. Industrial Union of Marine & Shipbuilding Workers*,
  391 U.S. 418 (1968) .............................................................................57

# TABLE OF AUTHORITIES (cont'd)

**Cases** **Page(s)**

*NLRB v. Ingredion Inc.*,
    930 F.3d 509 (D.C. Cir. 2019)..........................................................31

*NLRB v. Interbake Foods, LLC*,
    637 F.3d 492 (4th Cir. 2011).....................................................32, 33

*NLRB v. International Association of Bridge Structural & Ornamental Iron
    Workers*, 864 F.2d 1225 (5th Cir. 1989)..............................29, 31, 32

*NLRB v. International Medication Systems, Ltd.*,
    640 F.2d 1110 (9th Cir. 1981)..........................................................34

*NLRB v. Jones & Laughlin Steel Corp.*,
    301 U.S. 1 (1937)........................................... 52, 55, 56, 57, 58, 59

*NLRB v. Kentucky Tennessee Clay Co.*,
    179 F. App'x 153 (4th Cir. 2006)......................................................22

*NLRB v. Laborers' International Union*,
    758 F.2d 1001 (5th Cir. 1984)..........................................................48

*NLRB v. Link-Belt Co.*,
    311 U.S. 584 (1941).........................................................................23

*NLRB v. Miami Coca-Cola Bottling Co.*,
    360 F.2d 569 (5th Cir. 1966).....................................................48, 53

*NLRB v. Newton-New Haven Co.*,
    506 F.2d 1035 (2d Cir. 1974)...........................................................45

*NLRB v. Promedica Health Sys., Inc.*,
    206 F. App'x 405 (6th Cir. 2006)......................................................20

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                 **Page(s)**

*NLRB v. Red Top Cab & Baggage Co.*,
  383 F.2d 547 (5th Cir. 1967) ..............................................................28

*NLRB v. RELCO Locomotives, Inc.*,
  734 F.3d 764 (8th Cir. 2013) ...........................................37, 39, 45

*NLRB v. Seven-Up Bottling Co.*,
  344 U.S. 344 (1953) .............................................................................50

*NLRB v. Starbucks Corp.*,
  125 F.4th 78 (3d Cir. 2024) .............................................................53

*NLRB v. Strong*,
  393 U.S. 357 (1969) .............................................................................47

*NLRB v. Transportation Management Corp.*,
  462 U.S. 393 (1983) ...........................................................22, 23, 51

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
  584 U.S. 325 (2018) .............................................................................56

*Parsippany Hotel Management Co. v. NLRB*,
  99 F.3d 413 (D.C. Cir. 1996) ...........................................................24

*Phelps Dodge Corp. v. NLRB*,
  313 U.S. 177 (1941) ...........................................................47, 49, 53

*Pollard v. E.I. du Pont de Nemours & Co.*,
  532 U.S. 843 (2001) .............................................................................50

*Publix Supermarkets, Inc.*,
  347 NLRB 1434 (2006) .................................................................27, 37

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                              **Page(s)**

*Renew Home Health v. NLRB,*
  95 F.4th 231 (5th Cir. 2024) ...............................................................23

*Republic Steel Corp. v. NLRB,*
  311 U.S. 7 (1940) ................................................................................50

*Rodriguez de Quijas v. Shearson/American Express, Inc.,*
  490 U.S. 477 (1989) ............................................................................58

*SEC v. Jarkesy,*
  603 U.S. 109 (2024) ............................................ 51, 55, 56, 57, 58, 59

*Shepard v. NLRB,*
  459 U.S. 344 (1983) ............................................................................55

*Sitka Sound Seafoods, Inc. v. NLRB,*
  206 F.3d 1175 (D.C. Cir. 2000) .........................................................55

*Southern Tours, Inc. v. NLRB,*
  401 F.2d 629 (5th Cir. 1968) ..............................................................47

*Sprain Brook Manor Nursing Home, LLC,*
  351 NLRB 1190 (2007) ......................................................................17

*Sure-Tan, Inc. v. NLRB,*
  467 U.S. 883 (1984) ..................................................................... 50, 54

*Thryv, Inc.,* 372 NLRB No. 22, 2022 WL 17974951 (2022),
  *enforcement denied*, 102 F.4th 727 (5th Cir. 2024).................... 41, 42, 47, 52, 55

*Tinker Air Force Base v. FLRA,*
  321 F.3d 1242 (10th Cir. 2002) .........................................................44

## TABLE OF AUTHORITIES (cont'd)

**Cases**                                                                 **Page(s)**

*Tull v. United States*,
   481 U.S. 412 (1987) ....................................................................51

*Turnbull Cone Baking Co. v. NLRB*,
   778 F.2d 292 (6th Cir. 1985) ......................................................25

*UNF West, Inc. v. NLRB*,
   844 F.3d 451 (5th Cir. 2016) ......................................................18

*United States v. Burke*,
   504 U.S. 229 (1992) ....................................................................49

*United States v. L.A. Tucker Truck Lines, Inc.*,
   344 U.S. 33 (1952) ................................................................ 43-44

*Universal Camera Corp. v. NLRB*,
   340 U.S. 474 (1951) ....................................................................15

*U.S. Contractors, Inc. v. NLRB*,
   697 F.2d 692 (5th Cir. 1983) ......................................................57

*Virginia Electric & Power Co. v. NLRB*,
   319 U.S. 533 (1943) ..............................................................49, 54

*Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083 (1980),
   *enforced*, 662 F.2d 889 (1st Cir. 1981) ................................ 11, 22, 26, 30, 37, 39

## **TABLE OF AUTHORITIES (cont'd)**

**Constitutions**                                                          **Page(s)**

United States Constitution

U.S. Const. art. III ................................................................. 56
U.S. Const. amend. VII ................................................. 48, 56, 57, 58, 59

**Statutes**

National Labor Relations Act, as amended
  (29 U.S.C. § 151 et seq.)

Section 7 (29 U.S.C. § 157) ........................................................15, 23
Section 8(a)(1) (29 U.S.C. § 158(a)(1)) ..........................2, 9, 10, 11, 15, 18, 19, 22
Section 8(a)(3) (29 U.S.C. § 158(a)(3)) ............................... 2, 9, 10, 11, 22
Section 10(a) (29 U.S.C. § 160(a)) ................................................... 1
Section 10(c) (29 U.S.C. § 160(c)) ....................................... 46, 48, 49, 51, 52, 55
Section 10(e) (29 U.S.C. § 160(e)) ..................................... 2, 14, 42, 43, 44, 45
Section 10(f) (29 U.S.C. § 160(f)) .................................................... 2
Section 11(2) (29 U.S.C. § 161(2)) .................................................33

Other Statutes

18 U.S.C. § 1702 ..................................................................41
42 U.S.C. § 2000e-5(g) ............................................................49
Pub. L. 92-261, 86 Stat. 103 ......................................................48

**Manuals**

NLRB Casehandling Manual, Part One, Unfair Labor Practice Proceedings

Section 10536.1 ..................................................................55

# UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

_____

### No. 24-60649

_____

## STARBUCKS CORPORATION

**Petitioner/Cross-Respondent**

**v.**

## NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

_____

## ON PETITION FOR REVIEW AND
## CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD

_____

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD

_____

## JURISDICTIONAL STATEMENT

This case is before the Court on Starbucks Corporation's petition to review,

and the National Labor Relations Board's cross-application to enforce, a final

Board Order issued on December 16, 2024 (374 NLRB No. 8).  Workers United

("the Union") intervened on the Board's behalf.  The Board had jurisdiction over

the proceedings below pursuant to Section 10(a) of the National Labor Relations

Act ("the Act"), 29 U.S.C. §160(a).  The Court has jurisdiction over this

1

proceeding pursuant to Section 10(e) and (f) of the Act, *id.* §160(e) and (f), because Starbucks transacts business in the Fifth Circuit.

## STATEMENT OF ISSUES

I.   Whether substantial evidence supports the Board's finding that Starbucks created the impression of surveilling employees' protected concerted activities in violation of Section 8(a)(1) of the Act.

II.  Whether substantial evidence supports the Board's findings that Starbucks violated Section 8(a)(3) and (1) of the Act by disciplining and discharging employee James Schenk for his union activity.

III. Whether the Board acted within its broad remedial discretion by ordering Starbucks to make Schenk whole for all direct or foreseeable pecuniary harms.

## STATEMENT OF THE CASE

## I.     STATEMENT OF RELEVANT FINDINGS OF FACT

### A.     Background

Starbucks operates a worldwide chain of coffee shops, including two in the Albany, New York area ("Latham" and "Stuyvesant"). (ROA.1008; ROA.34.)[1] District Manager Beate Kuhnle-Hambster oversees both stores and eight others. (ROA.996n.5; ROA.354.)

In November 2021, Shift Supervisor James Schenk, a six-year employee, contacted the Union about representing Latham employees. (ROA.996,1008,1011; ROA.81,83.) Schenk collected coworkers' signed union-authorization cards and formed an organizing committee. (ROA.996,1011; ROA.86.) In March 2022, Schenk and ten colleagues signed a public letter to Starbucks's then-Chairman and CEO Howard Schultz announcing their organizing campaign. (ROA.996,1008-09; ROA.40,83-84,190-91,728-29.) Schenk wore a union pin throughout the campaign. (ROA.996,1011; ROA.87.) Latham employees voted to join the Union on May 17, and the Union was certified as their exclusive collective-bargaining representative on May 26. (ROA.996,1009; ROA.35,243-44,724-25.) Stuyvesant

---

[1] "ROA" refers to the administrative record; "SROA" refers to the supplemental administrative record. References preceding a semicolon are to the Board's findings; those following are to the supporting evidence. "Br." refers to Starbucks's opening brief.

employees announced their organizing campaign on April 20 or 21 and elected the

Union on June 7, with subsequent certification.  (ROA.1009; ROA.35,50,268.)

### B.    Kuhnle-Hambster Dramatically Increases Her Presence During Stuyvesant's Campaign

Before Stuyvesant employees began organizing, Kuhnle-Hambster visited

the store roughly once every other month.  After the campaign announcement, her

visits increased to 4-5 per week.  Kuhnle-Hambster sometimes positioned herself

in the customer seating area, where she could observe employee workstations, and

began testing employees' proficiency at making drinks.  She also frequently

approached employees individually to discuss the campaign and the consequences

of unionization.  (ROA.1009-11,1015; ROA.51-57,268-72,275-77.)

### C.    Kuhnle-Hambster Refuses To State How She Obtained Photos of Employees' Private Messages; Schenk Requests Bargaining; Schenk's June 27 Final Written Warning

Schenk and four other Latham shift supervisors participated in a Snapchat

message thread.[2]  They discussed union activity and vented about work concerns,

particularly chronic understaffing.  (ROA.996; ROA.195-96,280-82,284,286-87.)

On May 24, Latham Store Manager Nick Cain scheduled Schenk for a

closing shift that included a deep cleaning of the store, or "clean play."  Clean

plays typically require four people, but only two other employees were scheduled.

---

[2]  Snapchat is a social-media application with enhanced privacy features, including deleting messages after 24 hours.  (ROA.996; ROA.95,160,280-81.)

