No. 24-60649

# In the United States Court of Appeals for the Fifth Circuit

STARBUCKS CORPORATION,

*Petitioner/Cross-Respondent,*

v.

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner*

ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

**BRIEF OF INTERVENOR WORKERS UNITED**

MICHAEL DOLCE
IAN HAYES
Hayes Dolce LLP
135 Delaware Ave, Suite 502
Buffalo, NY 14202
Tel: (716) 912-3480
Tel: (716) 608-3427
mdolce@hayesdolce.com
ihayes@hayesdolce.com
*Attorneys for Intervenor,*
*Workers United*

## INTERVENOR'S CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Petitioner/Cross-Respondent:**

- Starbucks Corporation

**Respondent/Cross-Petitioner:**

- National Labor Relations Board

**Intervenor:**

- Workers United, affiliated with the Service Employees International Union

**Counsel for Petitioner/Cross-Respondent:**

Lisa S. Blatt
Amy Mason Saharia
Claire R. Cahill
Jason Howell Clayton
Williams & Connolly LLP
680 Maine Avenue, S.W.
Washington, DC 20024
(202) 434-5000
lblatt@wc.com
asaharia@wc.com
ccahill@wc.com
jclayton@wc.com

Jeffrey S. Hiller
Littler Mendelson, P.C. 41 S. High St., Ste. 3250
Columbus, OH 43215

(614) 463-4230
jhiller@littler.com

Jonathan O. Levine Littler Mendelson, P.C.
1111 E. Kilbourn Ave., Ste. 1000
Milwaukee, WI 53202
(414) 291-5537
jlevine@littler.com

**Counsel for Respondent/Cross-Petitioner:**

Ruth E. Burdick
Usha Dheenan
Gregoire Sauter
National Labor Relations Board
1015 Half Street, SE Washington, DC 20570
(202) 273-2960
appellatecourt@nlrb.gov
usha.dheenan@nlrb.gov
gregoire.sauter@nlrb.gov

M. Kathleen McKinney
National Labor Relations Board
600 S. Maestri Place, 7th Floor
New Orleans, LA 70130
(504) 589-6361

**Counsel for Intervenor:**

Michael Dolce
Ian Hayes
Hayes Dolce LLP
135 Delaware Ave., Ste. 502
Buffalo, NY 14202
(716) 534-8388
mdolce@hayesdolce.com
ihayes@hayesdolce.com

Manuel Alfonso Quinto-Pozos
Deats Durst & Owen, P.L.L.C.

8140 N. Mopac Expy., Ste. 250
Austin, TX 78759
(512) 474-7896
mqp@ddollaw.com

/s/ Michael Dolce
Attorney of Record for Workers United

## STATEMENT OF INTERVENOR'S IDENTITY AND INTEREST

Workers United ("Union") is a labor organization that represents more than 86,000 workers in the apparel, textile, industrial laundry, food service, manufacturing, warehouse distribution, and non-profit industries in the United States and Canada, including over 12,000 Starbucks workers. Workers United is affiliated with Service Employees International Union (SEIU). No public company owns an interest in Workers United or SEIU.

Workers United was the successful charging party in the unfair labor practice cases here, NLRB Case Nos. 03-CA-296757, 03-CA-299016, and 03-CA-302451, that resulted in the Order issued against Starbucks Corporation on December 16, 2024 and which is the subject of these proceedings for review and cross-application for enforcement. On February 6, 2025, the Court granted Workers United's Motion to Intervene in this matter.

## STATEMENT REGARDING ORAL ARGUMENT

Workers United believes that oral argument would assist the Court in clarifying and resolving the issues in this appeal.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ......................................................................... 1

STATEMENT OF THE ISSUES ............................................................................ 2

STATEMENT OF THE CASE ............................................................................... 3

   I.  Employee Unionization and Starbucks's Response ....................................... 3

      A.  Impression of Surveillance ................................................................. 6

      B.  Starbucks's Targeting of Union Leader James Schenk ...................... 7

  II.  The Underlying Unfair Labor Practice Charges and Proceedings ............... 26

      A.  The Charges .................................................................................... 26

      B.  The ALJ and Board Decisions ......................................................... 27

SUMMARY OF ARGUMENT ............................................................................. 29

ARGUMENT ....................................................................................................... 36

   I.  THE BOARD CORRECTLY DETERMINED THAT STARBUCKS UNLAWFULLY CREATED THE IMPRESSION OF SURVEILLANCE IN THE IMMEDIATE WAKE OF THE STUYVESANT PLAZA UNION CAMPAIGN. ................................................................................................ 36

  II.  THE BOARD CORRECTLY DETERMINED THAT STARBUCKS UNLAWFULLY CREATED THE IMPRESSION OF SURVEILLANCE BY KUHNLE-HAMBSTER NOT DISCLOSING TO SCHENK HOW SHE HAD RETRIEVED HIS PRIVATE SNAPCHAT MESSAGES. .................. 36

 III.  THE BOARD CORRECTLY DETERMINED THAT STARBUCKS DISCIPLINED AND DISCHARGED JAMES SCHENK IN RETALIATION FOR HIS UNION ACTIVITY AND TO DISCOURAGE OTHERS FROM ENGAGING IN UNION ACTIVITY. ........................................................... 40

      A.  James Schenk's Union Activity ....................................................... 41

      B.  Starbucks's Anti-Union Animus ..................................................... 43

## TABLE OF CONTENTS (cont'd)

**Page**

    C.  Final Written Warning, June 27, 2022.................................................47

    D.  Memorialized Coaching, July 18, 2022 ...........................................50

    E.  Notice of Separation, August 31, 2022 ...........................................52

IV.  THE BOARD'S ORDERED REMEDY IS NECESSARY TO EFFECTUATE THE PURPOSES OF THE ACT....................................................................56

CONCLUSION ......................................................................................................57

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Cadbury Beverages, Inc. v. NLRB*,
　160 F.3d 24 (D.C. Cir. 1998) ...............................................................47

*Cordua Restaurants, Inc. v. NLRB*,
　985 F.3d 415 (5th Cir. 2021) .................................................41, 48, 56

*David Saxe Prods.*,
　370 NLRB No. 103, slip op. (2021) .....................................................37

*Dynamics Corp.*,
　296 NLRB 1252 (1989)........................................................................51

*ExxonMobil Rsch. & Eng'g Co., Inc. v. NLRB*,
　132 F.4th 337 (5th Cir. 2025 ...............................................................35

*Hudson Inst. of Process Rsch. Inc. v. NLRB*,
　117 F.4th 692 (5th Cir. 2024) ..............................................................35

*In-N-Out Burger, Inc. v. NLRB*,
　894 F.3d 707 (5th Cir. 2018) ...............................................................35

*Lucky Cab Co.*,
　360 NLRB 271 (2014)..........................................................................56

*NCRNC, LLC v. NLRB*,
　94 F.4th 67 (D.C. Cir. 2024)................................................................36

*NLRB v. Ky. Tenn. Clay Co.*,
　179 F. App'x 153 (4th Cir. 2006) .........................................................39

*NLRB v. Transportation Management Corp.*,
　462 U.S. 393 (1983) .............................................................................41

*Promedica Health Sys., Inc.*,
　206 F. App'x 405 (6th Cir. 2006) .........................................................39

*Promedica Health Sys., Inc.*,
　343 NLRB 1351 (2004)........................................................................38

**TABLE OF AUTHORITIES (cont'd)**

Page

*Renew Home Health v. NLRB,*
95 F.4th 231 (5th Cir. 2024) ................................................................55

*Sara Lee Bakery Grp., Inc. v. NLRB,*
514 F.3d 422 (5th Cir. 2008) ..............................................................35

*St. John's Community Services of N.J.,*
355 NLRB No. 70 (2010) ....................................................................48

*Starbucks Corp.,*
374 NLRB No. 10, slip op. (Dec. 16, 2024)................................17, 49

*Starbucks Corp.,*
No. 03-CA-285671, JD-17-23, 196 (Mar. 1, 2023).........................3, 5

*Starbucks Corp.,*
No. 03-CA-295470, JD-42-23, 2023 WL 4363911 (July 6, 2023) .........3, 5, 6, 17

*Starbucks Corp.,*
No. 19-CA-294579, JD-29-23, 2023 WL 6379600 (Sept. 28, 2023)....................5

*United States v. Chapman,*
179 F. Supp. 447 (E.D.N.Y. 1959)................................................22, 55

*Universal Camera Corp. v. NLRB,*
340 U.S. 474 (1951) ............................................................................35

**Statutes**

18 U.S.C. § 1702 ...................................................................................22

29 U.S.C. § 160(a).................................................................................1

29 U.S.C. § 160(d).................................................................................1

29 U.S.C. § 160(e)..............................................................................1, 48

29 U.S.C. § 160(f).................................................................................1

## STATEMENT OF JURISDICTION

Workers United agrees with the National Labor Relation Board's ("NLRB" or "Board") Statement of Jurisdiction: This case is before the Court on Starbucks Corporation's ("Company") petition for review, and the NLRB's cross-application to enforce, a final Board order issued December 16, 2024 (374 NLRB No. 8). The Board had jurisdiction over the proceeding below pursuant to Section 10(a) of the National Labor Relations Act, 29 U.S.C. § 160(a). The Court has jurisdiction under Section 10(e) and (f) of the Act, as the Company transacts business in this Circuit. 29 U.S.C. § 160(e)–(f). The petition and cross-application are timely, given that the Act provides no time limits for such filings.

**STATEMENT OF THE ISSUES**

Workers United agrees with the NLRB's Statement of the Issues:

I.  Whether substantial evidence supports the Board's finding that Starbucks created the impression of surveilling employees' protected concerted activities in violation of Section 8(a)(1) of the Act.

II. Whether substantial evidence supports the Board's findings that Starbucks violated Section 8(a)(3) and (1) of the Act by disciplining and discharging employee James Schenk for his union activity.

III. Whether the Board acted within its broad remedial discretion by ordering Starbucks to make Schenk whole for all direct or foreseeable pecuniary harms.