4

One had a known medical condition preventing her from working with cleaning products, and the other was an inexperienced high-school student. (ROA.996; ROA.98-100,282-84,285-87,371,430-31.) During a break, Schenk complained on Snapchat about Cain's decision to schedule the clean play despite inadequate staffing. (ROA.997; ROA.193-94,796-97.) Schenk called Cain a "Fucking [p]ussy" who was "too fucking chicken shit to stand up to [Kuhnle-Hambster]." (ROA.997n.6; ROA.797.) Schenk also referred to the employee who could not tolerate cleaning products as "useless fucking [name]," and called her a "dumb fuc[k]ing bitch who can't even use cleaners." (ROA.997n.6; ROA.796,799.) Finally, Schenk wrote, "[Cain] can suck my fucking dick," adding that it was "lizard brain fucking stupidity" for Cain to "convince himself it's okay to ask me to come in and do 3 fucking people[']s jobs." (ROA.997n.6; ROA.796,799.)

Starbucks's How We Communicate ("HWC") policy states that employees must communicate "in a professional and respectful manner" and that "vulgar or profane language is unacceptable." (ROA.997,1000; ROA.788.) However, Latham employees and managers commonly used vulgar or profane language among themselves. (ROA.1000; ROA.100-01,282,287.) Shift Supervisor Siena Phelps, who was part of the Snapchat group, "didn't even bat an eye" when she read Schenk's messages, which she saw as "just venting" and "letting off some steam." (ROA.1000; ROA.279-80,292.)

5

Shortly afterwards, on June 8, 16, and 22, Schenk emailed Kuhnle-Hambster to request bargaining over the effects of Starbucks's plan to renovate Latham. (ROA.996; ROA.88-92,732-36, SROA.751-52.)  Kuhnle-Hambster told Starbucks's Human Resources ("HR") department that Schenk sent the June 16 message during his work hours and recommended firing him.  (ROA.996; ROA.403-08, SROA.754-55.)  Schenk received no discipline because HR could not ascertain whether he sent the message during a break.  (ROA.996,1011; SROA.755.)

Meanwhile, a member of the Snapchat group sent photos of Schenk's messages to Cain and Kuhnle-Hambster.  (ROA.997; ROA.376-77,796-97,799.) On June 16, Kuhnle-Hambster met with Schenk and showed him the pictures. Schenk admitted writing the messages and asked how Kuhnle-Hambster obtained the photos, but she refused to answer.  (ROA.997; ROA.92-93,101,237.)

Kuhnle-Hambster contacted HR Representative Althea Williams for guidance on how to proceed.  Williams responded that the nature of the messages supported either termination or a final written warning, but that a final written warning would be appropriate "if [the] behavior is common in store by other partners."  (ROA.997; SROA.761.)  Kuhnle-Hambster apparently recommended termination, because Williams wrote in HR's case notes that she was "aligned with [firing Schenk] based on my conversation with [Kuhnle-Hambster]."  (ROA.997;

6

SROA.760.)  However, on June 27 Kuhnle-Hambster gave Schenk a final written

warning for "unprofessional behavior, including use of profanity and name calling

… in violation of Starbucks Code of Conduct & [HWC]."  (ROA.997; SROA.742-

43.)  After Schenk's discipline, employees stopped using the Snapchat group out of

fear that they might be disciplined for posting something.  (ROA.998; ROA.287.)

### D.    Schenk's July 18 Memorialized Coaching

On June 30, Schenk worked the closing shift with an inexperienced high-

school student.  The next morning, another employee observed that four store-

closing tasks were not done:  the high-variance count (*i.e.*, inventorying high-sale

items), stamping pastries with expiration dates, restocking bathrooms, and filling

cold-brew kegs.  Employees periodically failed to perform one or more store-

closing tasks without incurring discipline.  (ROA.1013; ROA.288-90,

SROA.766,771-75.)  Kuhnle-Hambster asked to fire Schenk, but HR

recommended a memorialized coaching, which was delivered on July 18.

(ROA.1013; ROA.114-15,391, SROA.745,768-69.)

Two weeks later, on August 1, Schenk and Cain had this exchange:

Cain:    …  That memorialized coaching…, I fought against that.…  I thought
those things were one-offs and I was like, why?

\* \* \*

Schenk:    …  I've never seen anybody receive like a formalized coaching or
write-up for what would be under any other circumstance, an
innocuous like connection over a shift that like didn't go great.

7

Cain:     Yeah. To me … especially with the count, it was a one off.  But from what I'm seeing…, that's what [Kuhnle-Hambster] is going to be looking for…. [S]o making sure that we … cross our Ts and dot our Is…. [D]oing those little things is going to keep both of us from having to be in those positions.

Schenk:   … I feel extremely targeted by [Kuhnle-Hambster].  I am basically waiting at any point to receive my termination.…  I know her ultimate goal is to fire me as well as several other people….

Cain:     Trust me, I know.…  I've had the same thing since February….  I've been on all the write-ups and corrective actions all the way down….

(ROA.997,1013-14; ROA.124-28,137-38.)

### E.     Schenk's August 31 Discharge

On August 12, the U.S. Postal Service delivered a Board envelope marked "official business" and addressed to "Starbucks Corporation."  With no manager present, Schenk opened the envelope, which contained a letter certifying the Union as representing Latham employees.  Schenk returned the letter to its envelope and placed it on Cain's desk.  (ROA.997; ROA.143-44,160,802-05.)  The next day, Cain and Schenk had the following conversation:

Cain:     … So I saw there was the mail and I saw it was open.  Could you in the future not open -- was it you who opened them?

Schenk:   Well, I opened the NLRB one because it was just addressed to the store.

Cain:     Yeah….  I would ask you not to just in case there's anything legal or anything like that, that I may have to take care of….  I know it seemed confusing when it just says the store, but that's something that I would like to be able to open and look at first.

8

Schenk:   Well, with respect, I am the Union liaison with the store and papers
          given to us by the NLRB to put up have been taken down....

(ROA.997,1014; ROA.151.)  Latham shift supervisors had previously been

permitted to open any store-delivered mail.  (ROA.1003; ROA.145-47,159-

60,244,288,306.)

After consulting with HR, Kuhnle-Hambster informed Schenk of his

discharge on August 31.  (ROA.1014; ROA.392-94.)  In relevant part, Schenk's

notice of separation stated that he "opened a letter that was not addressed to him,

despite [not being] authorized to open Company mail," and that his conduct "could

have constituted a felony under federal law," which therefore violated Starbucks's

conduct standard requiring compliance with all applicable laws.  (ROA.998,1014;

SROA.749.)  The notice also cited Schenk's final written warning and

memorialized coaching.  (ROA.998,1014; SROA.749.)

## II.   PROCEDURAL HISTORY

On unfair-labor-practice charges filed by the Union, the Board's General

Counsel ("the GC") issued a complaint alleging, in relevant part, that Starbucks

violated Section 8(a)(1) of the Act by giving the impression of surveilling

employees' union activities at Stuyvesant and Latham, and Sections 8(a)(3) and (1)

by disciplining and discharging Schenk.  (ROA.438,440,442-43,445,602-20.)

After a hearing, an administrative law judge found that Starbucks violated Section

8(a)(1) by creating the impression of surveillance at Stuyvesant and dismissed the remaining claims.  (ROA.884-911.)

## III.   THE BOARD'S CONCLUSIONS AND ORDER

On December 16, 2024, the Board (Chairman McFerran, Members Prouty and Wilcox) issued a Decision and Order affirming the judge's impression-of-surveillance finding at Stuyvesant.  (ROA.996n.2.)  The Board further found that Starbucks violated Section 8(a)(1) of the Act by creating an impression of surveillance regarding Schenk's Snapchat messages, and that Schenk's final written warning, memorialized coaching, and discharge violated Section 8(a)(3) and (1).  (ROA.996-1007.)

The Board's Order requires Starbucks to cease and desist from the unfair labor practices found and from violating the Act in any like or related manner. (ROA.1005.)  Affirmatively, the Order requires Starbucks to offer Schenk reinstatement, make him whole for any loss of earnings or benefits and any direct or foreseeable pecuniary harms suffered as a result of Starbucks's actions, expunge the unlawful disciplines and discharge from its files, and post remedial notices electronically and at Stuyvesant and Latham.  (ROA.1005-07.)

10

# SUMMARY OF ARGUMENT

1(a)  Substantial evidence supports the Board's finding that Kuhnle-Hambster's increased presence at Stuyvesant created the impression that employees' union activities were under surveillance.  Stuyvesant employees testified that after the campaign announcement, Kuhnle-Hambster started visiting more frequently, staying longer, having one-on-one conversations with employees, and testing their drink-making skills.  The judge reasonably credited the employees' detailed testimony over Kuhnle-Hambster's vague claim that she came to resolve store-manager issues.

(b)  Substantial evidence likewise supports the Board's finding that Kuhnle-Hambster created an impression of surveillance by refusing to explain how she obtained pictures of Schenk's Snapchat messages.  Without knowing who forwarded the private conversations to management, or why, employees were left to speculate about that person's intentions, and Kuhnle-Hambster's silence only reinforced the impression that someone was monitoring their discussions.  Employers have the right to investigate employee misconduct, but cannot give the impression of spying on protected activity.

2.  Applying its well-established *Wright Line* framework, the Board found that Starbucks violated Section 8(a)(3) and (1) of the Act by disciplining and discharging Schenk for engaging in protected concerted activity.  The record fully

supports the Board's finding that Starbucks knew of Schenk's union activities and, given Cain's admission that Kuhnle-Hambster was targeting Schenk, Starbucks's belated claim that it harbored no animus towards Schenk's union activity rings hollow.

(a)  Substantial evidence supports the Board's finding that Starbucks failed to prove its affirmative defense that it would have disciplined Schenk for profanity in the absence of his protected activity.  Starbucks cannot show that it maintained a consistent policy or practice of punishing foul language at Latham.  Schenk and Shift Supervisor Phelps testified without contradiction that Latham employees commonly used profanity without sanction, and Starbucks produced no evidence that other employees were disciplined for profanity, that Schenk's language exceeded the bounds of tolerance, or that he was held to a higher standard as shift supervisor.

Although not necessary to its finding, the Board reasonably drew an adverse inference from Starbucks's failure to have Cain testify about this issue.  Cain was ideally positioned to rebut Schenk and Phelps's testimony, and thus the Board was within its discretion to infer that his testimony would have corroborated theirs.

The Board also drew a reasonable adverse inference from Starbucks's refusal to disclose unredacted versions of subpoenaed documents appearing to show that it tolerated profanity at Latham.  The majority of circuits agree that

12

adverse inferences can be drawn without subpoenas, or without enforcing existing subpoenas, even when a party invokes the attorney-client privilege. Moreover, adverse inferences are not equivalent to court-imposed sanctions because parties can always challenge them on appeal. In any event, substantial evidence supports the Board's finding without drawing this inference.

(b) The Board reasonably found that Starbucks failed to prove its affirmative defense regarding Schenk's memorialized coaching. The record shows that Cain fought against Schenk's discipline and that other employees omitted multiple store-closing tasks without repercussion. In addition, Starbucks cannot show why four omitted tasks justified discipline when three did not. Starbucks's reliance on Schenk's unlawful final written warning to justify the memorialized coaching further precludes meeting its burden.

(c) Substantial evidence supports the Board's finding that Starbucks failed to show it would have discharged Schenk absent his protected conduct. Schenk and Phelps testified without contradiction that Latham had no rule forbidding employees from opening store mail, and no one was previously disciplined for doing so. Further, the Board did not abuse its discretion in drawing an adverse inference from Starbucks's failure to have Cain testify. Starbucks produced no evidence that employees were only allowed to open certain types of mail, and its

13

attack on Schenk's credibility falls flat. Starbucks's reliance on Schenk's prior unlawful disciplines to justify his discharge also dooms its affirmative defense.