## STATEMENT OF THE CASE

### I.    Employee Unionization and Starbucks's Response

In August 2021, employees at Starbucks stores in Buffalo, New York announced their intent to unionize in a letter sent to then CEO Kevin Johnson.  See *Starbucks Corp.*, No. 03-CA-285671, JD-17-23, 196 (Mar. 1, 2023), aff'd. 374 NLRB No. 10 (Dec. 16, 2024), appeal docketed as Fifth Cir. Case No. 24-60650. Employees at three Buffalo-area Starbucks stores petitioned for a union election with the National Labor Relations Board not long after.  *Id.*  On December 9, 2021, workers at the Elmwood Avenue Starbucks in Buffalo voted to become the first unionized Starbucks location in the country.  *Id.*  Since then, workers at over 640 Starbucks locations, representing more than 12,000 workers, have voted to unionize.[1]

The campaign spread quickly across the country and within New York State. After the Elmwood Avenue vote in December 2021, workers at all three Starbucks stores in Ithaca, New York announced their intent to unionize in January 2022 and then voted to unionize by a combined tally of 47-3.  See *Starbucks Corp.*, No. 03-CA-295470, JD-42-23, 2023 WL 4363911 (July 6, 2023).

Then, in March 2022, workers in the state's Capital District followed suit, beginning with Latham Plaza's campaign announcement to then CEO Howard

---

[1]    Workers United, https://sbworkersunited.org/ (last visited September 15, 2025).

Schultz. ROA.727-29.[2]  Employees at eight stores petitioned to unionize in the Capital District during Spring and Summer 2022—and James Schenk helped organize all of them—including in-person visits to all eight stores with Union District Director Emily Vick during Summer 2022.  ROA.40-41.[3]  After the incredible success of the initial Capital District organizing campaign and in the heat of the organizing boom, Starbucks terminated union leader Schenk on August 31, 2022, after he had been promoted and served the company for over six years.  See ROA.40-41; see also ROA.749.  The termination was Schenk's third discipline in a nine-week period after he had successfully organized his coworkers in May 2022.

Starbucks responded swiftly to oppose its employees' unionization efforts at the local and national level.  As an Administrative Law Judge detailed, Starbucks responded to the initial organizing efforts in Buffalo with "egregious and widespread misconduct demonstrating a general disregard for the employees' fundamental

---

[2]     The Record on Appeal is referred to herein as "ROA."  The Record Excerpts is referred to as "RE."  Petitioner Starbucks Corporation's brief is referred to as "Pet.Br." and Respondent National Labor Relations Board's brief is referred to as "R.Br."

[3]     Workers at all eight stores voted for union representation. ROA.40-41. *See* Latham Plaza (Case 03-RC-293138; docketed March 30, 2022); Stuyvesant Plaza (Case 03-RC-294402; docketed April 21, 2022); Malta (Case 03-RC-295892; docketed May 17, 2022); East Greenbush (Case 03-RC-297980; docketed June 22, 2022); Niskayuna (Case 03-RC-297987; docketed June 22, 2022); Clifton Park (Case 03-RC-298672; Docketed July 5, 2022); Crossgates Mall (Case 03-RC-299064; docketed July 11, 2022); New Scotland Ave (Case 03-RC-303114; docketed September 12, 2022).

rights," including by terminating and disciplining union leaders, closing down stores on the verge of unionizing, surveilling workers with a barrage of managers, and refusing to bargain with those stores that managed to unionize. *Starbucks Corp.*, No. 03-CA-285671, JD-17-23, (Mar. 1, 2023), aff'd. 374 NLRB No. 10 (Dec. 16, 2024), appeal docketed as Fifth Cir. Case No. 24-60650.  Then, another Administrative Law Judge noted the same extreme illegal anti-union conduct in response to the Ithaca union campaign, including unlawfully terminating union leaders, closing down union stores, and threatening workers with loss of benefits.  See *Starbucks Corp.*, No. 03-CA-295470, JD-42-23, 2023 WL 4363911 (July 6, 2023).  On the national level, yet another Administrative Law Judge found the company engaged in an unprecedented campaign to coerce employees to abandon their organizing effort, including threats made from the very top of the company to withhold benefits from organizing workers.  See *Starbucks Corp.*, No. 19-CA-294579, JD-29-23, 2023 WL 6379600 (Sept. 28, 2023).

The primary Starbucks official responsible for the violations at issue here also participated in Starbucks's unlawful counter campaigns in Buffalo and Ithaca, despite her position as a District Manager on the other side of the state.  See ROA.422-28 ("I supported the Ithaca stores at the end of January '22 through the beginning of March '22.").  It just so happened that Albany-area District Manager Kuhnle-Hambster arrived in Ithaca to "support" the employees there mere days after

the union campaign went public.[4]

During her stint in Ithaca, Kuhnle-Hambster engaged in conduct that is eerily similar to that at issue here. For instance, as the Administrative Law Judge noted there, Kuhnle-Hambster interrogated known union organizers over private group chat messages much like she did with Schenk here. See *Starbucks Corp.*, No. 03-CA-295470, JD-42-23, 2023 WL 4363911 (July 6, 2023) ("On February 3, 2022, [the employee] met with interim District Manager Beate Kuhler-Hambster [sic] and interim Store Manager Kat Holzer about a text message exchange [the employee] had with other employees, apparently in late December or January. The message was not on a company application.").

## A.     Impression of Surveillance

Kuhnle-Hambster first unlawfully created the impression of surveillance by dramatically increasing her presence at the Stuyvesant Plaza store in the immediate wake of the public union announcement there. ROA.51-55. Before the union announcement, Kuhnle-Hambster visited the Stuyvesant Plaza store about once every other month during Precious Melendez's shifts, during which Kuhnle-Hambster would stop in for five to ten minutes and check on the general state of the

---

[4]     Kuhnle-Hambster previously testified that she arrived in Ithaca "I believe it was -- it was a Friday so it must have been the 28th probably" in reference to Friday, January 28, 2022. See Case No. 03-CA-295470 et al., Tr. 1872. For reference, the Ithaca union campaign went public on January 25, 2022. *Starbucks Corp.*, No. 03-CA-295470, JD-42-23, 2023 WL 4363911 (July 6, 2023).

store.  ROA.52.  After the campaign announcement, Melendez "would see [Kuhnle-Hambster] multiple times a week, about four or five times a week" when Melendez "was still working the same amount of hours, 25 to 30."  ROA.53.

When Kuhnle-Hambster visited the store after the campaign announcement, she approached workers for one-on-one conversations as she had never done in the past and inspected their work product unlike before.  ROA.54-55.  During these one-on-one conversations, Kuhnle-Hambster also touted Starbucks's unique benefits and attempted to persuade workers against unionization.  ROA.55-56.

Multiple Stuyvesant Plaza workers testified about the conspicuous nature of Kuhnle-Hambster's presence at the store in the immediate wake of the union announcement.  ROA.51-57,268-72,275-77.  Jake Evans, a Stuyvesant Plaza shift supervisor, testified he was "scared" for his job in the face of Kuhnle-Hambster's constant monitoring and one-on-one conversations.  ROA.271.

Kuhnle-Hambster also refused to share with Latham Plaza Shift Supervisor James Schenk how she had retrieved his private Snapchat group chat messages when she questioned him about the messages on June 16 without union representation present.  ROA.92-93,101,237; see also *supra* pp.13-19.  Starbucks does not dispute this fact.  Pet.Br.9.

### B.  Starbucks's Targeting of Union Leader James Schenk

Kuhnle-Hambster was the primary enforcer of Starbucks's anti-union

campaign in the Capital District during Spring and Summer 2022. Even other Starbucks *managers*—like Latham Plaza Store Manager Nick Cain—were terrified of her retribution due to the organizing activity in Albany-area stores. See ROA.124-132 ("they were trying to push me out […] take over the store [there] with Beate if you want to know my honest opinion."). The retaliation was so obvious that Schenk predicted his unlawful termination in a conversation with Cain on August 1, eleven days *before* Starbucks alleged Schenk *committed a felony* for opening mail addressed to his store. ROA.128-29. During the same conversation, Cain acknowledged the unlawful nature of Kuhnle-Hambster's actions in response to the organizing campaign, as he told Schenk: "I mean they're -- they're going to do what they're going to do, right? Because if it does go there, you're going to go to NLRB with the Union". ROA.131.

### 1.     Starbucks's Early Targeting of Schenk

Internal Starbucks communications uncovered at trial reveal Starbucks began targeting Schenk *before* Schenk's May 24 Snapchat messages to coworkers. See ROA.754-55,760-63. On June 13, 2022, Althea Williams from Starbucks Partner Relations (the Human Resources department) entered a "Note" in Starbucks's intranet system that said: "Asked SM to Chronicle events" and then includes such a chronicle of Schenk's activity every day from May 16 through May 24. *See* ROA.761-63. The report lists "other relevant cases" within Starbucks Partner

Relations, labeled "220513-000273" (May 13, 2022) and "220518-000105" (May 18, 2022). Starbucks had opened HR investigations into Schenk weeks before his private text exchange with coworkers on May 24. ROA.754-55,762.

Other Starbucks intranet communications unearthed at hearing reveal blatant discrimination against Schenk for his Union activity—DM Kuhnle-Hambster wanted to terminate Schenk for *sending a bargaining demand* on behalf of the Union. ROA.754-55. On June 23, 2022, Koda Pecaro from Starbucks Partner Relations entered a note into the Company's intranet system which documented a call they received from Kuhnle-Hambster. In the report, it notes "DM is leaning separation" because "On 6/16 DM Beate states they believe SS James wrote a non-work related email on the clock at work." *Id.* The report continues: "The email was about the partners of the store expressing disagreement about the upcoming store renovation." *Id.* Importantly, the report notes "we are unknown when SS James took their 10 min breaks." *Id.*

Starbucks states to the Court that "Kunhle-Hambster's request to Human Resources [on whether she should terminate Schenk for sending a bargaining demand] noted that there were 'several other cases' concerning Schenk, which undoubtedly referred to his offensive messages from late May." Pet.Br.28. Yet Starbucks's own documents betray this supposition, as Starbucks had two pending "related cases" against Schenk before the May 24 conversation occurred—including

one that Kuhnle-Hambster herself had initiated into "BAR/SS Concerns" on May 13. ROA.754.

The Administrative Law Judge acknowledged Kuhnle-Hambster's early targeting of Schenk proved Starbucks's anti-union animus here: "Anti-union animus is also shown by Kuhnle-Hambster's demonstrated eagerness to terminate Schenk. Prior to any of the discipline at issue in this case, Kuhnle-Hambster was already 'leaning' towards firing Schenk for emailing a bargaining request to her during his June 16 shift." RE.37.  He also noted that Kuhnle-Hambster was not truthful about wanting to terminate Schenk for sending the bargaining demand when testifying at hearing: "At trial, prior to being confronted with the human resources report, Kuhnle-Hambster denied that she was leaning towards firing Schenk for sending the email regarding bargaining. Given the documentary evidence, and the record as a whole, I find that Kuhnle-Hambster's testimony in this regard was not credible." (internal citations omitted).  RE.16n.13.