3.   Section 10(e) of the Act bars the Court from entertaining Starbucks's remedial challenges, which Starbucks admittedly never presented to the Board.   In any event, the challenged make-whole provision is a rational exercise of the Board's remedial discretion, and Starbucks's statutory and constitutional arguments are contrary to well-settled precedent.

## STANDARD OF REVIEW

This Court will uphold the Board's unfair-labor-practice findings "if they have a reasonable basis in the law and are not inconsistent with [the Act]," and the Board's findings of fact "so long as they are supported by 'substantial evidence.'" *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018) (quoting 29 U.S.C. §160(e)) (other citations omitted).   "Substantial evidence is that which is relevant and sufficient for a reasonable mind to accept as adequate to support a conclusion." *Flex Frac Logistics, LLC v. NLRB*, 746 F.3d 205, 207 (5th Cir. 2014).   Under that deferential standard, "[the Court] may not reweigh the evidence, try the case de novo, or substitute [its] judgment for that of the Board, 'even if the evidence preponderates against the [Board's] decision.'" *El Paso Elec. Co. v. NLRB*, 681 F.3d 651, 656 (5th Cir. 2012) (quoting *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)).   The substantial-evidence standard "is not modified in any

14

way when the Board and its [judge] disagree." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951).  The Court "give[s] special deference to the Board's credibility determinations, upholding [them] unless they are inherently unreasonable or self-contradictory." *Cordua Rests., Inc. v. NLRB*, 985 F.3d 415, 428 (5th Cir. 2021) (quotation omitted).

## ARGUMENT

I.  **SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT STARBUCKS VIOLATED SECTION 8(a)(1) OF THE ACT BY CREATING THE IMPRESSION OF SURVEILLANCE**

Section 7 of the Act guarantees employees the right "to engage in … concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. §157.  Section 8(a)(1) of the Act makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [S]ection 7." *Id.* §158(a)(1).  An employer violates Section 8(a)(1) by creating the impression of surveilling employees' union activities. *Delchamps, Inc. v. NLRB*, 585 F.2d 91, 93 (5th Cir. 1978).  A violation occurs when the employer's conduct would lead reasonable employees to believe their protected activities are under surveillance. *Frontier Tel. of Rochester, Inc.*, 344 NLRB 1270, 1276 (2005), *enforced mem.*, 181 F. App'x 85 (2d Cir. 2006). The test is an objective one, based on the totality of the circumstances. *Id.*

**A.    Kuhnle-Hambster's Increased Presence at Stuyvesant After the Campaign Announcement**

Substantial evidence supports the Board's finding that Kuhnle-Hambster's actions at Stuyvesant would lead reasonable employees to believe their protected activities were under surveillance.  (ROA.1015.)  Stuyvesant employee Precious Melendez testified that, after the organizing campaign became public, Kuhnle-Hambster's visits increased from once every other month to 4-5 per week.  She also stayed longer and began having one-on-one conversations with employees about the Union, and testing their drink-making abilities.  (ROA.1009&n.5; ROA.49,51-57.)  Stuyvesant employee Jacob Evans similarly testified that after the campaign announcement, Kuhnle-Hambster started coming more frequently and staying longer, up to several hours.  Kuhnle-Hambster also observed employee workstations and spoke at least weekly to individual employees about union-related matters.  (ROA.1009n.6; ROA.266-72,276-77.)  Melendez and Evans testified that Kuhnle-Hambster's presence inhibited them from talking to coworkers about the Union.  (ROA.1015,1028; ROA.53,270.)

The judge reasonably concluded that Melendez and Evans's testimony was "more credible than Kuhnle-Hambster's," (ROA.1009), and Starbucks fails to show that his finding is "unreasonable or self-contradictory," *Cordua Rests.*, 985 F.3d at 428.  Kuhnle-Hambster's conduct was unusual and directly tied to the onset of the campaign, which supports the Board's finding that Starbucks unlawfully

16

created the impression of surveillance at Stuyvesant.  *See NCRNC, LLC v. NLRB*, 94 F.4th 67, 75-76 (D.C. Cir. 2024) (finding that employer surveilled employees during union drive because increased managerial presence "represented a significant departure from prior practice"); *Sprain Brook Manor Nursing Home, LLC*, 351 NLRB 1190, 1191 (2007) ("[A]n employer may not do something 'out of the ordinary' to give employees the impression that it is engaging in surveillance of their protected activities." (quotation omitted)).

Notwithstanding Starbucks's claim (Br.52-53), the timeline of Kuhnle-Hambster's increased presence is very clear.  Kuhnle-Hambster's version of events does not negate Melendez and Evans's unequivocal testimony that her visits increased immediately after the campaign announcement on April 20 or 21.[3] (ROA.50-52,268-69,275.)  Kuhnle-Hambster testified generally that she visited Stuyvesant more often because then-Store Manager Gerard Hedge had performance issues, but she did not specify when she increased her presence. (ROA.1009; ROA.357-58.)  The only specific timeframe Kuhnle-Hambster identified with more time spent at Stuyvesant was March 18-20, when Hedge was absent with no replacement.  (ROA.358-59,807.)  Kuhnle-Hambster also stated

---

[3] Evans's testimony was neither "vague" nor "inconsistent."  (Br.53.)  When Starbucks's counsel asked whether Kuhnle-Hambster's presence increased "in May of 2022," Evans replied unequivocally that it was "right after our Union campaign went public, which was on April 20th of 2022."  (ROA.275.)

17

that she visited Stuyvesant three times a week after Jacob Barkman replaced

Hedge, but Barkman started on May 16, over three weeks after the campaign

announcement, and after Kuhnle-Hambster had already increased her presence, per

employee testimony.[4]  (ROA.1009; ROA.324-29,363-64.)  Finally, there is no

evidence that Kuhnle-Hambster continued her frequent visits after the June 7

election, even though Barkman had barely been store manager for two weeks by

then.  (ROA.1009.)

Starbucks's claim that the Board "treated Kuhnle-Hambster's mere presence

as inherently coercive" (Br.53) misconstrues the Section 8(a)(1) analysis and the

Board's findings.  First, the test is whether the employer's behavior "tends to be

coercive, not whether the employees are in fact coerced."  *UNF W., Inc. v. NLRB*,

844 F.3d 451, 462 (5th Cir. 2016) (quotation omitted); *accord Contemp. Cars, Inc.

v. NLRB*, 814 F.3d 859, 869 (7th Cir. 2016) ("Coercion need not be successful to

be an unfair labor practice." (citation omitted)).  Moreover, the evidence easily

shows "a reasonable tendency to restrain" protected activity.  (ROA.1028.)

Kuhnle-Hambster drastically increased her presence and went from hardly

speaking with employees to accosting them individually to discuss union-related

matters, and even spot-checking their skills.  The coercive tendency of Kuhnle-

---

[4]  Even if true, Kuhnle-Hambster's explanation would not mitigate the coercive
tendency of her visits because Starbucks offers no evidence employees knew of her
store-manager concerns.

Hambster's actions far exceeds anything shown in the cases cited by Starbucks

(Br.51). *See Intertape Polymer Corp. v. NLRB*, 801 F.3d 224, 239-40 (4th Cir.

2015) (employer leafletting during union campaign); *Greater Omaha Packing Co.*

*v. NLRB*, 790 F.3d 816, 824-25 (8th Cir. 2015) (employer's accusations that two

employees were union leaders were unknown to other employees so not coercive).

Thus, substantial evidence supports the Board's finding that Kuhnle-Hambster

gave the impression of surveilling employees' union activities, and unsurprisingly

Melendez and Evans confirmed that her actions inhibited them from talking to

coworkers about the Union. *See NCRNC*, 94 F.4th at 73 (employer's actions are

unlawful if they have "a reasonable tendency … to intimidate the employees."

(quotation omitted)). And where the Board found Kuhnle-Hambster's conduct

"would reasonably tend to *restrain*" protected activity under Section 8(a)(1)

(ROA.1028 (emphasis added)), Starbucks's gripe about the Board not using the

term "coerce" (Br.45-46,51) is pointless nitpicking.

### B. Kuhnle-Hambster's Refusal To Disclose How She Obtained Schenk's Snapchat Messages

An employer's refusal to divulge how it obtained evidence of protected

activity creates the impression of surveillance because employees will reasonably

"conclude that the information was obtained through employer monitoring."

*Charter Commc's, LLC*, 366 NLRB No. 46, 2018 WL 1522489, at *6 (2018)

(cleaned up), *enforced*, 939 F.3d 798, 811-12 (6th Cir. 2019). Starbucks does not

dispute that employees used Snapchat to discuss protected matters regarding the Union and workplace conditions.  The very topic of Schenk's rant was his frustration about having to "do 3 … people[']s jobs."  (ROA.799.)  Shift Supervisor Phelps also testified without contradiction that employees stopped using Snapchat after Schenk's discipline because they were "nervous about maybe venting or wanting to say something and didn't want to be disciplined for it." (ROA.1000 (quoting ROA.287).)  The Board reasonably found (ROA.998) that Kuhnle-Hambster's unexplained possession of Schenk's messages from an enhanced-privacy messaging platform would lead participants to believe management was monitoring their union-related conversations.  *See NLRB v. Promedica Health Sys., Inc.*, 206 F. App'x 405, 412 (6th Cir. 2006) (employer's refusal to divulge source of information allowed reasonable inference that there was "a member of management or an employee recruited to spy on [employees'] union activity" (quotation omitted)).

Contrary to Starbucks's hyperbolic claim (Br.50), the Board's decision does not restrict employers' ability to investigate workplace misconduct.  The law simply requires them to explain, upon request, how they obtained their information.  Kuhnle-Hambster's refusal suggested she had something to hide.  *See 800 River Rd. Operating Co. v. NLRB*, 784 F.3d 902, 916, 917-18 (3d Cir. 2015) (employer unlawfully created impression that it had "sources of information about

20

[employees'] union activity"); *Hendrix Mfg. Co. v. NLRB*, 321 F.2d 100, 104 n.7 (5th Cir. 1963) ("[T]he furtive nature of the snooping tends to demonstrate spectacularly the state of the employer's anxiety.").  Starbucks offers no evidence to support its speculation that employees may have stopped using the Snapchat group because they "fear[ed] … other offensive messages" would be exposed. (Br.49.)  And as Starbucks itself concedes (Br.47), the chat contained other messages discussing union activity.

Starbucks's assertion that Schenk knew who reported his chats to Kuhnle-Hambster (Br.47-48) defies logic—Schenk would not have asked a question to which he knew the answer—and is unsupported by the record.  (ROA.101,237,380, SROA.743.)  And since Schenk did not know the employee's identity, he also would not have known that she was a member of the organizing committee. (Br.48.)  Therefore, the Board's finding that employees would believe her motives "involve[d] employer monitoring" (ROA.998) was just as reasonable as Starbucks's alternative explanation (Br.48) that she was offended by Schenk's messages.  That is no ground for reversal.  *See Dean Transp., Inc. v. NLRB*, 551 F.3d 1055, 1061 (D.C. Cir. 2009) (court asks not whether employer's "view of the facts supports its version of what happened, but rather whether the Board's interpretation of the facts is reasonably defensible").  In any event, "[t]he fact that the source of [Kuhnle-Hambster]'s knowledge may have been another employee

21

does not eliminate the impression of Company surveillance carried out indirectly through other employees acting on the Company's behalf." *NLRB v. Ky. Tenn. Clay Co.*, 179 F. App'x 153, 161 (4th Cir. 2006).