### 2.    Final Written Warning, June 27, 2022

On May 24, 2022, several employees called out for their shift and left the closing shift severely short staffed.  ROA.99-100.  Schenk was the closing shift supervisor that day, noting his displeasure with the short staffing in the daily records book as well as in a private group chat with coworkers on the social media platform Snapchat.  ROA.766,795-99.  The message Schenk left in the daily records book,

which Store Manager Nick Cain described as "negative," reads: "Store left a disaster because we had no staff.  Nothing I could do with one barista.  Store staying open was truly absurd."   ROA.766.   The messages Schenk wrote other organizing committee members in their private group chat were much more strongly worded, including the use of profanity, yet communicated the same message—the store was severely short staffed and the manager's expectation for Schenk and a lone barista to remain open, perform closing duties, and to also do the weekly "Clean Play"[5] was "truly absurd."   ROA.795-99.

Kuhnle-Hambster incorrectly labeled Schenk's private communication in the Snapchat group chat a "business related matter".   ROA.109.   Schenk and other organizing committee members at the Latham Plaza store like Siena Phelps and Jess Mahoney started their private Snapchat group chat as friends in which they would discuss organizing matters and store issues along with their personal lives.   ROA.96-97,282.   In addition, the participants used Snapchat because it is known for its *privacy*, as there is a setting for messages to *automatically delete* after 24 hours, which was the case with the Snapchat messages in this case.   ROA.96.   There is no dispute that: (1) the participants in the Snapchat group chat discussed union matters within the chat with the expectation of privacy from management; (2) the chat was

---

[5] A "clean play" is Starbucks's term for a deep clean of the restaurant, which requires closing staff to perform many additional duties.  ROA.99-101.

not sanctioned or controlled by Starbucks; and (3) the participants discussed union and workplace matters in the chat, but also their personal lives. ROA.96-97,282.

Starbucks states in its brief that "another partner, Mahoney, obviously found the messages sufficiently offensive to report to management." Pet.Br.33. There is no dispute that Starbucks did not call Mahoney nor Cain—the manager she initially shared the messages with—to testify, even though it was the only party that was aware how the company retrieved the private group chat messages before trial.

Moreover, the facts betray Starbucks's unfounded supposition. At 12:07 p.m. on May 24, Shift Supervisor Jess Mahoney sent an email to SM Nick Cain alerting him of an issue with call outs at the Latham Plaza store: "On Friday 5/23 I overheard a conversation between Jordan and Temera about how Jordan planned on calling out at some point because she was moving soon anyway." ROA.797-98. Eleven minutes later at 12:18 p.m., Mahoney sent a screenshot of the private group chat she was in with Schenk and other workers, which contained the following exchange:

James Schenk:

> Sick ass
> Get to do clean play solo with temera
> The dumb fucning bitch who can't even use cleaners

Jess Mahoney:

> We're looking for coverage

James Schenk

> I dint give a fuck
> DON'T FUCKING OPEN IF YOU ARENT FUCKING
> STAGGED
> What kind of lizard brain stupidity does ot take to convince
> himself it's okay to ask me to come in and do 3 fucking peoples
> jobs

*Id.* The timing of the messages is confirmed by the screenshot itself—time stamped at 12:14 p.m.—*after* Mahoney had first raised the issue of staffing and callouts with Cain via her typed email at 12:07 p.m. *Id.*

The messages and their timing indicate that Mahoney shared the messages with Cain not to report Schenk's language, but to report the issue with staffing, which was a primary grievance of the organizing committee in their campaign announcement letter in March 2022. ROA.727-29. In fact, Starbucks's internal documentation demonstrates that Mahoney did not share the additional screenshots with Cain until two days later, on May 26 at 5:36 p.m., which indicates that Cain inquired further into the content of the private Snapchat group chat after reporting the incident to Partner Resources. See ROA.795-97. Cain then forwarded Mahoney's May 26 email directly to Althea Williams from Partner Resources the following afternoon. ROA.795.

On June 14, 2022, Williams sent an intranet communication to Kathleen Kelly, a higher-up in Starbucks Operations, and recently-promoted Regional

Director Mallori Coulombe,[6] along with DM Kuhnle-Hambster, in which she stated: "In speaking with Beate, *while the SM may not have been holding partners accountable previously*, Beate is confident that this is the only partner using this type of language and partners have said the SS uses profanity verbally as well.  I am aligned with [Separation] based on my conversation with Beate." ROA.757 (emphasis added).[7]  There is no dispute that Starbucks did not take Schenk's statement regarding the messages until June 16, *after* Starbucks officials had first recommended termination.  ROA.92-93.

The bizarre timing of Starbucks's investigation demonstrates the company's discriminatory intent in issuing Schenk the Final Written Warning over a month after he sent the messages.  Starbucks betrays the record when it states to the Court: "Kuhnle-Hambster sent the request to Human Resources [on whether to terminate Schenk for sending a bargaining demand email] on June 23, one week after she and

---

[6] Coulombe was promoted to Regional Director after she worked as a "Regional Operations Coach" in Buffalo from September 2021 – November 2021. *See* 03-CA-285671 et al., Tr. 2674-77.  In Summer 2022, Coulombe had worked for the Company for 12 years but had never worked anywhere other than the West Coast (Seattle and California) until she was transferred to Buffalo to fight the union campaign in September 2021. *Id.*

[7] Other parts of the same report are marked "REDACTED: Privileged" and were not provided to the General Counsel in response to its subpoena or for in camera inspection by the Administrative Law Judge, even though other communications on the same thread are self-labeled "*A/C Privilege*" without any counsel attached and in which legal matters are not discussed.  ROA.760.

Cain delivered the final written warning to Schenk." Pet.Br.28n.3. That is not accurate. Kuhnle-Hambster did not issue Schenk the Final Written Warning until June 27, 2022. ROA.386.

Rather, Partner Resources received an inquiry from Cain on May 26 at 1:46 p.m: "Seeking consultation on actions to take regarding SS behaviors." ROA.762.[8] At the time Cain submitted this inquiry, Starbucks already had two "other relevant case(s)" pending against Schenk, one dated May 13, 2022, and the other dated May 18, 2022 (the union election was on May 17, 2022). *Id.*; see also ROA.754. Partner Resources then requested Cain document Schenk's behaviors every day from May 16-24. ROA.762.

A few weeks later, multiple high-ranking Starbucks officials then weighed in on Schenk, many wanting to terminate him for the conduct, even though the company's own records indicated that "the SM may not have been holding partners accountable previously". ROA.760. It is undisputed that Schenk had previously used vulgar language while at work, which had been tolerated and joked about for years, and he was never disciplined or reprimanded for it. See ROA.760-63.

While Starbucks investigation into the May 24 Snapchat messages was ongoing, Schenk was actively organizing Capital District stores, helping the union

---

[8] Note that Cain did not have in his possession at the time of the inquiry all the relevant messages from the Snapchat group chat, as Mahoney did not forward the additional screenshots until May 26 at 5:36 p.m. ROA.795.

successfully win the first store outside Latham Plaza and launching several other campaigns. ROA.40-41. Then—over a month after learning of Schenk's vulgar messages in the private group chat—Starbucks issued Schenk the Final Written Warning on June 27, 2022, a couple of weeks after he had helped organize Stuyvesant Plaza workers, who voted 15-0 for union representation. ROA.742,386.

It is uncontroverted that profanity was commonly used at the Latham Plaza store by both employees and managers without repercussion. ROA.100-01. Another coworker in the Snapchat group chat, Siena Phelps, testified that she "didn't bat an eye" when she read the at-issue messages, and that she "definitely saw this as James just venting." ROA.293. Starbucks now attempts to sensationalize Schenk's conduct by claiming he "attacked" Cain and a coworker in the messages, yet neither Cain nor the coworker were in the chat. Pet.Br.8. Starbucks also attempts to castigate Schenk as one who "disparage their colleagues on the basis of sex or medical condition," yet he never said anything of the sort to Cain or the coworker. Pet.Br.2. Rather, Schenk officially addressed the staffing issue through his handwritten note in the Latham Plaza daily store report and then vented to his friends about the situation in their private Snapchat group chat. ROA.766,795-99.

### 3. Memorialized Coaching Conversation, July 18, 2022

Less than a month after receiving the Final Written Warning, Starbucks disciplined Schenk again. ROA.745. In the *six years* prior to the Union campaign,

16

Schenk had been written up only twice. ROA.783,792. After Latham Plaza employees voted for Union representation, Starbucks disciplined Schenk twice in *three weeks*. ROA.742-45.

The July 18, 2022 discipline references the prior Final Written Warning, along with alleged "policy" violations, including: (1) missed high variance count; (2) not dating pastries; (3) not stocking bathrooms; (4) leaving less than half the cold brew kegs filled. ROA.745. The document also states: "Additionally, all shift supervisors attended a meeting around Clean, Safe & Ready on May 6, 2022 as part of an area-wide initiative." *Id.* In the immediate aftermath of the Union campaign spreading to the Capital District, Starbucks took the "area-wide initiative" to tell workers it would now strictly enforce all Company policies.[9] The document concludes: "Moving forward James, *any* violation of Starbucks policy or standard may lead to your separation of employment." *Id.* (emphasis added).

All the tasks referenced in Schenk's second discriminatory discipline are closing duties of store staff. However, none of them have previously been enforced

---

[9] This is identical to Starbucks's unlawful response to the union campaigns in Buffalo and Ithaca. *Starbucks Corp.*, 374 NLRB No. 10 (Dec. 16, 2024) ("Here, starting around September 2021, district managers and support district managers engaged in an unprecedented area-wide "level setting" of stores in the Buffalo market—a program of stricter enforcement of work rules—that, as the judge found, occurred solely as a result of the organizing campaign."); *Starbucks Corp.*, No. 03-CA-295470, JD-42-23, 2023 WL 4363911 (July 6, 2023) ("if managers were not sent to Ithaca to 'tighten the screws,' they were instructed to do so upon their arrival.")

with written discipline.  ROA.115; ROA.770-75 (Latham Plaza daily records book indicating other employees committed the same violations without discipline).  Store Manager Nick Cain admitted as much in a conversation less than two weeks after the discipline issued.  ROA.124-25 ("I fought against that […] I thought those things were one-offs and I was like, why?") (emphasis added).  Rather, Starbucks has historically corrected such lapses with coaching conversations or has relied on hourly partners to sort out such issues on their own.  As Schenk testified, he failed to do each of these tasks in the past and was never written up for such "violations" until the Union campaign began.  ROA.119-22.