In sum, the Board reasonably found (ROA.998) that Kuhnle-Hambster's refusal to disclose her source would lead reasonable employees to believe Starbucks was monitoring their protected conversations. *See Caterpillar Logistics, Inc. v. NLRB*, 835 F.3d 536, 544 (6th Cir. 2016) (finding surveillance where employer said he "knew everyone that … [was] involved" in union-organizing effort without revealing his source).

## II.    SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT SCHENK'S DISCIPLINES AND DISCHARGE VIOLATED SECTION 8(a)(3) AND (1) OF THE ACT

Section 8(a)(3) of the Act prohibits employers from acting to "discourage membership in any labor organization." 29 U.S.C. §158(a)(3).[5] The legality of an employment action depends on the employer's motivation. In *NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983), the Supreme Court approved the Board's test for determining motive as set forth in *Wright Line, a Division of Wright Line, Inc.*, 251 NLRB 1083, 1088-89 (1980), *enforced on other grounds*, 662 F.2d 889 (1st Cir. 1981). Under that test, if substantial evidence

---

[5] Violations of Section 8(a)(3) of the Act are derivative violations of Section 8(a)(1). *Adams & Assocs., Inc. v. NLRB*, 871 F.3d 358, 370 n.2 (5th Cir. 2017).

supports the Board's finding that protected activity was "a motivating factor" in the employer's action, it is unlawful unless the record as a whole compels acceptance of the employer's affirmative defense that it would have taken the same action in the absence of protected activity. *Transp. Mgmt.*, 462 U.S. at 401-03.

"Because motive is a fact question, [this Court] will not lightly displace the Board's factual finding of discriminatory intent." *Renew Home Health v. NLRB*, 95 F.4th 231, 245 (5th Cir. 2024) (quotation omitted). "Direct evidence of motive is rarely available" in Board cases. *Halstead Metal Prods. v. NLRB*, 940 F.2d 66, 71 (4th Cir. 1991). Accordingly, "the Board may determine motive by relying on circumstantial evidence and inferences reasonably drawn from the totality of the evidence." *Hosp. Cristo Redentor, Inc. v. NLRB*, 488 F.3d 513, 518 (1st Cir. 2007) (citing *NLRB v. Link-Belt Co.*, 311 U.S. 584, 602 (1941)) (other citations omitted). "The Board may infer a discriminatory motive where the evidence shows that: (1) the employee engaged in concerted activities protected by Section 7; (2) the employer knew of the employee's engagement in those activities; and (3) the employer harbored animus toward the employee's protected activities." *Cordua Rests.*, 985 F.3d at 423.

23

### A. The Board Reasonably Found That Schenk's Union Activity Was a Motivating Factor in Starbucks's Decisions to Discipline and Discharge Him

Although Starbucks did not contest the judge's finding that Schenk's union activities were a motivating factor in his discipline and discharge (*see* ROA.999 (noting Starbucks "does not dispute[] that the General Counsel easily met her initial burden")), it now insists that it harbored no animus towards his protected conduct. (Br.27-30.) This belated claim does not withstand scrutiny.

It is undisputed that Schenk engaged in protected union activism of which Starbucks was aware. Schenk contacted the Union, collected authorization cards, wore a union pin, signed a public letter announcing the campaign, and sent multiple bargaining requests over Latham store renovations.

Substantial evidence also supports the Board's finding that Starbucks was motivated against Schenk's union activities. (ROA.999,1018.) For starters, Kuhnle-Hambster's apparent surveillance establishes her antiunion animus. *See Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 424 (D.C. Cir. 1996) (surveilling employees' union activities evidences animus). Kuhnle-Hambster's "eagerness to terminate Schenk" at every opportunity also powerfully demonstrates unlawful motivation. (ROA.1018.) Kuhnle-Hambster first asked that Schenk be terminated for his Snapchat messages. (SROA.760.) Then, without waiting for a decision, she recommended discharging him for his bargaining request.

24

(SROA.754-55.)  After that, Kuhnle-Hambster asked to fire Schenk for not completing store-closing duties.  (SROA.769.)  Every time, Kuhnle-Hambster immediately sought the highest possible sanction.

Store Manager Cain confirmed Kuhnle-Hambster's agenda when Schenk expressed concern about his store-closing discipline, stating, "from what I'm seeing…, that's what [Kuhnle-Hambster] is going to be looking for," and advising that "we cross our Ts and dot our Is" to avoid trouble.  (ROA.999&n.21,1018n.28; ROA.125-26.)  And when Schenk confided that he felt "extremely targeted by [Kuhnle-Hambster]" and that her "ultimate goal" was to fire him, Cain replied, "Trust me, I know."  (ROA.126-27.)  "Because an employer rarely admits unlawful discrimination," *Hosp. Cristo Redentor*, 488 F.3d at 518, such direct evidence of antiunion animus is "especially persuasive." *Airgas USA, LLC v. NLRB*, 760 F. App'x 413, 417 (6th Cir. 2019) (quoting *Turnbull Cone Baking Co. v. NLRB*, 778 F.2d 292, 297 (6th Cir. 1985) (per curiam)).  Accordingly, the Board reasonably concluded that Kuhnle-Hambster's animus was "unusually well-supported by this record."  (ROA.999 (footnote omitted).)

## B.    The Board Reasonably Found That Starbucks Failed to Prove Its Affirmative Defense

The Board found that Starbucks failed to show it would have twice disciplined Schenk and discharged him even absent his union activity.  (ROA.999-1004.)  The Board's findings are supported by substantial evidence.

25

**1.    Starbucks failed to show that it would have given Schenk a final written warning absent his union activity**

Substantial evidence supports the Board's finding that Starbucks failed to prove its affirmative defense regarding Schenk's final written warning. (ROA.999-1000.)  The Board "assum[ed] without deciding that the content of Schenk's [Snapchat] messages provided a legitimate basis for discipline." (ROA.999.)[6]  To prove its *Wright Line* defense, however, Starbucks must show that it would—not could—have disciplined Schenk even absent protected activity. *See Cadbury Beverages, Inc. v. NLRB*, 160 F.3d 24, 31 (D.C. Cir. 1998) (employer must show it "*would* have fired [employee] *because of* his insubordination, not that it *could* have done so.").

The Board reasonably found that Starbucks failed to prove its defense. (ROA.999-1000.)  Schenk testified that Latham employees and every manager he worked for used profanity daily, including Cain.  (ROA.100-01,187-88,203.) Phelps confirmed that every employee under age 30 routinely used profanity. (ROA.282,287.)  Phelps also corroborated Schenk's testimony that Latham employees commonly used the same language he used on Snapchat, stating that she "didn't even bat an eye" when she read Schenk's messages because she knew he was "just venting."  (ROA.203-04,292.)  Schenk recounted that Cain once asked

---

[6]  Thus, the Board did not rely on Phelps's testimony to evaluate the offensiveness of Schenk's language.  (Br.33.)

employees to "watch[] their mouths," and then added, "[e]xcept for [Schenk]...,

he's going to say what he wants."  (ROA.1000&n.25; ROA.101.)  Therefore, Cain

knew of Schenk's (and others') propensity to use profanity, but did not strictly

enforce the HWC policy.  "[This] substantial record evidence establishes that

Latham employees and managers commonly used profanity without being subject

to discipline," (ROA.1000), and thus Starbucks failed to prove it would have

disciplined Schenk even absent his protected conduct.[7]  *See Publix Supermkts.,*

*Inc.*, 347 NLRB 1434, 1439 (2006) (inconsistent application of disciplinary rules

supports finding violation).  Indeed, the fact that Schenk and Phelps's testimony is

uncontradicted means that, by definition, Starbucks *cannot* show it would have

terminated Schenk for using profanity regardless of his union activity.[8]

Starbucks's argument that the Board improperly conflated "ordinary

profanity with Schenk's egregious comments" (Br.31-32) fails because there is no

evidence that it treats profanity on a sliding scale.  The HWC policy generally

prohibits "vulgar or profane language," (ROA.788), and does not sanction some

_____

[7]  As the Board made clear, requiring Starbucks to carry the burden of its
affirmative defense neither "condone[s] nor minimize[s] the seriousness of
Schenk's use of profanity."  (ROA.1001.)

[8]  Starbucks's false claim that the judge discredited Schenk on this issue (Br.32)
misleadingly quotes from the judge's evaluation of Schenk's testimony about the
campaign announcement (ROA.1009n.4), and the letter-opening incident
(ROA.1014).  The judge's discussion of Schenk's outburst does not impugn his
credibility.  (ROA.1012-13,1017-19.)

words more than others.[9]  Nor has Starbucks produced any example either of

Latham employees being disciplined for language exceeding the bounds of

"ordinary" profanity.[10]  Indeed, Starbucks produced no evidence of *any* employee

disciplined for profanity under Cain.  In any event, if Starbucks found error in the

Board's views on profanity compared to the judge's, it should have moved for

reconsideration.

Starbucks also failed to show that Latham's shift supervisors were held to a

higher standard for profanity.  The 2018 coaching to which Starbucks refers

(Br.33) predates this case by four years and involved employees submitting *written*

obscenities into Starbucks's employee-recognition system.  (ROA.1001;

ROA.792.)  Moreover, it was issued by another store manager, Verlette Diaz, who

was at least two managers before Cain.  (ROA.82,792.)  Whatever Diaz's

standards may have been, the evidence establishes that Cain was more permissive,

as shown.  The Board reasonably concluded that the record "f[e]ll far short of

---

[9]  Starbucks gains no ground (Br.31) relying on this Court's dicta in *NLRB v. Red Top Cab & Baggage Co.*, 383 F.2d 547, 555 n.11 (5th Cir. 1967).  Starbucks's defense requires showing it treated other employees comparably to Schenk for similar language, not the existence of some abstract rating of profanity.

[10]  Evidence that other employees became "nervous" about also being disciplined for "venting" (ROA.1000 (quoting ROA.287)) undermines Starbucks's claim (Br.32) that their language was qualitatively different than Schenk's.

establishing that [Starbucks] disciplined Schenk pursuant to a consistently applied policy." (ROA.1001.)

In addition to this evidence showing that "language comparable to that used in Schenk's messages was common and had previously been tolerated" at Latham, (ROA.1001n.30), the Board drew adverse inferences from Starbucks's failure to have Cain testify and refusal to divulge unredacted subpoenaed documents showing that it investigated employees' use of profanity. Those adverse inferences are reviewed for abuse of discretion. *NLRB v. Bannum Place of Saginaw, LLC*, 97 F.4th 351, 364 (6th Cir. 2024).

> ### a. The Board did not abuse its discretion in drawing an adverse inference from Starbucks's failure to call Cain

The adverse-inference rule posits that, "all other things being equal, a party will of his own volition introduce the strongest evidence available to prove his case." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. NLRB (UAW)*, 459 F.2d 1329, 1338 (D.C. Cir. 1972). It follows that "[a] party's failure to call rebuttal witnesses who are peculiarly within its control raises the inference that their testimony would not have been favorable to that party's position." *NLRB v. Int'l Ass'n of Bridge Structural & Ornamental Iron Workers (Iron Workers)*, 864 F.2d 1225, 1232 n.7 (5th Cir. 1989) (citing cases). As store manager, Cain was uniquely positioned to substantiate Starbucks's defense about

profanity at Latham. The Board reasonably inferred from Starbucks's decision not to call Cain that "his testimony would have supported finding that [Starbucks] previously tolerated comparable profanity" at Latham. (ROA.1000.)