Starbucks also did not account for extenuating circumstances in its investigation.  The document notes: "his explanation was that he spent a lot of time with the coin counter for the partner tips in the BOH."  ROA.745.  As Schenk testified, Starbucks recently required all partner tips be rolled in a coin roller, rather than distributing coin tips via hand.  ROA.112-14.  Schenk was one of the only employees at Latham Plaza that knew how to work the coin roller, and therefore he often had to roll out coins from several shifts in a row.[10]  *Id.*  If Schenk did not roll out the tips that day, the Company would be delayed in lawfully paying its workers.  *Id.*  Starbucks attempts to characterize Schenk's justified issue with the coin roller

---

[10] Shift Supervisors are responsible for ensuring partners receive their tips for each shift.

as an unjustified excuse, when in reality he was attempting to do his job and make sure employees were paid timely.

There are other issues with the allegations in Schenk's second discriminatory discipline. For instance, Starbucks's assertion that "pastries had not been dated" is misleading, as all the pastries are dated when they are delivered to stores. If the closing shift does not date them, which has occurred frequently without incident, then the opening shift can refer to the delivery date and properly date them. ROA 119-121. Starbucks introduced no evidence that any product needed to be discarded or could not be sold because of Schenk's alleged "policy" infraction. In fact, a shift supervisor had failed to date pastries for "two days" without consequence. ROA.771 (emphasis in original).

Starbucks also faulted Schenk because "bathrooms are not stocked," even though Schenk testified that the bathroom *was* stocked as the workers would normally stock it on that day. ROA.120,221-22. Starbucks produced no evidence of a bathroom stocking policy, nor any evidence that the bathroom was not properly stocked that day. Moreover, evidence in the record demonstrates that Starbucks previously did not discipline workers on this ground. ROA.775 ("bathroom not cleaned or stocked").

The high variance count is a weekly inventory count to make sure the Latham Store had not used a "high variance" of a particular product, which would require

more product than usual be ordered for the store.  ROA.121.  As Schenk testified, he was unaware of any other Latham Plaza employee receiving discipline for missing a high variance count, and Starbucks produced no comparator evidence.  *Id.*  In fact, Starbucks's own documentation demonstrates that another shift supervisor had missed the high variance count as recently as April.  ROA.769 ("James is the only SS that has missed a count since beginning of April").  Moreover, Starbucks introduced no evidence that the Latham Plaza store's inventory or potential sales were impacted in any way by the missed count.

At Latham Plaza, the routine practice was for the closing shift supervisor to make sure there was enough cold brew to sustain the morning rush.  ROA.117-18.  It was usually not an issue, and as Schenk testified: "In fact, after they -- they changed the way that it was made a couple years ago, I hadn't made cold brew in probably two years myself. So that's generally more of a morning thing."  ROA.118.  No one at Latham Plaza had ever been formally disciplined for failing to fill cold brew kegs, Starbucks produced no comparator evidence, and such disputes would normally be handled by shift supervisors themselves.  ROA.119.  Again, Starbucks presented no evidence that the opening shift did not have enough cold brew the following morning, nor did Starbucks present any evidence that the store lost customers over the issue.

Like Schenk's Final Written Warning, the timing of his second discriminatory

discipline substantiates Starbucks's anti-union motivation. Rather than correct the alleged behavior on June 30 or in the immediate days afterward, Starbucks waited 19 days to issue the discipline on July 18. ROA.745. Further substantiating the discriminatory nature of the discipline, Store Manager Nick Cain had a conversation with Schenk the day after the alleged violations and did not discipline Schenk nor state that any of the alleged violations were subject to discipline. ROA.114. Moreover, by July 11, workers from the Malta, East Greenbush, Niskayuna, Clifton Park, and Crossgates Mall Starbucks locations had all joined Latham Plaza and Stuyvesant Plaza in petitioning for Union elections. See ROA.40-41; see also *supra* n.3. There is no dispute Schenk played a key role in organizing each unit, including in-person visits to each store. ROA.40-41.

Finally, further establishing Starbucks's animus, Kuhnle-Hambster wanted to *terminate* Schenk for the policy violations that Store Manager Cain decried as "one-offs" that should not be subject to discipline. ROA.769. District Manager Kuhnle-Hambster recommended terminating Schenk on *three* separate occasions[11] in the *six weeks* after Latham Plaza workers voted to unionize—on June 14 (Snapchat messages), June 16 (bargaining demand email), and June 30 (closing duties). ROA.760,755,769.

---

[11] This was in addition to the earlier "relevant cases" Kuhnle-Hambster submitted to Partner Resources, including over "BAR/SS Concerns". ROA.754.

### 4.    Notice of Separation, August 31, 2022.

Starbucks terminated Schenk on August 31 for opening a letter addressed to the Latham Plaza store on August 12.  ROA.749.  The Company claimed Schenk violated its "Compliance with Laws and Regulations" standard, which requires employees "must comply with all applicable laws, rules and regulations when performing their duties."  *Id.*  The Notice of Separation continues: "James' conduct was not consistent with our Mission and Values and could have constituted a felony under federal law in violation of his responsibilities under the Standards of Business Conduct."[12]  *Id.*

At the time of the alleged violation Starbucks *had* a formal policy entitled "Receipt of Legal Documents" which Schenk followed verbatim.[13]  See ROA.339-40,351-52.  As Starbucks's own witness confirmed, its policy for handling "legal documents" is that the documents "should be turned over via email, fax, or overnight delivery to the Starbucks Corporation" to an address in Seattle.  ROA.338.  One

---

[12] An employee who opens mail on behalf of an employer does not violate any state or federal law.  The statute that Starbucks cited in defense of its sensational claims against Schenk, 18 U.S.C. § 1702, protects "Obstruction of Correspondence" and protects mail handled by the United States Postal Service.  Once mail is received at the intended address, the statute does not apply.  *United States v. Chapman*, 179 F. Supp. 447, 453 (E.D.N.Y. 1959).

[13] The policy document itself titled "Receipt of Legal Documents" was not admitted to the record after the General Counsel objected on completeness grounds, but the Judge ruled "I'll allow [Starbucks's witness] to talk about it and you can explore on cross any context you think you might need."  ROA.341-42.

cannot "email" or "fax" an envelope and its contents without opening the correspondence, which indicates Starbucks intended "legal documents" addressed to individual stores to be opened by store-level employees and then forwarded to the corporate office.   Again, as Starbucks's own witness confirmed, the policy "is addressed to partners generally".   ROA.339-40.   To further substantiate the point, Starbucks's own witness confirmed that the policy does *not* prohibit shift supervisors from opening "legal documents" addressed to the store.   ROA.351-52.

Rather, shift supervisors had opened mail addressed to the Latham Plaza store for years as the undisputed testimony of both Schenk and Phelps confirm.   ROA.147-48,288.   In fact, Starbucks relied on shift supervisors to open deliveries to the store as part of their job duties.   ROA.146.   Moreover, Schenk followed Starbucks's "Receipt of Legal Documents" policy exactly as written, by opening the letter, sharing the notification with coworkers, and then placing the letter back in the envelope and onto Store Manager Nick Cain's desk to be forwarded to corporate. ROA.145 ("So with the manila envelope and the N[L]RB letter, I opened those, I installed the new headset pieces, read the N[L]RB letter, shared that with the partners on the floor, put the letter back in the envelope and then placed that back in the -- in the back of the store on Nick's desk.").   Schenk's testimony confirms he even opened *other* mail addressed to the store at the *same* time—a package with new headset pieces—yet Starbucks did not discipline him for this.

The letter Schenk opened on August 12 was addressed to "Starbucks Corporation" at the Latham Plaza address and contained the NLRB certification of the Latham Plaza store's union election.  ROA.802.  In his years working as a shift supervisor at Latham Plaza, Schenk had opened packages and mail addressed to "Starbucks Corporation" at the Latham Plaza address dozens of times and had never once been told to not do so, let alone disciplined.  ROA.147-48.  In fact, when Nick Cain confronted Schenk about opening the letter the following day, Schenk explicitly said "I opened the NLRB one because it was addressed to the store." ROA.152.  Moreover, in the same conversation, Cain requested that Schenk not open mail addressed to the store "in the future" because "I would ask that you not to just in case there's anything legal or anything like that, that I may have to take care of." *Id.*  Schenk then confirmed he would comply with Cain's new instructions for handling mail with potential legal communications when Schenk replied "okay" in response to Cain's statement that he should go into it "first."  ROA.153.

By the time the NLRB certification letter made it to the Latham Plaza store, the contents of the letter were public knowledge for months, and nothing in the communication concerned any private business or confidential information.  In addition, Schenk merely shared the contents of the notification with coworkers, then placed the letter back in its envelope onto the desk of Store Manager Nick Cain to be forwarded to corporate in compliance with Starbucks policy.  ROA.145.

Despite the undisputed contents of the record and in a rather shocking twist, the Administrative Law Judge determined: "The record does not support the notion that shift supervisors were generally authorized to open whatever mail came into the store or, more specifically, that they were authorized to open official business mail sent by government entities and addressed to Starbucks Corporation."  RE.19.  In fact, the record revealed that Starbucks *had* a governing policy entitled "Receipt of Legal Documents" and that Schenk *had not* violated it.  *See* ROA.339-40,351-52. Starbucks now doubles down on the Administrative Law Judge's error by hiding from its own policy documents.  Pet.Br.36 ("The ALJ correctly recognized that opening mail addressed to 'Starbucks Corporation,' from a federal agency, and labeled 'Official Business,' was 'a brazen intrusion into management's prerogatives.'").

Store Manager Nick Cain was aware that Schenk had opened the certification letter as early as August 13, yet Starbucks did not terminate Schenk for its bogus allegations until August 31.  ROA.151-53,749.  In the meantime, workers at five other Capital District Starbucks locations had voted for union representation immediately preceding Schenk's termination in August.  *See* ROA.41.

Starbucks did not terminate a single hourly employee before Schenk's termination at the Latham Plaza store dating back to 2018.  The only comparator evidence Starbucks produced was a Notice of Separation the company issued to a

Store Manager in training—who was still on his probationary period—from July 2022, and who had been found: (1) sexually harassing subordinates; (2) threatening to fight coworkers while at work, (3) swearing on the floor at work, and (4) regularly missing scheduled shifts.  ROA.811.  Rather than comparing the nature of the allegations with those against Schenk, the Administrative Law Judge found Starbucks did not allow profanity at the store.  RE.12  The Administrative Law Judge also appeared not to consider that Starbucks could not produce evidence of a single termination of an hourly worker at Latham Plaza since at least 2018.  RE.12.