In challenging this adverse inference, Starbucks forgets that once the GC (convincingly) showed that Schenk's discipline was unlawfully motivated under *Wright Line*, Starbucks bore the burden to prove that it would have disciplined Schenk absent his union activities. Accordingly, the GC had no reason to call Cain. (Br.44.) Likewise, Starbucks had no "'reason to believe that its opponent ha[d] failed to meet its burden of proof' and that there was 'no need to offer further evidence.'" (Br.43 (quoting *NLRB v. Chester Valley, Inc.*, 652 F.2d 263, 271 (2d Cir. 1981)).) This case is the reverse of *Chester Valley*, where the court found it improper to draw an adverse inference against the employer when the GC had the burden of proof.

Contrary to Starbucks's suggestion (Br.42-43), nothing precludes the Board from drawing an adverse inference where the judge did not. The Board is "entrusted by Congress with the responsibility for making findings under the statute … and is free to substitute its judgment for the [judge]'s" so long as its findings are supported by substantial evidence, as they are here. *Kiewit Power Constructors Co. v. NLRB*, 652 F.3d 22, 26 (D.C. Cir. 2011) (cleaned up). Starbucks also fails to show that its due-process rights were violated. (Br.43-44.)

The Board drew two adverse inferences from Cain's absence, one regarding the use of profanity at Latham, and the other about shift supervisors' ability to open mail (see below, p.38).  Starbucks knew those issues would come up at the hearing and was able to litigate them fully, including by opting not to call Cain.  *See NLRB v. Ingredion Inc.*, 930 F.3d 509, 519 (D.C. Cir. 2019) (no due-process violation where employer had "full and fair opportunity to litigate the matter" and failed to show prejudice).

> **b.    The Board did not abuse its discretion in drawing an adverse inference from Starbucks's refusal to supply unredacted versions of subpoenaed documents**

Starbucks refused to produce unredacted copies of subpoenaed documents showing that it investigated the use of profanity at Latham.  Starbucks's stonewalling supports the Board's reasonable inference that those documents "would not have contradicted Phelps and Schenk's testimony about the type and frequency of profanity previously tolerated" at Latham.  (ROA.1001.)

Courts generally recognize that "the adverse inference rule plays a vital role in protecting the integrity of the administrative process in cases where a subpoena is ignored."  *UAW*, 459 F.2d at 1338.  It does so by allowing the Board to "attach weight to a party's intransigence" based on "the commonsense inference that if the evidence would do the suppressing party any good, he would readily produce it."  *Id.* at 1339; *see also Iron Workers*, 864 F.2d at 1232 n.7 (recognizing importance

of adverse-inference rule).  And while the rule "in no way depends on the existence

of a subpoena, … the willingness of a party to defy a subpoena in order to suppress

the evidence strengthens the force of the preexisting inference." *UAW*, 459 F.2d at

1338; *accord Iron Workers*, 864 F.2d at 1232 n.7.  Several courts have upheld the

Board's ability to draw adverse inferences or preclude the introduction of evidence

without having subpoenas enforced.  *See UAW*, *supra*; *see also* cases cited at

ROA.1001n.29.

In a similar case, the D.C. Circuit upheld a preclusion order and adverse

inference against a party who defied a subpoena by claiming attorney-client and

work-product privileges.  *Atl. Richfield Co. v. DOE*, 769 F.2d 771, 777-78 (D.C.

Cir. 1984).  The court reasoned that the power of a federal agency to "adjudicate

'public rights' necessarily carries with it power … to take such procedural actions

as may be necessary to maintain the integrity of the agency's adjudicatory

proceedings." *Id.* at 794 (footnote omitted).  The court emphasized that "[a]n

evidentiary preclusion order falls far short of an effort to exact compliance with a

subpoena by a judgment of fine or imprisonment," and that judicial review of

agency discovery orders always remains available.  *Id.* at 795.

Starbucks argued that the subpoenaed documents were protected by the

attorney-client privilege, but offered no reason for refusing to submit them for in-

camera inspection.  *See NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 498 (4th

Cir. 2011) ("Board adjudicators are authorized to make rulings on questions of privilege."). Such apparent gamesmanship perfectly illustrates *Atlantic Richfield*'s observation that "[w]ithout an adequate evidentiary sanction, a party served with a discovery order … has no incentive to comply, and ofttimes has every incentive to refuse to comply." 769 F.2d at 795 (footnote omitted); *see also Nat'l Football League*, 309 NLRB 78, 99 (1992) (explaining numerous incentives for employers to delay Board proceedings).

Ignoring these precedents, Starbucks asserts that the adverse inference is an improper sanction because only federal district courts can punish noncompliance with Board subpoenas. (Br.40-41.) There are several problems with this argument. First, Section 11(2) of the Act, 29 U.S.C. §161(2), allows district courts to punish those who disobey *their own* subpoena-enforcement orders, but does not restrict the Board's authority and options to manage its proceedings short of obtaining subpoena enforcement.[11] Second, the adverse-inference rule does not require a subpoena, *UAW*, 459 F.2d at 1338, and therefore the Board could draw its inference without seeking enforcement. Third, contrary to a court-imposed sanction, Starbucks always retained the right to refuse to produce the documents and to challenge the Board's adverse inference in court, as it does now. *Id.* at

---

[11] Likewise, *Interbake Foods*, 637 F.3d at 492, and *NLRB v. Detroit Newspapers*, 185 F.3d 602 (6th Cir. 1999), deal with judicial enforcement of subpoenas.

1339; *Atl. Richfield*, 769 F.2d at 795.  Lastly, Starbucks's assertion of the attorney-client privilege did not "require" the GC to get the subpoena enforced.  (Br.41.)  The GC had already met her burden of proof, and withholding the information only hurt Starbucks's affirmative defense.  The fact that "a party holding privileged information that could establish a claim or defense as to which it has the burden of proof always faces the difficult choice whether to produce that information" does not preclude drawing an adverse inference if it refuses to do so.  *Cmty. Hosps. of Cent. Cal. v. NLRB*, 335 F.3d 1079, 1087 (D.C. Cir. 2003) (affirming adverse inference and finding employer's privilege argument "singularly unpersuasive").

It is also worth noting that in *NLRB v. American Art Industries, Inc.*, 415 F.2d 1223 (5th Cir. 1969), this Court enforced a judge's order precluding an employer who defied a subpoena from presenting secondary evidence on the matter.  The Court agreed that "[i]n order to maintain the integrity of the hearing process, the [judge] had, under the circumstances, little choice but to" proceed as he did.  *Id.* at 1230.  *American Art* is instructive not only because it affirms the Board's ability to police its proceedings, but also because the Board's adverse inference in this case did not preclude Starbucks from mounting a full defense.  *Cf. NLRB v. Int'l Medication Sys., Ltd.*, 640 F.2d 1110, 1111 (9th Cir. 1981) (refusing to enforce order precluding subpoena-defying employer from cross-examining witnesses or presenting evidence).

34

In any event, the Board's adverse inferences are not necessary to its conclusion that Starbucks failed to prove its affirmative defense. (ROA.1001n.30.) As discussed above (pp.26-27), no evidence contradicts Schenk and Phelps's testimony that Latham employees commonly used language comparable to Schenk's Snapchat messages, and that Starbucks tolerated this behavior prior to Schenk's discipline. Therefore, the same result would obtain even without those inferences. *See Cmty. Hosps.*, 335 F.3d at 1087 (adverse inference not necessary if employer's defense lacks evidentiary support).

### 2. Starbucks failed to show that it would have given Schenk a memorialized coaching absent his union activity

Substantial evidence also supports the Board's finding that Starbucks failed to prove it would have disciplined Schenk for failing to complete four store-closing tasks regardless of his protected activity. (ROA.1002-03; SROA.745.) The record shows that employees regularly missed store-closing duties without consequence, and Starbucks failed to show that Schenk's mistakes were "sufficiently extraordinary to establish that they would have resulted in discipline absent Schenk's union activity." (ROA.1002.)

Starbucks's affirmative defense rests on the fact that no shift supervisor previously failed to complete four store-closing tasks in one night. (Br.34-35.) This argument has two fatal flaws. First, Starbucks "produced no evidence tending to show that Schenk's mistakes went beyond those ordinarily tolerated when made

35

by other employees." (ROA.1002.)  The record shows that before and after Schenk's discipline, Starbucks did not punish other employees who missed three store-closing tasks, including some of the same Schenk omitted.[12]  Starbucks does not explain how Schenk's mistakes differed qualitatively, or why omitting three tasks was acceptable but four was not.  By itself, "[Starbucks]'s failure to produce a single prior comparable discipline precludes a finding that it has carried its defense burden." (ROA.1003.)

Second, the supposed severity of Schenk's actions conflicts with Cain's recorded statement that he "fought against" the coaching because he thought Schenk's omissions were "one-offs." (ROA.124-25.)  Starbucks's primary rejoinder to the plain meaning of Cain's words—that he was merely "expressing sympathy with the 'stress' that Schenk was under" (Br.35)—is pure speculation engendered by not having Cain testify.  Further, Cain's next sentence, "[F]rom what I'm seeing…, *that's what [Kuhnle-Hambster] is going to be looking for*…" (ROA.125 (emphasis added)), reflects his belief that Kuhnle-Hambster was changing the rules for tolerable mistakes, at least for Schenk.  Starbucks also fails

---

[12] *See* SROA.771 (May 26: "hot bar needs deliming"; "fruit left in cold bar drain"; "pastries not dated from <u>two</u> days ago"), SROA.775 (Aug. 6: "both bars needed to be cleaned at open"; "bathrooms not cleaned or stocked"; "milks not rotated or counted").

to explain why Cain would "attempt to keep Schenk from quitting" (Br.29) if Schenk purportedly was such a terrible employee.

Starbucks cannot justify Schenk's memorialized coaching on grounds that "no other partner failed to complete tasks *while on final written warning*." (Br.35.) "An adverse employment decision is unlawful if it relies upon and results from a previous unlawful action." *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 787 (8th Cir. 2013). Starbucks cannot hang its defense on a daisy chain of unlawful disciplines. (ROA.1003; SROA.745.)

Finally, Starbucks misses the mark arguing that the memorialized coaching was an act of leniency proving it bore no animus towards Schenk's union activities. (Br.35-36.) Starbucks's *Wright Line* burden is to show that it would have disciplined Schenk even absent his protected conduct, not disprove the Board's animus finding. Moreover, Starbucks ignores that Kuhnle-Hambster requested the highest punishment for Schenk's offense—termination. The fact that Kuhnle-Hambster's request was so completely out of proportion with the memorialized coaching approved by HR is direct evidence of her persistent "eagerness to terminate Schenk," (ROA.1018; SROA.769), and only bolsters animus. *See Publix Supermkts.*, 347 NLRB at 1439 (inconsistent application of disciplinary rules and substantial evidence of unlawful motive forecloses employer defense).