## II.    The Underlying Unfair Labor Practice Charges and Proceedings

### A.    The Charges

On June 1, 2022, the Union filed an unfair labor practice charge against Starbucks for various violations of Section 8(a)(1) of the National Labor Relations Act at Stuyvesant Plaza, including unlawfully creating the impression of surveillance.  ROA.438.

On July 11, 2022, the Union filed an unfair labor practice charge against Starbucks for violating Section 8(a)(1) and (3) of the National Labor Relations Act for issuing James Schenk a Final Written Warning in response to union activity and to discourage union activity.  ROA.440.

On July 28, 2022, the Union filed an unfair labor practice charge against Starbucks for violating Sections 8(a)(1), (3), and (5) of the National Labor Relations

Act, for violations including unlawfully creating the impression of surveillance via Kuhnle-Hambster's June 16 investigatory conversation with Schenk, and Starbucks issuing Schenk the July 18 discipline in response to union activity and to discourage union activity.  ROA.442-43.

On August 31, 2022, the Union filed an unfair labor practice charge against Starbucks for violating Sections 8(a)(1), (3), and (5), for the termination of James Schenk done in response to union activity and to discourage union activity, and for not providing the Union pre-implementation notice or an opportunity to bargain.

The National Labor Relations Board General Counsel then issued a Consolidated Complaint to prosecute Starbucks for its violations of the National Labor Relations Act.  ROA.602-620.  A two-day hearing was held at the National Labor Relations Board office in Albany, New York on April 24-25, 2023.  RE.13.

### B.    The ALJ and Board Decisions

On August 25, 2023, Administrative Law Judge Paul Bogas issued his decision, finding Starbucks unlawfully created the impression of surveillance at Stuyvesant Plaza, but dismissing the General Counsel's allegations from Latham Plaza.  RE.13-39.  Of note, the Administrative Law Judge held that the General Counsel "easily" established the prima facie case to prove discriminatory intent under *Wright Line* and its progeny, citing Kuhnle-Hambster's "demonstrated eagerness to terminate Schenk" as particularly strong evidence of animus.  RE.23.

However, the Administrative Law Judge found that Starbucks had met its responsive burden for each of Schenk's disciplines.  RE.23-24.

All parties timely filed Exceptions to the Administrative Law Judge Decision. ROA.915-936.  Starbucks did *not* Except to the Administrative Law Judge's finding that "the Respondent bore animus towards Schenk's protected activity and that the animus was connected to the discipline issued to Schenk."  RE.23; ROA.915-18.

On December 16, 2024, a three-member panel of the National Labor Relations Board issued a Decision and Order affirming the Administrative Law Judge's finding that Starbucks unlawfully created the impression of surveillance at Stuyvesant Plaza, but otherwise overturning the decision, holding Starbucks violated Section 8(a)(1) of the Act by unlawfully creating the impression of surveillance by failing to inform Schenk of how the company retrieved his private Snapchat messages, and that Starbucks violated Section 8(a)(1) and (3) of the Act by issuing a written warning, memorialized coaching, and notice of separation to James Schenk in response to union activity and to discourage union activity.  Of note, the Board held that the Administrative Law Judge filled the evidentiary gaps in Starbucks's responsive case with his own normative judgments, and therefore Starbucks failed to carry its responsive burden under well-established law.  RE.6 ("the Board has repeatedly emphasized that a judge's personal belief that the employer's legitimate reason was sufficient to warrant the action taken is not a substitute for evidence that the

employer would have relied on this reason alone.").

## SUMMARY OF ARGUMENT

Workers United supports the National Labor Relations Board's Decision and Order, including its well-founded positions that: (1) Kuhnle-Hambster unlawfully created the impression of surveillance at Stuyvesant Plaza by increasing her presence, staying for longer periods of time, conducting unheard of one-on-one conversations with workers at the store in view of other employees, and new inquiries into workers' on-the-job tasks; (2) Kuhnle-Hambster unlawfully created the impression of surveillance by questioning James Schenk about his private Snapchat messages with coworkers without revealing how Starbucks had retrieved the messages; and (3) Starbucks unlawfully disciplined and discharged James Schenk in response to union activity and to discourage union activity because "the General Counsel's *Wright Line* showing is unusually well-supported by this record" and Starbucks's responsive case lacks evidentiary support. RE.4.

Substantial evidence supports the finding that Starbucks unlawfully created the impression of surveillance in the immediate wake of the Stuyvesant Plaza Union campaign announcement through District Manager Beate Kuhnle-Hambster's increased presence and conspicuous monitoring of employee activity. As the Administrative Law Judge noted: (1) Kuhnle-Hambster "dramatically increased her presence" at the store in the immediate wake of the announcement; (2) Kuhnle-

29

Hambster conspicuously positioned herself within the store and had one-on-one conversation with workers in view of other staff, something she had not previously done; and (3) two witnesses corroborated the timing and conspicuous nature of Kuhnle-Hambster's presence in the store, whereas her own testimony was "vague." RE.20,14.

Substantial evidence also supports the Board's Decision and Order finding Starbucks violated Section 8(a)(1) by unlawfully creating the impression of surveillance through Kuhnle-Hambster's refusal to provide Schenk an explanation of how the company retrieved his private messages.  First, the Board correctly noted that the private Snapchat group chat was used to discuss union activity with the expectation of privacy from management.  Second, Schenk's messages themselves were protected concerted activity as they explicitly dealt with a primary union grievance over staffing issues at the store.  Third, the Board correctly found that the Administrative Law Judge's reliance on the fact that there was a hand in the photograph provided insight to Schenk that a coworker had provided the messages to Starbucks is unfounded and irrelevant.  The Board also correctly noted that the participants disbanded the group chat soon after Schenk's discipline.

The Board's Decision and Order finding the discipline and discharge of James Schenk violated Section 8(a)(1) and (3) is well-founded.  First, Starbucks did not challenge the Administrative Law Judge's determination that there was direct

evidence in the record of anti-union animus.  Starbucks cannot now challenge that determination.  Moreover, the Board correctly determined there is ample direct and circumstantial evidence in the record proving Starbucks's anti-union animus here, including Store Manager Nick Cain's direct admission that Kuhnle-Hambster was targeting Schenk in the wake of the Union campaign (as well as himself as store manager), in addition to Kuhnle-Hambster's well-documented obsession with terminating Schenk for numerous bogus allegations—including sending a bargaining demand on behalf of the Union.  RE.4.

Second, Starbucks cannot meet its *Wright Line* responsive burden on this record even after the Administrative Law Judge ignored crucial evidence in his decision.  The undisputed facts substantiate the pretextual nature of Schenk's disciplines and discharge from every angle.

The Board correctly determined that substantial evidence proved Schenk's June 27, 2022 Final Written Warning violated Section 8(a)(1) and (3).  First, the Board noted that "Latham employees and managers commonly used profanity without being subject to discipline under that policy."  RE.5.  Second, Schenk and Phelps testified without contradiction that Schenk had used such vulgar language in the store before without repercussion, and that Phelps "didn't even bat an eye" when she read the private Snapchat messages.  *Id.*  Third, Store Manager Nick Cain had previously acknowledged and even joked with workers at the store about Schenk's

common use of profanity, yet Starbucks did not call Cain to refute that testimony. Fourth, the fact that Starbucks did not call Cain when he was the most relevant witness to establish past policy enforcement at the Latham Plaza store supports the Board's adverse inference against Starbucks.  Fifth, Starbucks did not provide subpoenaed documents for in camera inspection to the Administrative Law Judge after claiming attorney-client privilege, further supporting an adverse inference against Starbucks.  Sixth, the Board also correctly noted that it is Starbucks's burden to establish a distinction between the profanity at issue here with that previously accepted by management at the store, and that Starbucks's comparator evidence falls "far short of establishing that [Starbucks] disciplined Schenk pursuant to a consistently applied policy."  RE.6.

The Board also correctly determined that substantial evidence proved Schenk's July 18, 2022 Memorialized Coaching violated Section 8(a)(1) and (3). First, the Board highlighted record evidence that the types of policy violations at issue "were not uncommon" at Latham Plaza and that "the record does not show that the Respondent had ever previously disciplined any Latham shift supervisor for such failures."  RE.7.  As the Board noted, it is Starbucks's burden to demonstrate why Schenk's violations would trigger discipline when other shift supervisors with multiple policy violations on the same shift did not sustain such discipline.

Second, the recording of Store Manager Nick Cain—who was previously

responsible for employee discipline before the Union campaign—in which he said that he "fought against" the discipline as the violations were "one-offs" is a direct admission that Starbucks changed its policy enforcement in the wake of the Union campaign. RE.8n.37. Then, in the face of this recording, Starbucks did not call Cain to testify about his comments to Schenk.

The Board also correctly determined that substantial evidence proved Schenk's August 31, 2022 termination violated Section 8(a)(1) and (3). First, the Board correctly noted that "record evidence supports finding that Latham store shift supervisors were generally authorized to open mail arriving at the store, and no record evidence supports finding that that authorization was limited to exclude certain kinds of mail." RE.8. As the Board found, the undisputed record evidence established that shift supervisors had opened mail at the Latham Plaza store without repercussion for years before the Union campaign.

Second, the Board noted that Store Manager Nick Cain had a conversation with Schenk the day after he opened the letter in which Cain admitted the situation "seemed confusing" and instructed Schenk not to open such mail "in the future." RE.8. It also took Starbucks eighteen days after learning of the alleged infraction to terminate Schenk, during which period workers at numerous other Capital District stores had voted to unionize, in large part due to Schenk's on-the-ground organizing.

Third, the Board correctly noted that Starbucks "has no written policy

governing opening mail and introduced no evidence bearing on the practice at the Latham store." RE.9. Moreover, the Administrative Law Judge improperly ignored relevant record evidence that Starbucks *had* a policy entitled "Receipt of Legal Documents", which Schenk did not only *not violate*, but *complied* with to the letter. This point further underscores the Board's finding that any distinction Starbucks attempts to make regarding "packages" and "mail" is a red herring.

The Board also correctly noted additional points that support the unlawful nature of Schenk's disciplines and discharge. First, the Board noted that under well-established law the Administrative Law Judge is not allowed to substitute his own normative judgments to fill evidentiary gaps in Starbucks's responsive case. Second, the Board correctly drew an adverse inference against Starbucks for its failure to call Latham Plaza Store Manager Nick Cain as a witness, who was still employed at the time of hearing, and who had direct knowledge of relevant evidence (and who was contemporaneously recorded multiple times by General Counsel witnesses during the at-issue period). Third, the Board correctly drew an adverse inference due to Starbucks's refusal to provide relevant documents identified as attorney-client privileged for the Administrative Law Judge's in-camera inspection. Workers United also agrees with the Board that such adverse inferences are not necessary to establish Starbucks's well-documented violations here.