### 3. Starbucks failed to show that it would have terminated Schenk absent his union activity

Substantial evidence supports the Board's finding that Starbucks failed to prove it would have fired Schenk for opening mail absent his protected activity. (ROA.1003-04.)  Starbucks undisputedly has no written policy governing who may open store mail.  (ROA.1004.)  Moreover, Schenk and Phelps testified that until Schenk's discharge they did not know of any rule against opening mail, and that shift supervisors did so routinely under previous store managers.  (ROA.145-47,159-60,244,288,306.)  The only other relevant witness, Store Manager Barkman, could only speak to his practice at Stuyvesant.  (ROA.345,349.)  The Board also reasonably inferred from Starbucks's failure to have Cain testify that he would not have contradicted Schenk and Phelps.[13]  (ROA.1004.)  In fact, Cain implicitly acknowledged that no such rule existed when he asked Schenk to refrain from opening similar letters "in the future" and admitted that "it seemed confusing" since the letter was addressed to the store.  (ROA.1003&n.43; ROA.151.)  Thus, the Board reasonably found that, prior to Schenk's discharge,

---

[13] The Board specified that, even without that adverse inference, "the weight of the affirmative record evidence" would still support its finding.  (ROA.1004n.45.)

Latham shift supervisors were generally authorized to open mail if no supervisor was present, regardless of its nature or provenance.[14]  (ROA.1004.)

The notice of separation's reliance on Schenk's prior unlawful disciplines to justify discharging him also "precludes finding that [Starbucks] carried its *Wright Line* defense burden as a matter of law."  (ROA.1004 (footnote omitted).)  As explained above (p.37), Starbucks's defense cannot consist of citing serial unlawful disciplines.  Starbucks never argued below that it would have discharged Schenk absent those prior disciplines.  (Br.39-40.)  By definition, therefore, Starbucks failed to show that it would have terminated Schenk regardless of his protected activity.  *See RELCO*, 734 F.3d at 787.

Starbucks unpersuasively argues that Schenk's explanation for opening the letter "flatly contradicted" his testimony that Latham shift supervisors frequently opened mail, and falsely accuses the Board of ignoring related credibility findings.  (Br.37-38.)  Initially, the Board expressly affirmed the judge's credibility findings.  (ROA.996n.1.)  More importantly, Schenk's concern about Starbucks withholding union-related information from employees (ROA.151, 159) is distinct from, and

---

[14]  This case is a far cry from *NLRB v. Brookshire Grocery Co.*, 919 F.2d 359, 361 (5th Cir. 1990), where an employee slipped into a manager's office at night to copy confidential files.  (Br.36-37.)  Also inapposite is *6 West Ltd. v. NLRB*, 237 F.3d 767, 778 (7th Cir. 2001) (finding it "obvious that companies must be able to discharge a thief"), (Br.37) because there is no evidence Schenk violated any extant rule and it is undisputed that he stole nothing.

not inconsistent with, his and Phelps's uncontradicted testimony that shift supervisors previously opened store mail with impunity. Moreover, Schenk made the point about being union liaison after Cain asked him not to open similar types of mail "in the future … in case there's anything … I may have to take care of." (ROA.151.) Read as a whole, the transcript shows that Schenk used his union-liaison status to argue that he should be able to open *union-related* mail *going forward*, not to explain why shift supervisors opened *all types* of mail *in the past*.

Starbucks's claim that the Board faulted it for "not having a written policy expressly prohibiting partners from opening its official mail" (Br.38) misrepresents the Board's decision. The Board's actual finding was that Starbucks had "no written policy governing opening mail and introduced no evidence bearing on the practice" at Latham. (ROA.1004.) In other words, Starbucks's defense fails because it showed neither a policy nor a practice prohibiting employees from opening store mail. *See Fortuna Enters., LP v. NLRB*, 665 F.3d 1295, 1304 (D.C. Cir. 2011) (selective policy enforcement forecloses employer defense). Thus, Starbucks's reliance on *6 West Ltd. v. NLRB*, 237 F.3d 767, 778 (7th Cir. 2001) (employer's lack of express, written policy that employee's conduct was terminable offense did not support finding violation), is misplaced.

Finally, the Board soundly rejected (ROA.1008,1014) Starbucks's claim that shift supervisors were only barred from opening "mail from *government agencies*

to '*Starbucks Corporation*' and labeled '*Official Business*.'" (Br.39 (emphases added).) Until the hearing, Starbucks never claimed Schenk was fired for opening official government mail. Schenk's discharge notice simply states that he was discharged for "open[ing] a letter that was not addressed to him," which "*could have constituted a felony under federal law.*" (SROA.749 (emphasis added).) Furthermore, Schenk and Phelps testified without contradiction that shift supervisors regularly opened mail before Schenk's discharge, yet Starbucks never claimed they violated federal law.[15] The fact that Schenk is the only shift supervisor Starbucks ever accused of breaking the law further buttresses the Board's finding.

## III.     THE BOARD ACTED WITHIN ITS BROAD REMEDIAL DISCRETION BY ORDERING STARBUCKS TO MAKE SCHENK WHOLE FOR ALL DIRECT OR FORESEEABLE PECUNIARY HARMS

In *Thryv, Inc.*, 372 NLRB No. 22, 2022 WL 17974951 (2022), *enforcement denied on other grounds*, 102 F.4th 727 (5th Cir. 2024), the Board standardized the make-whole language of its remedial orders by incorporating an express requirement that respondents make employees whole for all "direct or foreseeable

---

[15]  The statute on which Starbucks relies (*see* ROA.235) applies to all mail, not just official correspondence from government agencies. *See* 18 U.S.C. §1702 ("Whoever takes *any* letter … before it has been delivered to the person to whom it was directed … or opens … the same, shall be fined … or imprisoned …, or both." (emphasis added)).

pecuniary harms" suffered as a result of unfair labor practices. *Id.* at *9-21. The Board explained that standardizing this language to clarify that make-whole relief includes direct or foreseeable pecuniary harms—rather than remedying such harms on an ad hoc basis, as it had in the past—was necessary to more fairly and consistently effectuate the Act's remedial objectives. *Id.* at *10-14.

The Board applied *Thryv* here, ordering Starbucks to reinstate Schenk and make him whole for all direct or foreseeable pecuniary harms suffered as a result of Starbucks's discrimination. (ROA.1005.) If any such harms are alleged following enforcement of the Board's Order, the Board's General Counsel will have the burden in a compliance proceeding of proving the causation and amount of such harms, and Starbucks will have an opportunity to respond. *Thryv*, 2022 WL 17974951, at *19.

Starbucks does not challenge the Board's reasoning for standardizing the language of its make-whole orders. Instead, it argues that the Act and the Constitution foreclose relief for direct or foreseeable pecuniary harms stemming from unfair labor practices, even though the Board, with court approval, has granted such relief throughout its history. Starbucks's arguments were not raised to the Board and therefore are not properly before the Court. In any event, the Board's remedy stands on firm statutory and constitutional ground.

**A.    Section 10(e) of the Act Precludes the Court From Considering Starbucks's Challenges to the Make-Whole Remedy**

Section 10(e) of the Act provides that "[n]o objection that has not been urged before the Board … shall be considered by the court," absent "extraordinary circumstances."  29 U.S.C. §160(e).  Starbucks undisputedly never challenged the *Thryv* remedy below.  (Br.61.)  Nonetheless, Starbucks asserts that extraordinary circumstances excuse its lapse because the Board rejected those arguments in prior cases (Br.61-63) and has patently exceeded the bounds of its authority (Br.63).  Neither claim withstands scrutiny.

First, Starbucks cannot raise its arguments for the first time now by claiming that it would have been futile, based on the Board's prior rulings, to present them below.  In *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952), the Supreme Court held that a party is required to raise an objection before an administrative agency to preserve its claims, even where the agency has previously rejected the same argument in other cases.  *Id.* at 37.  As the Court explained, "[r]epetition of [an] objection" to an agency may change the agency's position, or at least give it fair "notice of the accumulating risk[s]" it is assuming in maintaining its position.  *Id.*  This Court has likewise recognized that an agency's "prior rejection" of an argument in another case "does not constitute an extraordinary circumstance" excusing a party's failure to raise the same argument at the administrative level.  *Brown & Root, Inc. v. OSHRC*, 673 F.2d 111, 115 (5th

43

Cir. 1982) (citing *NLRB v. Children's Baptist Home of S. Cal.*, 576 F.2d 256, 262

(9th Cir. 1978)); *cf. Indep. Elec. Contractors of Hous., Inc. v. NLRB*, 720 F.3d 543,

551-52 (5th Cir. 2013) (extraordinary-circumstances exception satisfied, where,

among other reasons, the Board had "discussed" and "preemptively denied" the

potential objection *in the same case*).[16]  Accordingly, Starbucks's newly raised

challenges to the make-whole remedy do not survive Section 10(e)'s bar merely

because, at the time Starbucks should have raised them below, the Board had

rejected similar arguments in other cases.

Second, Starbucks cannot sidestep Section 10(e)'s restrictions by relying on

the exception for when the Board acts "patently in excess of its authority." *Detroit

Edison Co. v. NLRB*, 440 U.S. 301, 311 n.10 (1979).  For one, the Board has not

yet "imposed a specific remedy, whose legitimacy [the court] could examine," but

"has merely stated a general proposition." *3484, Inc. v. NLRB*, 137 F.4th 1093,

---

[16] To the extent that Starbucks cites out-of-circuit cases finding extraordinary circumstances based on so-called patent futility (Br.61), those cases are incompatible with *L.A. Tucker*. *See Tinker Air Force Base v. FLRA*, 321 F.3d 1242, 1248 (10th Cir. 2002) (explaining that, unlike some other circuits, the court "has applied the futility doctrine consistent with *L.A. Tucker*"); *see also Brown & Root*, 673 F.2d at 115 ("Supreme Court precedents compel our conclusion" that agency's prior rejection of argument does not establish futility).  One cited case— *Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351 (6th Cir. 1983)—is also distinguishable.  There, the court excused a party's failure to challenge a Board policy that had been "steadfastly maintained" despite adverse circuit court decisions.  *Id.* at 358.  By contrast, no court had rejected the Board's *Thryv* remedy when it issued the Order under review.

1115 (10th Cir. 2025) (rejecting employer's argument that *Thryv* patently exceeded Board's authority and finding its challenge barred by Section 10(e)). Further, the standard for patent excess is stringent: the Board does not act patently beyond its authority so long as, at the time of its decision, it "had at least arguable reason to believe that its practices were legal." *RELCO*, 734 F.3d at 797 (citing *NLRB v. Newton-New Haven Co.*, 506 F.2d 1035, 1038 n.2 (2d Cir. 1974)); *see also D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 351 n.5 (5th Cir. 2013) (no extraordinary circumstance where it was possible, but not definite, that the Board "lacked the authority to act"). The Board crosses the line into patent excess of its authority only if it contravenes "unambiguous circuit precedent" from "the time of its initial decision." *RELCO*, 734 F.3d at 797. As discussed below (pp.47-48), this Court has previously enforced the Board's ad hoc orders of make-whole relief for direct or foreseeable pecuniary harms. It has also never rejected the Board's newly standardized remedy. And the Ninth Circuit concluded that the Board did not "patently travel[] outside the orbit of its authority" in ordering the *Thryv* remedy. *IUOE, Stationary Eng'rs, Loc. 39 v. NLRB (Macy's)*, 127 F.4th 58, 82 n.11 (9th Cir. 2025) (quotation omitted), *en banc reh'g pet. filed* (Mar. 7, 2025).

Under these circumstances, Starbucks's failure to raise its challenges precludes their consideration for the first time on appeal. In any event, even if

Starbucks's *Thryv* challenges had been properly raised, they would nonetheless fail, as explained below.