Finally, Workers United supports the Board's ordered remedy here, requiring

34

Starbucks to make Schenk whole for all "direct or forseeable pecuniary harms" caused by Starbucks's unlawful conduct.

## STANDARD OF REVIEW

This Court's review "'of NLRB decisions and orders is limited and deferential.'" *ExxonMobil Rsch. & Eng'g Co., Inc. v. NLRB*, 132 F.4th 337, 344 (5th Cir. 2025 (quoting *In-N-Out Burger, Inc. v. NLRB*, 894 F.3d 707, 714 (5th Cir. 2018)).

The Court "will affirm the NLRB's legal conclusions if they have a reasonable basis in the law and are not inconsistent with the NLRA." *Hudson Inst. of Process Rsch. Inc. v. NLRB*, 117 F.4th 692, 700 (5th Cir. 2024) (internal quote omitted).

The Board's factual findings are reviewed under a "substantial evidence" standard, whereby the Court accepts the Board's findings if supported by "'more than a scintilla' of 'relevant evidence as a reasonable mind would accept to support a conclusion.'" *Sara Lee Bakery Grp., Inc. v. NLRB*, 514 F.3d 422, 428 (5th Cir. 2008) (internal citation omitted). Even where this Court could "'justifiably make a different choice had the matter been before it de novo,' it cannot 'displace the Board's choice between two fairly conflicting views' of the evidence." *ExxonMobil*, 132 F.4th at 344 (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

## ARGUMENT

I.  **THE BOARD CORRECTLY DETERMINED THAT STARBUCKS UNLAWFULLY CREATED THE IMPRESSION OF SURVEILLANCE IN THE IMMEDIATE WAKE OF THE STUYVESANT PLAZA UNION CAMPAIGN.**

Workers United supports the Board's position that substantial evidence proves Starbucks unlawfully created the impression of surveillance at Stuyvesant Plaza in the immediate wake of the Union campaign through Kuhnle-Hambster's increased and conspicuous presence in the store.  R.Br.16-19; RE.14; see also *NCRNC, LLC v. NLRB*, 94 F.4th 67, 75-76 (D.C. Cir. 2024) (finding unlawful surveillance when managerial presence is a "significant departure" from the norm).  Of note, the Administrative Law Judge correctly determined the Board's witnesses "were more credible" than Kuhnle-Hambster's "vague" testimony, that Kuhnle-Hambster's increased presence was tied to the campaign announcement and not to help a new store manager who did not start until several weeks later, and that Kuhnle-Hambster's actions while at Stuyvesant Plaza were a significant departure from past practice—including increased frequency, increased duration, frequent one-on-one meetings with employees, and increased monitoring.

II.  **THE BOARD CORRECTLY DETERMINED THAT STARBUCKS UNLAWFULLY CREATED THE IMPRESSION OF SURVEILLANCE BY KUHNLE-HAMBSTER NOT DISCLOSING TO SCHENK HOW SHE HAD RETRIEVED HIS PRIVATE SNAPCHAT MESSAGES.**

Workers United supports the Board's position that Kuhnle-Hambster violated the Act by failing to disclose how Starbucks had retrieved his private Snapchat

messages.  R.Br.19-22.  The facts are not in dispute, as Starbucks admits Schenk asked how Cain and Kuhnle-Hambster had retrieved the Snapchat messages and that "Kuhnle-Hambster did not reveal" how the company had acquired them.  Pet.Br.9.  Starbucks also does not contest that the chat was used by hourly employees to discuss union matters with the reasonable expectation of privacy from management and that Starbucks did not sanction or control the chat.  Pet.Br.8,47-48.

The Administrative Law Judge dismissed the charge despite citing Board authority which clearly states "unsourced" information tends to cause employees "to speculate as to how the employer obtained the information, causing them reasonably to conclude that the information was obtained through employer monitoring."  RE.34n.24 (citing *David Saxe Prods.*, 370 NLRB No. 103, slip op. at 38-39 (2021)).  To dismiss the charge, the Judge reasoned: "a hand was holding a cell phone that displayed the text messages [which] is consistent with the idea that a recipient had provided copies of the messages to the Respondent, rather than that management had somehow hacked into the group chat and obtained screenshots without the participants' knowledge."  RE.34.

This holding is nonsensical on the facts and the law.  First, as the Board correctly noted: "The record contains two sets of images, only one set of which shows a hand.  Schenk testified that the images which Kuhnle-Hambster showed to him on June 16 were not complete, and the record does not reflect that they included

any images showing a hand." RE.3n.10. Second, again as the Board pointed out: "we do not think the presence or absence of the hand in the images affects whether a reasonable employee would conclude that [Starbucks] obtained the images through its own monitoring of the message group because the hand, in and of itself, gives not information about *who* photographed the messages or for what *purpose*.") (emphasis added). *Id*.

Moreover, Board law is clear that whether Mahoney shared the messages with Cain and Kuhnle-Hambster to report Schenk's language, or for some other reason, is irrelevant to the surveillance analysis. *Promedica Health Sys., Inc.*, 343 NLRB 1351, 1352 (2004), enfd. in relevant part 206 F. App'x 405, 412 (6th Cir. 2006) ( "[Whether a complaint was bade by a coworker] is a distinction without significance. In *Avondale*, as here, the supervisor refused to reveal his source of the knowledge of the union activity. In both circumstances, the refusal to reveal the source could reasonably create the impression that the information was obtained by management surveilling the employee's protected activity.").

Starbucks's alternate position that because the messages refer to Mahoney as "Me" any reasonable employee would have known they were shared with management by Mahoney is not supported, and inapposite under the law. First, Starbucks did not provide a copy of the photographs to Schenk, but merely showed him a copy of the messages to confirm he had sent them. ROA.94-95. There is no

evidence that he had the time or ability to cross-reference the photographs that Cain and Kuhnle-Hambster showed him with the messages on his phone and see who was sending what message at what time. In addition, such cross referencing was impossible, since the messages had been set to delete after 24 hours, so they had been deleted from the app weeks prior. ROA.94-95. Moreover, as the Board notes in its brief, Schenk asked Kuhnle-Hambster how she had retrieved the messages *after* he reviewed them, indicating he did not know the answer. R.Br.21. Second, just because Mahoney is identified as "Me" in the photographs does not speak to the circumstances of her providing the messages—she just as easily could have been coerced into sharing them than by sharing them on her own volition. *Promedica Health Sys., Inc.*, 206 F. App'x 405, 412 (6th Cir. 2006) ("We do not believe, as [the employer] argues, that 'any reasonable employee would understand that [the employer was] simply protecting the confidentiality interests of the complainer.'"); see also *NLRB v. Ky. Tenn. Clay Co.*, 179 F. App'x 153, 161 (4th Cir. 2006).

The Administrative Law Judge's decision is plagued by other irrelevant and inaccurate facts. For one, his decision notes the private group chat was not "primarily" a union chat. RE.17n.15. That is inapposite to the analysis. It is undisputed in the record that the chat was used to discuss union matters and other protected concerted activity—including the at issue messages discussing pertinent staffing concerns—with the reasonable expectation of privacy from management.

Pet.Br.47-48. It does not matter if union advocacy was the primary purpose of the chat or a secondary one. Then, to compound his error, the Administrative Law Judge stated: "the group chat was used primarily as a means for shift supervisors to communicate information to help them run their shifts." RE.17n.15. Neither Schenk nor Phelps testified the chat was "primarily" used as a workplace tool. Rather, both Schenk and Phelps testified to the opposite: it was a "casual conversational group" in which the participants discussed union, workplace, and personal issues. ROA.95,282.

Finally, while the law imposes an objective standard, it also speaks volumes that Siena Phelps testified that in the aftermath of Schenk's discipline, the Snapchat group chat disbanded. ROA.287. As Phelps testified, participants disbanded the chat because they were "nervous about maybe venting or wanting to say something and didn't want to be disciplined for it." *Id.* In other words, Starbucks's disciplining Schenk chilled his coworkers' protected activity.

## III.    THE BOARD CORRECTLY DETERMINED THAT STARBUCKS DISCIPLINED AND DISCHARGED JAMES SCHENK IN RETALIATION FOR HIS UNION ACTIVITY AND TO DISCOURAGE OTHERS FROM ENGAGING IN UNION ACTIVITY.

Workers United supports the Board's position that Starbucks disciplined and discharged Schenk in violation of Section 8(a)(1) and (3). R.Br.22-41. Under the well-established *Wright Line* test, the General Counsel "easily" satisfied its burden based on the "unusually well-supported" record that: (1) Schenk engaged in union

activity; (2) Starbucks was aware of Schenk's union activity; (3) Starbucks harbored animus toward the employee's union activity. RE.23,4; *see also NLRB v. Transportation Management Corp.*, 462 U.S. 393 (1983); *Cordua Restaurants, Inc. v. NLRB*, 985 F.3d 415, 423 (5th Cir. 2021). As the Board correctly determined, Starbucks's responsive case fails in every respect, as it could not produce any relevant evidence of comparable discipline for its alleged policy violations against Schenk, and its own communications and recorded statements confirm that Schenk would not have been disciplined or discharged if he had not engaged in Union activity. RE.5-6,7-8,8-9.

### A.    James Schenk's Union Activity

The Administrative Law Judge and the Board both found that Schenk "was a very active union proponent" before Starbucks issued any of the at-issue disciplines, citing Schenk's signature on the public letter to then-CEO Howard Schultz in March 2022, and his bargaining demand emails in June 2022. RE.23,4. This just scratches the surface of the Union advocacy about which the record shows Starbucks knew during the relevant period.

After the Latham Plaza announcement, Schenk helped Union District Director Emily Vick organize seven additional stores in New York's Capital District. ROA.40. As Vick testified, she and Schenk "would make regular trips into the stores" once the workers publicly announced their campaigns. *Id.* Stuyvesant

Plaza's campaign publicly launched in April 2022, Malta in May 2022, East Greenbush and Niskayuna in June 2022, Clifton Park and Crossgates Mall in July 2022, and New Scotland closed out the Summer going public in September 2022. See *id.*; see also *supra* n.3. As Vick testified, the Capital District organizing campaign "ran really heavy" from March to October 2022. ROA.41.