## B.    The Board's Remedy Effectuates the Policies of the Act

Section 10(c) of the Act grants the Board "broad discretionary" authority to remedy unfair labor practices by ordering "such affirmative action … as will effectuate the policies of this Act." *Fibreboard Paper Prods. v. NLRB*, 379 U.S. 203, 215-16 (1964) (citing 29 U.S.C. §160(c)); *J.P. Stevens & Co. v. NLRB*, 417 F.2d 533, 538 (5th Cir. 1969).  The task of devising unfair-labor-practice remedies rests with the Board, so its choice of remedy must stand unless shown to be "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Fibreboard*, 379 U.S. at 216; *Mid-S. Bottling Co. v. NLRB*, 876 F.2d 458, 460 (5th Cir. 1989).[17]

---

[17]  Starbucks does not argue that this deferential standard of review was altered by *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).  *See Dist. Hosp. Partners, LP v. NLRB*, 141 F.4th 1279, 1289 n.2 (D.C. Cir. 2025) (argument regarding *Loper*'s effect waived).  Rather, Starbucks passingly cites *Loper* only for the proposition that the Court reviews agency legal conclusions de novo.  (Br.25.)  But *Loper* reaffirmed that Congress may enact specific statutes granting discretionary authority to expert agencies tasked with "prescrib[ing] rules to 'fill up the details' of a statutory scheme."  603 U.S. at 395 (citing cases).  Because that is the type of discretion Congress assigned the Board, the Board's legal conclusions will be upheld if "rational and consistent with the Act."  *NLRB v. Curtin Matheson Sci., Inc.*, 494 U.S. 775, 786-87 (1990) (citing decades of Supreme Court caselaw); *accord Hudson Inst. of Process Rsch. Inc. v. NLRB*, 117 F.4th 692, 700 (5th Cir. 2024) (discussing *Loper* and stating that Board's legal conclusions should be affirmed unless "inconsistent with the Act").

One fundamental remedial objective of the Act is to "restor[e] the situation, *as nearly as possible*, to that which would have obtained but for the [unfair labor practice]." *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941) (emphasis added); *S. Tours, Inc. v. NLRB*, 401 F.2d 629, 634 (5th Cir. 1968). The Board and the courts have "repeatedly underscored the essential role of make-whole relief in the statutory scheme." *King Soopers, Inc.*, 364 NLRB 1153, 1155 (2016), *enforced in relevant part*, 859 F.3d 23 (D.C. Cir. 2017). Accordingly, it is settled that "making the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces." *NLRB v. Strong*, 393 U.S. 357, 359 (1969) (citation omitted).

*Thryv* relief falls squarely within that rubric. As the Board explained, *Thryv*, 2022 WL 17974951, at *10-13, and the Ninth Circuit affirmed, *Macy's*, 127 F.4th at 81-82, 84, 86, full make-whole relief is necessary to undo the consequences of the unlawful conduct, restore the status quo ante, and dissipate the coercion so employees are willing to continue exercising their rights. And contrary to Starbucks's assertion that *Thryv* ordered unprecedented remedies (Br.55-56), the Board has repeatedly ordered make-whole relief for direct or foreseeable pecuniary harms on an ad hoc basis. *Thryv*, 2022 WL 17974951, at *11-13 (citing examples). Myriad forms of make-whole relief beyond backpay have been enforced on review, including by this Court. *E.g.*, *Bill Johnson's Rests. v. NLRB*,

461 U.S. 731, 747 (1983) (expenses from unlawful lawsuit); *NLRB v. Laborers'*

*Int'l Union*, 758 F.2d 1001, 1005-06 (5th Cir. 1984) (medical expenses union plan

would have covered, but for violation); *NLRB v. Miami Coca-Cola Bottling Co.*,

360 F.2d 569, 574-75 (5th Cir. 1966) (interim-employment expenses indirectly

attributable to unlawful discharge).

## C.    Starbucks's Attempt To Redefine the Board's Statutory Remedial Authority Is Unfounded

Starbucks urges the Court to read an unprecedented limitation into the Act

by confining the Board to "equitable," as opposed to "legal," remedies.  (Br.57.)

Its effort to import this common-law distinction into Section 10(c) is baseless.  The

Supreme Court has only revisited the historical distinction between legal and

equitable remedies when compelled to do so as a matter of textual interpretation.

*Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 216-17 (2002).  It has,

for example, interpreted Congress's deliberate use of the limiting term "equitable

relief" as referring to types of relief traditionally available in courts of equity.  *Id.*

at 209-10.  As discussed below (pp.58-59), courts also consider the legal/equitable

division in analyses under the Seventh Amendment, which specifically invokes the

distinction.

Section 10(c) contains no such textual limitation on the Board's remedial

authority.  Indeed, the Supreme Court implicitly rejected any such limitation in the

earliest years of the Act, holding that the Board's exercise of remedial authority

should *not* be evaluated based on the "narrow canons" applicable to "ordinary private controversies," because Congress granted the Board open-ended authority to exercise "all such remedial powers as will, from case to case, translate into actuality the policies of the Act." *Phelps Dodge*, 313 U.S. at 188 & n.6; *see Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 543 (1943) ("conventional common law or chancery principles" do not limit Board remedies).

Starbucks argues that because Section 706(g) of Title VII, 42 U.S.C. §2000e-5(g), was originally "modeled" on Section 10(c), and the Supreme Court later found Section 706(g) to preclude recovering compensatory damages, Section 10(c) must be similarly constrained. (Br.58 (citing *United States v. Burke*, 504 U.S. 229, 238 (1992)).) Starbucks omits that Congress amended Title VII in 1972 to insert language directing courts to order affirmative action or other "*equitable relief*" as they deem appropriate. Pub. L. 92-261, 86 Stat. 103 (1972) (emphasis added). It was this later textual revision that the Supreme Court construed to preclude the recovery of certain "legal" damages under Title VII. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255 (1993). No similar limitation appears in the Act.[18]

---

[18] Starbucks fares no better in pointing to statutory provisions that explicitly authorize compensatory damages (Br.58), given that Section 10(c)'s open-ended language is broader than the cabined language Starbucks references. The cited provisions merely highlight the remedial flexibility Congress conferred on the Board.

Further, although the Supreme Court has looked to Board caselaw from the time of Title VII's 1964 enactment as a guide for determining congressional intent regarding certain Title VII remedies, *e.g.*, *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 848-49 (2001), the reverse is not true. Even aside from the later textual revision that distinguishes the two statutes, Starbucks cites no majority opinion retroactively construing the scope of the Act based on what another Congress may have intended three decades later when drafting Title VII.

More generally, the Supreme Court has cautioned against falling into a "bog of logomachy" when evaluating Board remedies, since the operative question is not a remedy's label, but whether the remedy bears "appropriate relation to the policies of the Act." *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 348 (1953). Accordingly, the Supreme Court and this Court have for decades reviewed the Board's remedies under the Act's carefully defined policies—and rejected those that exceed the Board's statutory authority, without referencing concepts of law and equity. *E.g.*, *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 900 (1984) (disapproving monetary remedy not "sufficiently tailored to expunge only the actual, and not merely speculative, consequences of the unfair labor practices"); *N.Y. Party Shuttle, LLC v. NLRB*, 18 F.4th 753, 767-68 (5th Cir. 2021) (same); *Elec. Data Sys. Corp. v. NLRB*, 985 F.2d 801, 807-08 (5th Cir. 1993) (same); *see also Republic Steel Corp. v. NLRB*, 311 U.S. 7, 10-13 (1940) (disapproving remedy

requiring reimbursement of government entities as failing to "restore and make whole employees"). The Board's statutory authority to order *Thryv* make-whole relief thus turns on whether such relief can fairly be said to effectuate the policies of the Act, not whether it can be characterized as traditionally equitable. Because *Thryv* aims to restore employees by addressing actual harms suffered due to unfair labor practices, it meets that standard.[19]

### D.   In Any Event, the Make-Whole Remedy Is Equitable

Even if the equitable-versus-legal distinction were relevant, the *Thryv* remedy is properly characterized as equitable. As the Supreme Court explained in *SEC v. Jarkesy*, "monetary relief can be legal *or* equitable," and a determinative consideration is whether the relief "is designed to punish or deter the wrongdoer, or, on the other hand, solely to 'restore the status quo.'" 603 U.S. 109, 123 (2024) (emphasis added) (quoting *Tull v. United States*, 481 U.S. 412, 422 (1987) (legal remedy is "intended to punish culpable individuals, not just "extract compensation or restore the status quo")). The Board's remedy here is equitable because, consistent with longstanding Supreme Court precedent, it is not designed to

---

[19]   Contrary to Starbucks's claim (Br.58-59), nothing in *Thryv* suggests the Board would award non-backpay make-whole relief to employees discharged "for cause" within the meaning of Section 10(c)—an issue not presented in this case. *See Transp. Mgmt.*, 462 U.S. at 401 n.6 (construing Section 10(c) proviso as prohibiting any "compensat[ion]" for employees discharged solely for legitimate reasons).

"punish bad actors," but rather to "implement the statutory principles of rectifying the harms actually incurred by the victims of unfair labor practices and restoring them to where they would have been but for the unlawful conduct." *Thryv*, 2022 WL 17974951, at *17.

In addition, the Supreme Court has held that monetary make-whole relief that is incidental to the Board's equitable remedies is itself equitable for that reason alone. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 48 (1937); *see Atlas Roofing Co. v. OSHRC*, 430 U.S. 442, 453 n.10 (1977) (discussing *Jones & Laughlin* holding that monetary relief ordered with reinstatement is equitable). By restoring the status quo ante, the *Thryv* remedy is designed to undo the coercive effects of unlawful conduct so that employees are willing to keep exercising their statutory rights. It thus advances the same equitable purpose as the Order's indisputably equitable cease-and-desist, reinstatement, and notice-posting provisions: to ensure that employees may prospectively engage in activities encouraged by the Act without fear of retaliation or unremedied pecuniary loss. Section 10(c) requires the Board to issue a cease-and-desist order for violations and entitles it to require "affirmative action" to further advance that goal. 29 U.S.C. §160(c). Additional remedies are extensions of that equitable order. *See Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288 (1960) (monetary relief equitable where power to award it derives from statutory grant of equitable

authority).  As this Court explained shortly after the Act's inception, the Board's grant of further injunctive and monetary relief operates in service of the cease-and-desist order by giving it retrospective application; those remedies serve, in effect, as "[a] cease and desist order operating retrospectively." *Agwilines, Inc. v. NLRB*, 87 F.2d 146, 150-51 (5th Cir. 1936).  The cease-and-desist order itself might only be forward-looking, but the other remedies function as "an order to cease and desist as to unfair practices, from their beginning." *Id.* at 151.