In April 2018—four years before the Union campaign—Schenk was disciplined with a "Documented Coaching" (Starbucks's lowest level of discipline) for not reporting other employees' use of "obscene phrases" on Starbucks's scheduling cards. ROA.792. On August 31, 2021, Schenk received a Written Warning for an unrelated Time & Attendance issue. ROA.783. Both disciplines were administered *timely* and *only* by the store manager. That is the extent of Schenk's disciplines *over six years of service* to Starbucks, but before Schenk helped organize his coworkers and workers at seven other Capital District Starbucks stores in Spring and Summer 2022. Pet.Br.7.

Then, after Schenk helped organize his coworkers and while he was actively organizing workers at other Albany-area stores, Starbucks issued Schenk three disciplines over a nine-week period for previously-unenforced policies—or for alleged violations that *complied* with Starbucks's policy documents—culminating in his termination. ROA.742,745,749. Numerous Starbucks officials from the *regional* level of the corporation (each Starbucks "region" contains dozens if not hundreds of

stores) weighed in on each of Schenk's disciplines, and District Manager Kuhnle-Hambster administered them. *Id.*; see also ROA.760-63. Kuhnle-Hambster had recommended terminating Schenk for three separate alleged violations *before* Schenk opened the NLRB certification letter—one of which was for sending a bargaining demand email on behalf of the Union. ROA.755,760,769. Rather incredibly, Kuhnle-Hambster wanted to terminate Schenk for sending a bargaining demand email because "the email was about partners of the store *expressing disagreement* about the upcoming store renovation." ROA.755 (emphasis added).

Schenk's disciplines directly coincided with his organizing activity: (1) Starbucks issued Schenk's Final Written Warning after his repeated bargaining demand emails in June 2022; (2) Starbucks issued Schenk's Memorialized Coaching after a surge of Union election petitions in June and July 2022; and (3) Starbucks issued Schenk's Notice of Separation after the Union had won several other elections in the Capital District during August 2022. ROA.41 ("we had five elections, I believe in the month of August").

### B.     Starbucks's Anti-Union Animus

As the Administrative Law Judge and the Board correctly found, anti-union animus, especially against Schenk, is rampant in this record. RE.23,4. Both the Administrative Law Judge and the Board noted Kuhnle-Hambster's "eagerness" to terminate Schenk for a litany of violations and the recording of Cain from *before*

Schenk's termination in which he confirmed Kuhnle-Hambster was targeting Schenk in response to the Union campaign. *Id.* Starbucks did not Except to the Administrative Law Judge's determination that the General Counsel had proved Starbucks's anti-union animus in disciplining and discharging James Schenk, yet now argues against the finding before the Court. RE.4n.21; ROA.915-18; Pet.Br.27-30.

Starbucks makes two statements in support of its new animus argument that are betrayed by the record. First, Starbucks proffers: "Kunhle-Hambster's request to Human Resources [on whether she should terminate Schenk for sending a bargaining demand] noted that there were 'several other cases' concerning Schenk, which undoubtedly referred to his offensive messages from late May." Pet.Br.28. Yet Starbucks's own documents betray this supposition, as Starbucks had two pending "related cases" against Schenk *before* the May 24 conversation occurred— including one that Kuhnle-Hambster herself had initiated into "BAR/SS Concerns" on May 13. ROA.754. To compound this error, Starbucks also misstates that "Kuhnle-Hambster sent the request to Human Resources on June 23, one week after she and Cain delivered the final written warning to Schenk." Pet.Br.28n.3. It is undisputed that Cain and Kuhnle-Hambster did not issue the Final Written Warning to Schenk until June 27, 2022. ROA.386.

Second, Starbucks next attempts to undermine the recorded conversation with

Store Manager Nick Cain in which Cain *confirms* Kuhnle-Hambster is targeting

Schenk for engaging in Union activity *and himself* for letting a Union campaign

begin on his watch, by claiming that "Cain was attempting to reassure Schenk that

Cain was not targeting him by acknowledging that Schenk was under 'stress' that

'makes you miss little things and makes you create little mistakes.'" Pet.Br.29.  The

recording speaks for itself, but it bears repeating the relevant portion of the

conversation:

> MR. SCHENK: I -- I feel -- frankly -- *I feel extremely targeted by Beate [Kuhnle-Hambster]. I am basically waiting at any point to receive my termination.* I feel extremely uncomfortable being at work. I've always been an extremely high standing in any job that I've held.

> MR. CAIN: Mm-hmm.

> MR. SCHENK: And I do not feel that I've been treated fairly by Beate. I know that I haven't been treated fairly by Beate. *I know that she's targeting me and other people who are heavily involved with the Union* campaign because I'm in communication with those people. And so I don't really know how to respond to that because *I know her ultimate goal is to fire me* as well as several other people that I'm aware of. And that's an almost impossible -- like, what would be the word? Is there almost impossible conditions to work under. So –

> MR. CAIN: *Trust me, I know.* Between you and I, as of this is an open, honest, transparent conversation, *I've had the same thing* since February when I had the hernia surgery. I've been on all the write-ups and corrective actions all the way down through and – and having to –

> MR. SCHENK: Well *that's because you're one of the pre-Union* [] *managers*. You've been with the company for a fair amount of time, so you're still sort of, I guess a victim of the past in that *you are trying to do things in the way that Starbucks used to do them.* We're both undesirables.

MR. CAIN: Oh, I felt like it was okay. We were trying -- I -- before I thought it was, ***they were trying to push me out [], take over the store [there] with Beate if you want to know my honest opinion***. I don't know if you guys felt like that at that point.

ROA.127-28 (emphasis added).  Not only is Starbucks's interpretation ridiculous in the face of the recording, but Cain confirms Kuhnle-Hambster's—and by extension Starbucks's—contempt for *managers* of stores that unionize.  In addition, later in the conversation, Cain acknowledges the unlawful nature of the targeting: "I mean they're -- they're going to do what they're going to do, right? Because if it does go there, you're going to go to NLRB with the Union".  ROA.128.  Cain even directly states that he "fought against" Schenk's July 18 discipline.  ROA.125.

As the Board noted here, "the General Counsel's initial *Wright Line* showing is unusually well-supported by this record" due to such powerful evidence.  RE.4.  Moreover, Starbucks *did not even call Cain* to help explain his perspective of the conversation *after* Starbucks had the opportunity to review the recording.  Finally, it is inapposite whether Starbucks has a different interpretation of the recording, since all that matters is that substantial evidence supports the Board's finding.  *Cordua Restaurants,* 985 F.3d at 423 ("We will not disturb the Board's finding of a discriminatory motive even if the record would allow a competing, perhaps even equal, inference of a legitimate basis for discipline") (internal quotations and citations omitted).

### C.     Final Written Warning, June 27, 2022

Workers United supports the Board's position that Starbucks's Final Written
Warning issued to James Schenk on June 27, 2022 violated Section 8(a)(1) and (3).
R.Br.26-35.    Starbucks failed to sustain its responsive burden.    As the Board
correctly noted, Starbucks's burden is to prove it *would* have issued Schenk a Final
Written Warning for the alleged policy infraction, not that it *could* have under its
"How We Communicate" policy.    RE.4-5 (citing *Cadbury Beverages, Inc. v. NLRB*,
160 F.3d 24, 31 (D.C. Cir. 1998)).    Starbucks failed to sustain its responsive burden
because: (1) "Latham employees and managers commonly used profanity without
being subject to discipline under that policy" including the "specific expressions"
Schenk used in the Snapchat messages; (2) Siena Phelps testified such language was
normal in the Snapchat group chat and she "didn't even bat an eye" when she saw
the messages and "saw this as James just venting"; (3) Store Manager Nick Cain
acknowledged Schenk's common use of profanity at the store in the past, even joking
about it with workers; (4) Starbucks did not call Cain to dispute any of Schenk's or
Phelps's testimony, which "warrants an inference, which we draw, that, had Cain
testified, his testimony would have supported finding that [Starbucks] had
previously tolerated by Schenk and others at the Latham store"; (5) Starbucks
withheld documents on attorney-client grounds and did not provide them for in
camera inspection to the Administrative Law Judge, "those documents would not

have contradicted Phelps's and Schenk's testimony about the type and frequency of profanity previously tolerated by [Starbucks] there."; (6) The Judge impermissibly imposed his own normative judgment to fill the evidentiary gaps in Starbucks's case; (7) Starbucks did not establish a legitimate basis for distinction between Schenk's Snapchat messages and other accepted profanity at Latham Plaza; and (8) Schenk's prior 2018 discipline does not establish Starbucks's burden to prove it consistently applied its policy, it rather undermines equal enforcement.  RE.5-6.

In addition to the Board's stated findings, "the record considered as a whole" further supports Starbucks's failure to sustain its responsive burden.  *See Cordua Restaurants,* 985 F.3d at 422 ("the Board's findings of fact are 'conclusive' if they are 'supported by substantial evidence on the record considered as a whole.'") (quoting 29 U.S.C. § 160(e)).

First, Schenk's April 2018 discipline reveals *why* the June 2022 Final Written Warning is discriminatory.  Schenk's prior discipline was a *Documented Coaching* not a Final Written Warning (two steps lower on Starbucks's disciplinary scale).  ROA.792. The elevated discipline along with resuscitating four-year old disciplines proves discriminatory intent.  *See St. John's Community Services of N.J.*, 355 NLRB No. 70 (2010).  Moreover, Starbucks did not produce any evidence that the employees *who had written* the "obscene phrases" on Starbucks's official documents sustained any discipline at the time.

48

Second, the changes in Starbucks's disciplinary procedure also supports a finding of Starbucks's discriminatory intent. *Starbucks Corp.*, 374 NLRB No. 10, slip op. at 5 (Dec. 16, 2024) ("absent proof of a legitimate nondiscriminatory reason, an employer is presumed to act on an unlawful motive when it deviates from its past practices concerning employees after it becomes aware of its employees' organizing activity."). The alleged violations contained in the April 2018 discipline occurred on April 18, 2018, and Schenk was disciplined *only* by Store Manager Verlette Diaz *the following day* on April 19, 2018. ROA.792. Here, Cain received Schenk's Snapchat messages on May 26, 2022, which he then forwarded to Partner Resources on May 27, 2022. Then numerous corporate officials—some from the *regional* level—weighed in on his discipline. ROA.760-63. Starbucks then did not issue Schenk the written warning until June 27, 2022, *over a month* after the Store Manager had learned of the messages.