Starbucks fails to explain why the *Thryv* remedy is not properly deemed equitable as an aspect of a Board order to restore the status quo ante. *See Macy's*, 127 F.4th at 80-87 & n.12 (enforcing *Thryv* relief because it effectuates the Act by restoring status quo ante; characterizing *Thryv* remedy as equitable).  Instead, it quotes the Third Circuit's decision in *NLRB v. Starbucks Corp.*, 125 F.4th 78, 96 (3d Cir. 2024), for the proposition that pecuniary remedies are equitable only when they are based on monies employers wrongfully retained, not monies employees lost.  (Br.57.)  The suggestion that make-whole relief cannot be based on employees' losses is contrary to decades of precedent. *See Macy's*, 127 F.4th at 83 n.12 (criticizing *Starbucks* on this basis); *NLRB v. Armstrong Tire & Rubber Co.*, 263 F.2d 680, 683 (5th Cir. 1959) (instructing that "actual losses should be made good" (quoting *Phelps Dodge*, 313 U.S. at 198)); *Miami Coca-Cola*, 360 F.2d at 574-75 (requiring employer to compensate employee for "expenses incurred" as a

result of unlawful discharge).  The Supreme Court and this Court have constrained the Board to craft make-whole remedies based on the actual harm or loss to employees rather than on monies employers have withheld.  *See, e.g.*, *Sure-Tan*, 467 U.S. at 900-01 (noting requirement that Board consider employee's duty to mitigate damages when calculating backpay) (citing cases); *N.Y. Party Shuttle*, 18 F.4th at 767 (same).  Indeed, the Ninth Circuit described *Thryv* make-whole relief as analogous to "a backpay order," because both "*restore to the employees in some measure what was taken from them* because of the [employer's] unfair labor practices."  *Macy's*, 127 F.4th at 83.

Starbucks's repeated attempt to reframe *Thryv* as granting "damages," either "consequential" or "compensatory" (Br.57-60), also does not withstand scrutiny.  Although the Board's make-whole orders might sometimes "resemble compensation for private injury," it must "be constantly remembered that [they] are remedies created by statute … [which] vindicate public, not private rights."  *Va. Elec*, 319 U.S. at 543.  Victims of an unfair labor practice have no private claim guaranteeing them relief, and any make-whole remedies awarded at the discretion of the Board have no private character until they are in the employees'

hands. *See Amalgamated Util. Workers v. Consol. Edison Co.*, 309 U.S. 261, 265-70 (1940).[20]

Thus, as the Board explained in *Thryv*, 2022 WL 17974951, at *13, terms of art like "consequential damages," as used in other legal contexts, are inapt descriptions of make-whole relief designed to undo the effects of an unfair labor practice and advance the broader public policies of the Act. *See Macy's*, 127 F.4th at 80-85 (rejecting argument that *Thryv* relief is improper consequential or compensatory damages); *Agwilines*, 87 F.2d at 150 (explaining why Board make-whole remedies do not constitute "damages as such").[21]   Contrary to Starbucks's implication (Br.55), this Court did not hold otherwise when it described the remedy in *dicta*. *See Thryv*, 102 F.4th at 737-46 (denying enforcement of Board order because substantial evidence did not support violation).   A focus on purpose

---

[20]  Starbucks's citation to an internal manual (Br.56-57 (citing *Casehandling Manual, Part 3, Compliance Proceedings* §10536.1 (Oct. 19, 2020))), is not to the contrary.  The manual is published by the General Counsel, not the Board, and is not binding authority. *Sitka Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175, 1182 (D.C. Cir. 2000).

[21]  The Supreme Court in *International Union, United Automobile, Aerospace & Agricultural Implement Workers of America v. Russell* held that because Section 10(c)'s focus is stopping and preventing violations, not compensating individuals, it was not intended to supplant private tort claims or to confer "exclusive jurisdiction" on the Board as the sole entity tasked with providing "full compensatory damages" for private injuries.  356 U.S. 634, 642-43 (1958); *accord Shepard v. NLRB*, 459 U.S. 344, 351-52 (1983).

rather than label makes clear that the *Thryv* make-whole remedy is squarely within the Board's statutory authority.

### E.  Controlling Precedent Forecloses Starbucks's Article III and Seventh Amendment Claims

Longstanding Supreme Court precedent dictates that neither Article III nor the Seventh Amendment applies to unfair-labor-practice claims before the Board. Rather than confront that controlling law, Starbucks sidesteps it, advancing constitutional arguments against the Board's remedial authority as if the Supreme Court had never spoken.

### 1.  The public-rights exception applies

As Starbucks acknowledges (Br.59-60), Article III and the Seventh Amendment are not implicated in public-rights claims. *See Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 584 U.S. 325, 334 (2018) (Congress possesses "significant latitude to assign adjudication of public rights to entities other than Article III courts"). As Starbucks further acknowledges, whether a claim involves public or private rights turns not on whether the rights are "Congressionally created," but on the nature of the claim (Br.60): "[i]f a suit is in the nature of an action at common law, then the matter presumptively concerns private rights." *Jarkesy*, 603 U.S. at 128. The Supreme Court in *Jones & Laughlin* squarely held that the Board's unfair-labor-practice proceedings vindicate public rights "unknown to the common law" and are "not [suits] at common law or in the

56

nature of such [suits]." 301 U.S. at 48-49; *see also Agwilines*, 87 F.2d at 150 (protections for labor activity "were not only unknown, they were obnoxious to the common law"). Thus, the Court determined that Board proceedings "do not offend … constitutional requirements," and conform with the "well-settled rules" permitting Congress to establish administrative agencies "to aid in the enforcement of valid legislation." *Jones & Laughlin*, 301 U.S. at 46-47. It further specified that the Seventh Amendment has "no application" to such proceedings. *Id.* at 49.

Despite these holdings, which are dispositive here, Starbucks does not mention the Supreme Court's seminal *Jones & Laughlin* decision. Nor does Starbucks's conclusory assertion that *Thryv* relief "squarely implicate[s] private rights" (Br.60) acknowledge the wealth of other Supreme Court precedent confirming that the Board adjudicates public rather than private rights. *See, e.g.*, *NLRB v. Indus. Union of Marine & Shipbuilding Workers*, 391 U.S. 418, 424 (1968) (Board proceeding "is not to adjudicate private rights but to effectuate a public policy"); *NLRB v. Fant Milling Co.*, 360 U.S. 301, 307-08 (1959) (same); *Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 366 (1940) (same). This Court has reached the same conclusion. *See, e.g.*, *U.S. Contractors, Inc. v. NLRB*, 697 F.2d 692, 695 (5th Cir. 1983) ("The Board … enforce[es] public, not private rights…."); *Agwilines*, 87 F.2d at 150 (the Act "does not confer[] private rights").

And the Supreme Court's most recent discussion of the public-rights exception makes clear that the exception's application to claims under the Act remains settled law. In *Jarkesy*, the Court quoted—without disapproval—*Jones & Laughlin* and other precedent applying the exception to the Board's unfair-labor-practice proceedings. 603 U.S. at 137-38 (quoting *Jones & Laughlin* and discussion of *Jones & Laughlin* in *Atlas Roofing*); *see id.* at 122 (citing section of *Curtis v. Loether*, 415 U.S. 189, 194 (1974), distinguishing the Act from non-public-rights statutory schemes). Because *Jarkesy* did not purport to overrule *Jones & Laughlin*, it remains good law with "direct application" to this case and is therefore dispositive. *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989); *see also Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (directly controlling case must be followed even if "the precedent is in tension with some other line of decisions" (quotation omitted)).

## 2. The underlying claim is not legal in nature

Even if the Supreme Court's consistent designation of Board proceedings as adjudicating public rights were not dispositive, the Seventh Amendment is not implicated unless a claim is "legal in nature," which depends on an examination of "the cause of action" and "the remedy it provides." *Jarkesy*, 603 U.S. at 122-23; *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 41-42 (1989). Here, neither the cause of action nor the challenged remedy fits that description.

58

Again, the Supreme Court has definitively determined that unfair-labor-practice claims were unknown to the common law. *Jones & Laughlin*, 301 U.S. at 48-49. Although the remedy can be the "more important" consideration in determining whether an action is legal in nature for Seventh Amendment purposes, *Jarkesy*, 603 U.S. at 123 (quotation omitted), here the underlying claim is so firmly established as outside the common law as to be all but dispositive.

Should the Court nonetheless reach the issue, the nature of the remedy in this case would not change the result. As discussed above (pp.51-53), make-whole relief for direct or foreseeable pecuniary harms stemming from an unfair labor practice is equitable in nature for two reasons. First, such relief is aimed at restoring the status quo. *See Jarkesy*, 603 U.S. at 123. And second, it serves as an extension of the Board's indisputably equitable cease-and-desist and reinstatement orders. *Jones & Laughlin*, 301 U.S. at 48; *Atlas Roofing*, 430 U.S. at 453 n.10.

## CONCLUSION

For the foregoing reasons, the Board respectfully requests that the Court enter a judgment denying Starbucks's petition for review and enforcing the Board's Order in full.

Respectfully submitted,

/s/ Usha Dheenan

USHA DHEENAN
  *Supervisory Attorney*

/s/ Gregoire Sauter

GREGOIRE SAUTER
  *Attorney*

/s/ Jared Odessky

JARED ODESSKY
  *Attorney*

National Labor Relations Board
1015 Half Street SE
Washington, DC  20570-0001
(202) 273-2948
(202) 273-1714
(202) 273-1937

WILLIAM B. COWEN
  *Acting General Counsel*
STEPHANIE CAHN
  *Acting Deputy General Counsel*
PETER SUNG OHR
  *Associate General Counsel*
RUTH E. BURDICK
  *Deputy Associate General Counsel*
MEREDITH JASON
  *Assistant General Counsel*

September 2025

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

| | |
|---|---|
| STARBUCKS CORPORATION ) | |
| ) | |
| Petitioner/Cross-Respondent ) | |
| ) | |
| v. ) | |
| ) | No. 24-60649 |
| NATIONAL LABOR RELATIONS BOARD ) | |
| ) | Board Case Nos. |
| Respondent/Cross-Petitioner ) | 03-CA-296757 |
| ) | 03-CA-299016 |
| -------------------- ) | 03-CA-302451 |
| ) | |
| WORKERS UNITED ) | |
| ) | |
| Intervenor for Respondent/Cross-Petitioner ) | |
| ) | |

**CERTIFICATE OF SERVICE**

I hereby certify that on September 19, 2025, I electronically filed the

foregoing with the Clerk for the Court of the United States Court of Appeals for

the Fifth Circuit by using the appellate CM/ECF system.  I further certify that this

document was served on all parties or their counsel of record through the appellate

CM/ECF system.

> s/ Gregoire Sauter
> Gregoire Sauter
> Attorney
> National Labor Relations Board
> 1015 Half Street SE Washington,
> DC  20570-0001
> (202) 273-1714

Dated at Washington, DC
this 19th day of September 2025

61

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

| | |
|---|---|
| STARBUCKS CORPORATION ) | |
| ) | |
| Petitioner/Cross-Respondent ) | |
| ) | |
| v. ) | |
| ) | No.  24-60649 |
| NATIONAL LABOR RELATIONS BOARD ) | |
| ) | Board Case Nos. |
| Respondent/Cross-Petitioner ) | 03-CA-296757 |
| ) | 03-CA-299016 |
| -------------------- ) | 03-CA-302451 |
| ) | |
| WORKERS UNITED ) | |
| ) | |
| Intervenor for Respondent/Cross-Petitioner ) | |
| ) | |

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rules of Appellate Procedure 32(a)(5)-(6), 32(a)(7)(B), and 32(g)(1), the Board certifies that this brief contains 12,900 words of proportionally spaced, 14-point type, and that the word-processing software used was Microsoft Word for Office 365.

s/ Gregoire Sauter
Gregoire Sauter
Attorney
 National Labor Relations Board
 1015 Half Street SE Washington,
DC  20570-0001
(202) 273-1714

Dated at Washington, DC
this 19th day of September 2025