Third, the record shows Starbucks tolerated similar behavior. Again, Starbucks did not produce any evidence that it had disciplined other employees who had *written obscene statements on Starbucks's official company documents* back in 2018. Moreover, Starbucks' own internal communications explicitly state Cain was not "holding partners accountable previously" for profane language. ROA.760-63. This error is then heightened by the Administrative Law Judge's mischaracterization of Schenk's testimony when he claimed Schenk "bragged" at trial about Cain's

acceptance of his profanity in the workplace.  Schenk merely pointed out the exchange with Cain to reinforce Starbucks's lax past practice in enforcing workplace profanity at Latham Plaza.  ROA.102 ("I mean, I've even had -- Nick has made a joke in the past about, you know, people watching their mouths. Except for James, he's going to, you know, he's going to say what he wants. So I would consider it very casual.").

Fourth, Starbucks's only comparator termination shows Schenk's termination is unprecedented.  First, the only other comparator termination in the record also came *after* the anti-union discriminatory practices went into effect.  Second, the other employee's conduct was egregious, and categorically different than Schenk's, as he was terminated for: (1) sexually harassing subordinates; (2) threatening to fight coworkers while at work, (3) swearing on the floor at work, and (4) regularly missing scheduled shifts.  Third, the other termination was of a Store Manager in training, and not an hourly employee.  Rather than support Starbucks's responsive case, the only other Latham Plaza termination in the record supports the Board's finding here.

### D.    Memorialized Coaching, July 18, 2022

Workers United supports the Board's position that Starbucks's Memorialized Coaching issued to James Schenk on July 18, 2022 violated Section 8(a)(1) and (3). R.Br.35-37.  Starbucks failed to sustain its burden yet again because: (1) "the types of shortcomings mentioned in the memorialized coaching were not uncommon at

the Latham store, and the record does not show that [Starbucks] had ever previously disciplined any Latham shift supervisor for such failures"; (2) Starbucks did not sustain its burden to demonstrate how Schenk's alleged violations "went beyond those ordinarily tolerated when made by other employees"; (3) Store Manager Nick Cain explicitly stated he "fought against" the discipline and labeled the alleged violations as "one-offs" that could have been corrected with a conversation; (4) the Memorialized Coaching relied on Schenk's prior unlawful Final Written Warning, issued just three weeks prior.  RE.7-8.

Additional record evidence undermines Starbucks's responsive case.  First, Starbucks changed the way it administered discipline in response to the Union campaign, running store-level matters up to corporate officials as high as regional management.  ROA.768-69.  Here, if Starbucks had not changed its administration of policy enforcement in response to the Union campaign, Store Manager Nick Cain would not have issued the discipline based on his own recorded—and undisputed—statements.

Second, Starbucks relied on the discipline in terminating Schenk the following month, and therefore the record undermines the Judge's finding that it was a "mild form of discipline".  RE.24; ROA.749.  If the Memorialized Coaching is discriminatory, so is Schenk's termination. *Dynamics Corp.*, 296 NLRB 1252, 1256 (1989), enfd. 928 F.2d 609 (2d Cir. 1991) ("a legitimate basis for discharge or

suspension cannot be established by unlawful disciplinary warnings"). Starbucks's own documentation confirms Starbucks did not consider the discipline "mild", rather the Company terminated Schenk for the alleged infraction. ROA.749.

### E.    Notice of Separation, August 31, 2022

Workers United supports the Board's position that Starbucks's termination of James Schenk on August 31, 2022 violated Section 8(a)(1) and (3). R.Br.38-41. Starbucks failed to prove it would have terminated Schenk if he had not been a Union advocate because: (1) "record evidence supports finding that Latham store shift supervisors were generally authorized to open mail arriving at the store, and no record evidence supports finding that that authorization was limited to exclude certain kinds of mail"; (2) the day after Schenk opened the letter, Cain acknowledged that the situation "seemed confusing" and told Schenk not to open such mail "in the future"; (3) Starbucks "has no written policy governing opening mail and introduced no evidence bearing on the practice at the Latham store"; (4) Starbucks did not call Cain to dispute any of Schenk's or Phelps's testimony about shift supervisors opening mail at the Latham store without discipline or reprimand, which "supports an inference, which we draw, that Cain's testimony would not have contradicted other record evidence that Latham shift supervisors had generally been authorized to open mail prior to Schenk's discipline and that authorization had not excluded certain kinds of mail"; (5) Starbucks relied on Schenk's prior unlawful disciplines to

terminate Schenk on August 31, 2022.  RE.8-9.

The record considered as a whole further establishes the discriminatory nature of Schenk's termination.  First, at the time of Schenk's termination Starbucks *had* a policy called "Receipt of Legal Documents," which does *not* prohibit shift supervisors from opening mail.  ROA.339-40,351-52.  Again, as Starbucks's own witness confirmed, the policy "is addressed to partners generally" and not just to management.  ROA.339.  Moreover, Schenk followed the policy *exactly as written* by putting the letter back in the envelope and placing it on the store manager's desk to ensure the appropriate chain of custody.  ROA.145.

Second, Schenk did *not* open the letter as a Union liaison.  As Schenk testified, he opened the letter along with other mail and packages delivered to the store that day, such as a package with headsets in it, because the letter was addressed to the store.  ROA.145.  There is no dispute that Schenk was working at the time he opened the letter, that Cain was not present in the store, and that when the store manager is not present the shift supervisor oversees the store.  As the recording shows, when Cain spoke with Schenk about opening the letter the following day, Schenk explained his concerns with how Starbucks handled union postings in the past, nothing more.  Inexplicably, the Judge extended Schenk's legitimate challenge to the Company's past practice of removing Union materials from the store as the *reason* he opened the letter, rather than a legitimate challenge to Starbucks's past anti-union

practices and how things needed to change moving forward.

Third, it is inapposite that the letter was marked "official business" or that it was addressed to "Starbucks Corporation." Again, Starbucks's own "Receipt of Legal Documents" policy does *not* prohibit shift supervisors from opening mail, and according to Starbucks's own witness is "addressed to partners generally." ROA.351-52. Moreover, in his conversation with Cain the next day, Schenk *explicitly stated* the reason he opened the letter: "I opened the NLRB one because it was just addressed to the store." ROA.145. [14] There is no reason to suspect Schenk lied in the recording, as it was a casual conversation between himself and Cain with no potential discipline contemplated by either side at the time. Nevertheless, the Judge doubled-down on his mistake, finding "when Cain specifically told Schenk not to open mail that came to the store in the future, Schenk did not agree to abide by that direction, but rather maintained that it was his right to open the Respondent's mail because he was union liaison and lacked 'confidence' that the Respondent

---

[14]     Starbucks's comparison of Schenk's conduct here to that of thieves demonstrates just how far it strains itself to support Schenk's termination here. Pet.Br.36-37. Starbucks cites cases where the at-issue employees: (1) entered management's office after midnight and copied the employer's confidential information and then "admitted that he knew this information to be confidential" and then "copied the evaluations and wage-increase information for his own use", *NLRB v. Brookshire Grocery Co.*, 919 F.2d 359, 361 (5th Cir. 1990); and (2) where an employee had stolen managerial documents from the manager's office and the police were called and conducted an investigation into the theft, *6 W. Ltd. v. NLRB*, 237 F.3d 767, 772 (7th Cir. 2001). The comparison rings hollow.

would share information with him." RE.24. The recording speaks for itself, as Schenk replied "okay" in response to Cain's statement that he is the one to open the mail "first." ROA.153.

Fourth, Starbucks's policy justification for Schenk's termination supports its discriminatory intent. The federal statute Starbucks alleges Schenk violated is entitled "Obstruction of Correspondence." Starbucks misrepresents the statute. The statute is meant to protect the delivery of mail by the United States Postal Service. Once a package is delivered to its intended address—here the Latham Plaza store— the mail is considered delivered, and the statute cannot be violated because it no longer applies. *United States v. Chapman*, 179 F. Supp. 447, 453 (E.D.N.Y. 1959). Therefore, whether Starbucks explicitly authorized Schenk to open the package or not has no bearing on liability under the statute.

Here, the Judge found that Starbucks's stated grounds for Schenk's termination was an "overreach", yet he still found the termination lawful because "Schenk violated a common sense understanding of the Respondent's Standards of Business Conduct[.]". This is an error under the law, because pretextual justifications themselves are evidence of animus. *Renew Home Health v. NLRB*, 95 F.4th 231, 245 (5th Cir. 2024) ("The Board determined that [the employer] unlawfully terminated [the employee] based on her involvement in protected activity and that [the employer's] alleged justification for her termination was pretextual.").

Such animus is even more apparent here because Schenk complied with Starbucks's "Receipt of Legal Documents" policy exactly as written, and so Starbucks concocted a strained reason to terminate Schenk for opening the letter. It is Starbucks's pretextual justification, not the Judge's understanding of common sense, that dictates the appropriate analysis under the Act.

In addition, the timing of the disciplines and discharge in the immediate aftermath of the Union's election victory, *Cordua Restaurants*, 985 F.3d at 426 ("The timing of an employer's actions in relation to an employee's protected activity and the employer's knowledge thereof is a 'significant indicator' of unlawful motive"); the weeks-long delay from each alleged violation to imposition of each discipline, *id.* ("[the employer's] internally inconsistent response to [the employee's] purported misconduct also supports an inference of discriminatory motive"); and Starbucks's other contemporaneous violations of the Act in the Capital District and beyond, *Lucky Cab Co.*, 360 NLRB 271, 274 (2014); all support the determination that Schenk's disciplines and discharge violated Section 8(a)(1) and (3).

## IV.   THE BOARD'S ORDERED REMEDY IS NECESSARY TO EFFECTUATE THE PURPOSES OF THE ACT.

Workers United supports the Board's position on the necessary remedy here to effectuate the purposes of the Act and defers to the Board's expertise in interpreting the statute. R.Br.41-60.

## CONCLUSION

For the foregoing reasons, Workers United supports the Board and respectfully requests the Court enter a judgment denying Starbucks's petition for review and enforcing the Board's Order in full.

Buffalo, New York
September 26, 2025

Respectfully Submitted,

 /s/ Michael Dolce
Michael Dolce
Hayes Dolce LLP
135 Delaware Ave., Ste. 502
Buffalo, NY 14202
mdolce@hayesdolce.com
*Attorney for Intervenor Workers United*

## CERTIFICATE OF SERVICE

I hereby certify that on September 26, 2025, I served the original of the foregoing Brief of Intervenor, Workers United, via the Court's appellate CM/ECF filing system. I further certify that this document was served on all parties or their counsel of record through the appellate CM/ECF system.

/s/ Michael Dolce
Michael Dolce

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of Federal Rule of Appellate Procedure 27(d)(2)(A), because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 12,875 words.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point, Times New Roman.

 /s/ Michael Dolce
Michael Dolce