**No. 24-60649**

# In the United States Court of Appeals for the Fifth Circuit

STARBUCKS CORPORATION,

*Petitioner/Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

*On Appeal from a Decision of the National Labor Relations Board, Nos. 03-CA-296757, 03-CA-299016, 03-CA-302451*

## REPLY BRIEF OF PETITIONER/CROSS-RESPONDENT STARBUCKS CORPORATION

JEFFREY S. HILLER
LITTLER MENDELSON, P.C.
  41 S. High St., Ste. 3250
  Columbus, OH 43215

JONATHAN O. LEVINE
LITTLER MENDELSON, P.C.
  1111 E. Kilbourn Ave., Ste. 1000
  Milwaukee, WI 53202

LISA S. BLATT
  *Counsel of Record*
AMY MASON SAHARIA
CLAIRE R. CAHILL
JASON HOWELL CLAYTON
WILLIAMS & CONNOLLY LLP
  680 Maine Avenue, S.W.
  Washington, DC 20024
  (202) 434-5000
  lblatt@wc.com

*Counsel for Petitioner/Cross-Respondent*

# TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................1
ARGUMENT .........................................................................................2
I.   STARBUCKS LAWFULLY TERMINATED SCHENK'S
     EMPLOYMENT.............................................................................2
     A.   The Board's Animus Conclusion Lacks Substantial
          Evidence...............................................................................2
     B.   The Board's Conclusion That Starbucks Would Not Have
          Disciplined Schenk Absent Animus Lacks Substantial
          Evidence...............................................................................6
          1.   *Starbucks disciplined Schenk for grossly offensive
               messages* ......................................................................7
          2.   *Starbucks coached Schenk for failing to complete
               more tasks than any other partner* ...................................10
          3.   *Starbucks terminated Schenk's employment for
               opening official company mail*...........................................11
     C.   The Board's Adverse Inferences Were Improper ........................14
II.  STARBUCKS DID NOT CREATE AN UNLAWFUL
     IMPRESSION OF SURVEILLANCE.................................................18
     A.   Starbucks Lawfully Confronted Schenk with His Offensive
          Messages.............................................................................18
     B.   Starbucks Lawfully Increased Management Presence at
          the Stuyvesant Store .............................................................21
III. THE BOARD'S DAMAGES REMEDY IS UNLAWFUL....................24
     A.   The *Thryv* Remedy Is Legal Relief...............................................24
     B.   The NLRA Does Not Authorize Compensatory Damages..........26
     C.   The Board's Reading Poses Serious Constitutional
          Concerns..............................................................................29
     D.   This Court Should Reach the *Thryv* Issue ...................................30
CONCLUSION.....................................................................................33

## TABLE OF AUTHORITIES

Page

### CASES

*6 W. Ltd. v. NLRB*, 237 F.3d 767 (7th Cir. 2001) ..........................................11, 12

*800 River Rd. Operating Co. v. NLRB*, 784 F.3d 902 (3d Cir. 2015) ..............20

*3484, Inc. v. NLRB*, 137 F.4th 1093 (10th Cir. 2025)......................................32

*Advoc. S. Suburban Hosp. v. NLRB*, 468 F.3d 1038 (7th Cir. 2006) ...............15

*Agwilines, Inc. v. NLRB*, 87 F.2d 146 (5th Cir. 1936)......................................26

*Airgas USA, LLC*, 373 NLRB No. 102 (Sept. 18, 2024) ...................................31

*Airgas USA, LLC v. NLRB*, 760 F. App'x 413 (6th Cir. 2019)...........................5

*Amalgamated Util. Workers v. Consol. Edison Co.*,
   309 U.S. 261 (1940)......................................................................................25

*Apple Inc. v. NLRB*, 143 F.4th 291 (5th Cir. 2025).................................3, 12, 22

*Asarco, Inc. v. NLRB*, 86 F.3d 1401 (5th Cir. 1996) ...........................................7

*Bill Johnson's Rests. v. NLRB*, 461 U.S. 731 (1983) ........................................28

*Calcutt v. FDIC*, 598 U.S. 623 (2023)..........................................................5, 9, 14

*Cent. Freight Lines, Inc. v. NLRB*, 653 F.2d 1023 (5th Cir. 1981)....................7

*Compania Cervecera de P.R., Inc. v. NLRB*,
   150 F.4th 601 (D.C. Cir. 2025) ....................................................................15

*Ctr. Prop. Mgmt. v. NLRB*, 807 F.2d 1264 (5th Cir. 1987) ...............................12

*D.R. Horton, Inc. v. NLRB*, 737 F.3d 344 (5th Cir. 2013) .................................32

*Fed.-Mogul Corp. v. NLRB*, 566 F.2d 1245 (5th Cir. 1978)..............................20

*Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989).....................................29

*Greater Omaha Packing Co. v. NLRB*, 790 F.3d 816 (8th Cir. 2015) .......20, 21

*Hudson Inst. of Process Rsch. Inc. v. NLRB*,
   117 F.4th 692 (5th Cir. 2024) ......................................................................27

*Indep. Elec. Contractors of Hous., Inc. v. NLRB*,
   720 F.3d 543 (5th Cir. 2013) ..................................................................31, 32

*Int'l Union of Operating Eng'rs v. NLRB (Macy's)*,
   127 F.4th 58 (9th Cir. 2025) ........................................................................24

*Int'l Union of Operating Eng'rs v. NLRB (Macy's)*,
   --- F.4th ---, 2025 WL 2963359 (9th Cir. 2025)..............................24, 28, 29

*Intertape Polymer Corp. v. NLRB*, 801 F.3d 224 (4th Cir. 2015)..............19, 23

*Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351 (6th Cir. 1983) .............................31

*Lawson v. FMR LLC*, 571 U.S. 429 (2014) ........................................................28

Page

Cases—continued:

*Leedom v. Kyne*, 358 U.S. 184 (1958) ....................................................32

*Lhoist N. Am. of Ala., LLC v. NLRB*,
    2023 WL 4679013 (11th Cir. July 21, 2023)....................................5

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ...................27

*Mueller Brass Co. v. NLRB*, 544 F.2d 815 (5th Cir. 1977) ...........7, 10

*N.Y. Paving, Inc. v. NLRB*, 2023 WL 7544999 (D.C. Cir. Nov. 14, 2023) ........5

*Nat'l Licorice Co. v. NLRB*, 309 U.S. 350 (1940)................................30

*NCRNC, LLC v. NLRB*, 94 F.4th 67 (D.C. Cir. 2024) ................21, 23

*NLRB v. AllService Plumbing & Maint., Inc.*,
    138 F.4th 889 (5th Cir. 2025) ....................................................3, 4

*NLRB v. Am. Art Indus., Inc.*, 415 F.2d 1223 (5th Cir. 1969) ..........16

*NLRB v. Arkema, Inc.*, 710 F.3d 308 (5th Cir. 2013)..........................10

*NLRB v. Brookshire Grocery Co.*, 919 F.2d 359 (5th Cir. 1990).....................13

*NLRB v. Chester Valley, Inc.*, 652 F.2d 263 (2d Cir. 1981) ...............15

*NLRB v. Fla. Steel Corp.*, 586 F.2d 436 (5th Cir. 1978)................4, 10

*NLRB v. Int'l Bhd. of Teamsters*, 691 F.3d 49 (1st Cir. 2012) .........6

*NLRB v. Interbake Foods, LLC*, 637 F.3d 492 (4th Cir. 2011) .........17, 18

*NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1 (1937) ..........27, 29

*NLRB v. Ky. Tenn. Clay Co.*, 179 F. App'x 153 (4th Cir. 2006)......................20

*NLRB v. Laborers' Int'l Union*, 748 F.2d 1001 (5th Cir. 1984) ...............27, 28

*NLRB v. Miami Coca-Cola Bottling Co.*, 360 F.2d 569 (5th Cir. 1966)..........28

*NLRB v. Mueller Brass Co.*, 509 F.2d 704 (5th Cir. 1975) ................6

*NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764 (8th Cir. 2013)................32

*NLRB v. Ryder/P.I.E. Nationwide, Inc.*,
    810 F.2d 502 (5th Cir. 1987)................................................7, 9, 13

*NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344 (1953)........................26

*NLRB v. Starbucks Corp.*, 125 F.4th 78 (3d Cir. 2024)..............24, 25

*NLRB v. Strong*, 393 U.S. 357 (1969) ........................................26, 27

*Oil States Energy Servs. v. Greene's Energy Grp.*,
    584 U.S. 325 (2018)...............................................................29, 30

*Phelps Dodge v. NLRB*, 313 U.S. 177 (1941)....................................27

*Power Plant Div., Brown & Root, Inc. v. OSHRC*,
    673 F.2d 111 (5th Cir. 1982)........................................................30

Page

Cases—continued:

*Rockingham Machine-Lunex Co. v. NLRB,*
    665 F.2d 303 (8th Cir. 1981)................................................16
*SEC v. Jarkesy,* 603 U.S. 109 (2024)........................................30
*Space Expl. Tech. Corp. v. NLRB,* 151 F.4th 761 (5th Cir. 2025)..................31
*Starbucks Corp.,* 2023 WL 4363911 (NLRB Div. of Judges July 6, 2023)........4
*Stern Produce Co. v. NLRB,* 97 F.4th 1 (D.C. Cir. 2024) ...................................6
*Tex. World Serv. Co. v. NLRB,* 928 F.2d 1426 (5th Cir. 1991) .........................6
*Thryv, Inc. v. NLRB,* 102 F.4th 727 (5th Cir. 2024)..........................................32
*Tinker Air Force Base v. FLRA,* 321 F.3d 1242 (10th Cir. 2002)....................30
*UAW v. NLRB,* 459 F.2d 1329 (D.C. Cir. 1972)................................................15
*UAW-CIO v. Russell,* 356 U.S. 634 (1958) .....................................................26
*United States v. L. A. Tucker Truck Lines, Inc.,* 344 U.S. 33 (1952) .............30
*Universal Camera Corp. v. NLRB,* 340 U.S. 474 (1951).................................11
*Va. Elec. & Power Co. v. NLRB,* 319 U.S. 533 (1943).....................................25
*W&M Props., Inc. v. NLRB,* 514 F.3d 1341 (D.C. Cir. 2008)..........................30
*Wal-Mart Stores, Inc.,* 352 NLRB 815 (2008).................................................22
*Wright Line,* 251 NLRB 1083 (1980).........................................................*passim*

## CONSTITUTION AND STATUTES

U.S. Const.
    art. III ........................................................................17, 18, 30
    amend. VII.............................................................................29
18 U.S.C. § 1702 .......................................................................13
29 U.S.C. § 160 ...................................................................*passim*
42 U.S.C. § 2000e-5 ..................................................................28

## OTHER AUTHORITIES

*Damages*, Black's Law Dictionary (12th ed. 2024) ...........................................24
1 Dan B. Dobbs, Law of Remedies:  Damages—Equity—Restitution
    (2d ed. 1993)..........................................................................25

## INTRODUCTION

As the ALJ understood, Schenk's egregious misconduct easily justified Starbucks' decision to terminate his employment. The General Counsel's brief confirms the problems with the Board's contrary conclusion. At the first *Wright Line* step—whether discipline was motivated by anti-union animus— the General Counsel ignores that Starbucks first recommended firing Schenk only *after* discovering his misogynistic tirade, and it strains to twist a supervisor's expression of sympathy into a confession of animus. At the second *Wright Line* step—whether Starbucks would have disciplined Schenk irrespective of animus—the General Counsel recharacterizes, then minimizes, Schenk's misconduct and faults Starbucks for failing to identify another employee whose conduct was equally egregious. And the General Counsel's defense of the Board's improper adverse inferences would, if accepted, give the Board boundless discretion to decide, post hoc, any factual issues against employers.

The General Counsel's defense of the Board's surveillance conclusions likewise fails. Addressing the Board's conclusion that Starbucks unlawfully created an impression of surveillance by confronting Schenk with his offensive messages, the General Counsel offers the categorical rule that employers must

divulge the source of information used to investigate workplace misconduct to avoid NLRA liability.  That rule has no mooring in the statute and would undermine employers' efforts to protect accusers.  And like the Board, the General Counsel ignores evidence that Starbucks increased its managerial presence at the Stuyvesant store because the store manager was away on vacation.

Lastly, the Board's *Thryv* order exceeds its statutory authority, and the General Counsel's attempt to prevent this Court from reviewing the order lacks merit.

## ARGUMENT

## I.  STARBUCKS LAWFULLY TERMINATED SCHENK'S EMPLOYMENT

### A.  The Board's Animus Conclusion Lacks Substantial Evidence

The ALJ concluded, and the Board agreed, that animus was a substantial factor in Schenk's discipline and discharge because:  (1) Kuhnle-Hambster "recommended discharging Schenk" after he emailed a bargaining request during his shift; (2) Cain "confirmed" that Kuhnle-Hambster "was targeting Schenk"; and (3) Kuhnle-Hambster unlawfully created an

impression of surveillance at the Stuyvesant store.   RE4, 23.   Each is unsupported.[1]

1. ***Bargaining Request***.   The General Counsel (at 24) concedes that Kuhnle-Hambster first advocated firing Schenk for his offensive messages on June 14, *before* Schenk's bargaining-request email on June 16.   To state the obvious, Schenk's conduct on June 16 cannot have motivated Kuhnle-Hambster to recommend discipline on June 14.[2]   Neither the Board nor ALJ addressed this "evidence from which conflicting inferences could be drawn," requiring vacatur.   *Apple Inc. v. NLRB*, 143 F.4th 291, 300 (5th Cir. 2025) (citation omitted).

---

[1] "[A] party satisfies [Section 10(e)] by raising an argument before the Board *or its agent*," including an ALJ. *NLRB v. AllService Plumbing & Maint., Inc.*, 138 F.4th 889, 902 (5th Cir. 2025).   Starbucks denied that it disciplined Schenk because of his protected activity in its answer; argued that the General Counsel could not meet its step-one burden under *Wright Line*, 251 NLRB 1083 (1980); and contested animus during the hearing.   ROA.422-426, 493, 522-525.   That preserved the issue.   *Contra* Workers United Br. 30-31.

[2] In its opening brief, Starbucks (at 28 n.3) mistakenly stated that Kuhnle-Hambster suggested discharge after *disciplining* Schenk for his offensive messages.   As Workers United points out (at 14-15), she suggested discharge after *confronting Schenk about* his messages (before the discipline).   ROA.92-94, 378-380.   The mistake is immaterial:   Kuhnle-Hambster did not suggest disciplining Schenk for his bargaining request until *after* she suggested terminating him for his messages.

The General Counsel (at 25) suggests that Kuhnle-Hambster displayed animus by "immediately [seeking] the highest possible sanction" every time Schenk violated Starbucks' policies. But the "Board has no authority to sit in judgment on managerial decisions" or to decide whether discipline is "too harsh or too lenient." *NLRB v. Fla. Steel Corp.*, 586 F.2d 436, 444-45 (5th Cir. 1978). The General Counsel had to *prove*, not "simply support an inference," that Kuhnle-Hambster was motivated at least in part by anti-union animus. *AllService*, 138 F.4th at 902-03 (citation omitted). Her desire to terminate Schenk's employment before, during, and after his bargaining-request email proves only that she believed his offensive messages warranted discharge.

Workers United (the Union) (at 5-6, 8-9, 44) attempts to show anti-union animus by flinging baseless accusations at Kuhnle-Hambster based on events elsewhere; for example, it complains (at 6) that she confronted a partner about a text message telling another partner "to spit in a customer's coffee" even though the ALJ in that case *dismissed* the surveillance claim. *Starbucks Corp.*, 2023 WL 4363911 (NLRB Div. of Judges July 6, 2023). It also speculates about earlier investigations into Schenk's conduct. But neither the Board nor the ALJ relied on these accusations (let alone supporting evidence), so the Union's argument violates the "fundamental rule" that courts "must

judge the propriety of [agency] action solely by the grounds invoked by the agency." *Calcutt v. FDIC*, 598 U.S. 623, 624 (2023) (citation omitted).

2. **Cain**.  It was Schenk, not Cain, who asserted on August 1 that Kuhnle-Hambster was targeting him.  Cain responded to Schenk's complaints with a sympathetic "Mm-hmm" and "Trust me, I know"—but never said Starbucks was targeting anyone for union activities.  ROA.126-127.

Cain's responses are nothing like the sort of "direct evidence" of animus courts have recognized.  NLRB Br. 25 (quoting *Airgas USA, LLC v. NLRB*, 760 F. App'x 413, 417 (6th Cir. 2019)).  In *Airgas*, for example, management declared that discipline would change "due to the filing of NLRB charges" and, when questioned about one employee's discipline, retorted that "you filed all these NLRB charges."  760 F. App'x at 418; *see also N.Y. Paving, Inc. v. NLRB*, 2023 WL 7544999, at *1-2 (D.C. Cir. Nov. 14, 2023) (layoff notice stated that union "forced" company's actions); *Lhoist N. Am. of Ala., LLC v. NLRB*, 2023 WL 4679013, at *9 (11th Cir. July 21, 2023) (managers told employee he was suspended "due to his union activity").

If anything, Cain's comments undermine the Board's conclusion by showing equal treatment for managers in non-union settings.  After stating,

"Trust me, I know," Cain cited his own experience following surgery in February—*before* the union campaign launched in late March.  ROA.127.

3. ***Surveillance***.  The General Counsel also (at 24) defends the Board's animus conclusion by arguing that Starbucks created an impression of surveillance at the Stuyvesant store.  As discussed *infra* Part II.B, Starbucks did not.  In any event, "simple animus and general hostility toward the union are insufficient" to meet the General Counsel's burden.  *Stern Produce Co. v. NLRB*, 97 F.4th 1, 12 (D.C. Cir. 2024) (cleaned up).  The ALJ's findings that Kuhnle-Hambster both disciplined Schenk and increased her presence at the Stuyvesant store, RE23, do not demonstrate a "causal relationship" between *Schenk's* union activities and Starbucks' discipline.  *Id.*; *accord NLRB v. Mueller Brass Co.*, 509 F.2d 704, 711 (5th Cir. 1975).

## B. The Board's Conclusion That Starbucks Would Not Have Disciplined Schenk Absent Animus Lacks Substantial Evidence

For each disciplinary action, the ALJ cogently explained why Starbucks would have done the same for any other employee.  The Board's contrary conclusions cannot withstand "critical[]" review.  *Tex. World Serv. Co. v. NLRB*, 928 F.2d 1426, 1430 (5th Cir. 1991); *see also NLRB v. Int'l Bhd. of Teamsters*, 691 F.3d 49, 55 (1st Cir. 2012).

The General Counsel (at 27-28, 35-36, 40-41) insists that *Wright Line* requires Starbucks to identify another employee who committed the same infractions and was similarly disciplined.  That insistence is wrong.  "The essence of discrimination" is "in treating *like* cases differently."  *Mueller Brass Co. v. NLRB*, 544 F.2d 815, 819 (5th Cir. 1977) (emphasis added).  Accordingly, disciplining an employee for conduct that has not "occurred before" does not mean that an employer has "failed to meet its *Wright Line* burden."  *NLRB v. Ryder/P.I.E. Nationwide, Inc.*, 810 F.2d 502, 508-09 (5th Cir. 1987); *see also Cent. Freight Lines, Inc. v. NLRB*, 653 F.2d 1023, 1027 (5th Cir. 1981) (that employee is the first to be punished for particular misconduct is "of no moment"); *Asarco, Inc. v. NLRB*, 86 F.3d 1401, 1410 (5th Cir. 1996) (an employee "is not insulated from discharge simply because he is the first" to commit specific infractions).  The Board's decision flouts this principle for each form of discipline.

### 1.  *Starbucks disciplined Schenk for grossly offensive messages*

Both the General Counsel and Union continue to describe Schenk's intolerant, misogynistic tirade "simply as profanity, as if all uses of profanity in the workplace are the same."  RE23.  The ALJ rightly concluded:  "They

are not."  RE23.  That principle, which this Court has repeatedly recognized, *see* Starbucks Br. 31-32, requires vacatur.

Contrary to the General Counsel's contentions (at 26-27), the Board did not recognize the severity of Schenk's misconduct when it (in passing) denied condoning Schenk's "use of profanity" and (in a footnote) said it was "assuming that Schenk's profanity" could justify discipline.  RE6, 7 n.34.  Like the rest of the Board's decision, these passages improperly minimize Schenk's misconduct.

The General Counsel next (at 27 n.8) asserts that the Board rightly relied on Schenk's testimony that "[t]hat level of profanity is pretty common," ROA.203, even though the ALJ found him "melodramatic" with "a financial interest in the outcome of this litigation," RE14 n.4.  At any rate, even if he were credible, neither Schenk's testimony nor anyone else's established that Starbucks *knowingly* tolerated supervisors' rants about their "dumb fuc[k]ing bitch" subordinates.  ROA.799.

The General Counsel also (at 27-28) contends that Starbucks failed to show a "sliding scale" policy that considered the severity of Schenk's "language."  Again, it is not the Board's job to police common-sense distinctions between profane language and targeted, misogynistic insults.

8

That Schenk was, as far as the record shows, the first shift supervisor to direct such offensive attacks at a subordinate does not immunize him from discipline. *Ryder/P.I.E.*, 810 F.2d at 508-09.

Regardless, the General Counsel misunderstands the record. When issuing Schenk's final written warning, Kuhnle-Hambster mentioned "the severity of" his language. ROA.105-106. And when discussing Schenk's offensive messages, Human Resources employee Althea Williams reported that even if some profanity had been tolerated previously, Kuhnle-Hambster was "confident that [Schenk] *is the only partner using this type of language*." ROA.757 (emphasis added).[3]

The Union (at 49) suggests that the amount of time between Schenk's offensive messages and his discipline supports the Board's decision. The Board made no such finding. *See Calcutt*, 598 U.S. at 624. Starbucks used that time to thoroughly and conscientiously investigate the incident, including by meeting with Schenk on June 16. ROA.92-94, 378-380. The gap between the

---

[3] The General Counsel (at 28) also quips that, if the Board's decision was so flawed, Starbucks should have sought reconsideration. Tellingly, it cites no authority requiring such a step. Starbucks appropriately sought this Court's review.

chat and the eventual discipline was nothing like those courts have found suspicious. *See NLRB v. Arkema, Inc.*, 710 F.3d 308, 322 (5th Cir. 2013).

### 2. *Starbucks coached Schenk for failing to complete more tasks than any other partner*

The General Counsel (at 35) admits that no other shift supervisor left as many closing tasks undone in a single shift. Accordingly, Schenk was not "like" other employees who were not disciplined for missing fewer tasks. *Mueller Brass*, 544 F.2d at 819. The General Counsel (at 36) retorts that Starbucks had to justify treating four tasks differently than some other number. But whether coaching employees for missing four tasks but not three is "too harsh or too lenient" is not for the Board to decide. *Fla. Steel*, 586 F.2d at 444-45.

Regardless, Schenk was the only shift supervisor to miss four tasks *while on final written warning*. Although the General Counsel (at 37) faults Starbucks for relying on "a daisy chain of unlawful disciplines," it does not dispute that if the final written warning was lawful, the coaching was as well.

Nor can Cain's sympathetic comments to Schenk support the Board's decision. Whether Cain thought Schenk's failure to complete four tasks was a "one-off" says nothing about whether discipline was *selectively enforced*. Indeed, Cain confirmed to Starbucks that "there ha[d]n't been closing

violation[s] this large." ROA.768-769. Treating Cain's expression of sympathy as an admission of guilt "would send the wrong message to employers." *6 W. Ltd. v. NLRB*, 237 F.3d 767, 779 (7th Cir. 2001). The General Counsel points to Cain's comment that one-offs are "what [Kuhnle-Hambster] is going to be looking for." ROA.125. But the Board did not rely on this evidence, and the General Counsel speculates when it claims (at 36) Cain meant that "Kuhnle-Hambster was changing the rules for tolerable mistakes … for Schenk."

### 3. *Starbucks terminated Schenk's employment for opening official company mail*

When caught opening mail addressed to Starbucks from a federal agency, Schenk responded: "I am the Union liaison with the store. … I don't have a lot of confidence that I will receive that communication if I need it." ROA.151. The ALJ, who "observed the witnesses and lived with the case," *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496 (1951), concluded that Schenk's belated testimony that he believed he could open mail as shift supervisor was "not credible, facially or on the record here," RE19. Yet the Board, despite purporting to affirm the ALJ's credibility findings, RE1 n.1, embraced Schenk's testimony to conclude that shift supervisors routinely opened company mail.

11

The General Counsel (at 39-40) asserts that Schenk's initial, union-related justification for opening mail is "distinct from, and not inconsistent with," his later testimony. The ALJ concluded otherwise, and the Board never explained why it disagreed. The Board never addressed Schenk's initial justification *at all*, blithely calling it "not relevant." RE8 n.41. The Board's unexplained rejection of the ALJ's credibility findings and equally unexplained refusal to consider conflicting evidence require vacatur. *See Ctr. Prop. Mgmt. v. NLRB*, 807 F.2d 1264, 1268-69 (5th Cir. 1987); *Apple*, 143 F.4th at 300.

Nor did Cain's request, "Could you in the future not open" mail, ROA.151, mean that Schenk's actions were permitted before then. *Contra* NLRB Br. 38. Telling a person not to commit an offense again does not mean the offense was previously acceptable. The General Counsel's contrary argument defies "logical reasoning and common sense." *6 W. Ltd.*, 237 F.3d at 778.

The General Counsel's claim (at 38) that another partner confirmed Schenk's belated excuse that "shift supervisors [opened mail] routinely" misstates the record. That partner testified that she was "unaware to who those packages or mailers" she had seen supervisors open "were addressed."

ROA.306.   Even the Board called this testimony "uncertain[]," yet faulted Starbucks for failing to identify another employee disciplined for opening company mail.   RE8-9.   But, again, that Schenk was the first to commit such "a brazen intrusion into management's prerogatives," RE24, does not mean that Starbucks "failed to meet its *Wright Line* burden," *Ryder/P.I.E.*, 810 F.2d at 508-09.[4]

Moreover, even assuming shift supervisors *were* sometimes permitted to open mail, Schenk's stated intent in doing so was to surreptitiously obtain Starbucks' information.   Starbucks may appropriately distinguish between employees who open supplies "shipped to the store [] from other stores or from warehouses," ROA.306, and those "who abuse positions of trust," *NLRB v. Brookshire Grocery Co.*, 919 F.2d 359, 365 (5th Cir. 1990).   Schenk's separation notice recognized this distinction (*contra* NLRB Br. 40-41), stating that Schenk opened "Company mail" without being "authorized" to do so, and that he "admitted" that "he knew the letter was not intended for him and that he opened it because he wanted to know what it contained."   ROA.749.[5]

---

[4] And Schenk was certainly the first shift supervisor on a final written warning to open Starbucks' official mail.   Starbucks Br. 39-40.

[5] The ALJ's conclusion did not turn on whether Schenk violated 18 U.S.C. § 1702.

13

For its part, the Union (at 53) hypothesizes that Schenk was trying to forward the Board's letter to Starbucks headquarters (after showing it to his co-workers) and thereby comply with a company policy that is not in evidence. The Board made no such findings so, again, the Union's argument cannot sustain the Board's decision. *See Calcutt*, 598 U.S. at 624.

### C.    The Board's Adverse Inferences Were Improper

With or without the adverse inferences, the record demonstrates that Starbucks would have disciplined and fired Schenk notwithstanding his protected activities.  Regardless, the inferences were improper.

1. ***Cain***.  As Starbucks explained (at 43-44), no adverse inference may be drawn against a party when either side could have called a witness or the party reasonably believed no further evidence was necessary.  The General Counsel's primary rebuttal (at 30) is that Starbucks had the burden at *Wright Line*'s second step, so the General Counsel had no reason to call Cain but Starbucks did.  But Starbucks and the General Counsel both declined to call Cain *before the ALJ decided either prong of Wright Line*.  Neither party knew then how the ALJ would decide the *Wright Line* steps.  The Board was "not free to arbitrarily declare that it will accept the plausible inference against" Starbucks "but not the equally plausible and counterbalancing inference

14

against" the General Counsel. *Advoc. S. Suburban Hosp. v. NLRB*, 468 F.3d 1038, 1049 & n.8 (7th Cir. 2006).

The General Counsel did not argue before the ALJ, and the ALJ did not find, that evidence regarding Schenk's offensive messages or opening Starbucks' mail was missing, nor that Cain's input was needed on those questions. Starbucks had no reason to believe it was withholding essential testimony, and no inference may be drawn. *NLRB v. Chester Valley, Inc.*, 652 F.2d 263, 271 (2d Cir. 1981); *UAW v. NLRB*, 459 F.2d 1329, 1338 (D.C. Cir. 1972).

What is more, the General Counsel offers no limiting principle on the Board's discretion to draw inferences after evidence closes and the ALJ rules. On the General Counsel's logic, the Board could have declared that Cain's testimony would have resolved every disputed factual issue. But "[a]n adverse inference is specific to a particular disputed fact and cannot be tantamount to a directed verdict or resolution of the whole dispute." *Compania Cervecera de P.R., Inc. v. NLRB*, 150 F.4th 601, 613 (D.C. Cir. 2025) (citation omitted) (refusing "sweeping" inference even where non-testifying witness had "personal knowledge of all the facts"). The General Counsel's reasoning would require parties "to call every witness on every conceivable issue relevant" to

avoid open-ended, retroactive adverse inferences. *Rockingham Machine-Lunex Co. v. NLRB*, 665 F.2d 303, 305 (8th Cir. 1981).

2. ***Documents***.  The General Counsel offers no justification for its view that the Board has an unlimited right to decide factual issues via adverse inference.  Its cited cases involved targeted discovery sanctions in response to withheld information needed to prove a specific disputed fact, not blank checks to resolve any issue against the withholding party.  In *NLRB v. American Art Industries, Inc.*, for example, everyone knew the withheld documents would have revealed the size of the bargaining unit.  415 F.2d 1223, 1229-30 (5th Cir. 1969).  Because the General Counsel was forced to prove that fact through secondary evidence, when the employer later tried to contradict that evidence, this Court held the ALJ had "little choice but to refuse to admit" the employer's evidence "to maintain the integrity of the hearing process." *Id.*

Here, the General Counsel did not tell the ALJ that it needed the privileged documents to rebut Starbucks' evidence on Schenk's profanity.[6]  In fact, the General Counsel refused to advance any argument "about the contents of the withheld documents" or request any specific adverse inference.

---

[6] The General Counsel again (at 34) points to the burden of proof even though the ALJ had not yet decided either prong of *Wright Line*.

RE13 n.1. The ALJ accordingly did not draw any. Only after the ALJ ruled for Starbucks did the General Counsel request (and the Board draw) an inference on the issue of profanity. This Court should not countenance that transparently unfair procedure.

In any event, the Board lacked authority to sanction Starbucks. When Starbucks declined to produce the privileged documents, it cited decisions by the Fourth, Sixth, and Ninth Circuits holding that only Article III courts can enforce NLRB subpoenas, impose discovery sanctions, or require in camera production. ROA.310-314; *contra* NLRB Br. 32 (asserting that Starbucks "offered no reason"). Any other rule would "amount to no less than an improper delegation of Article III power to the ALJ." *NLRB v. Interbake Foods, LLC*, 637 F.3d 492, 500-01 (4th Cir. 2011). This Court should agree.

The General Counsel retorts (at 33) that the Board may draw adverse inferences whether or not it can enforce subpoenas. The Board's *reason* for drawing an adverse inference, however, was Starbucks' refusal to produce documents in camera. RE5-6. If the ALJ had no authority to compel Starbucks, then the Board's adverse inference punished Starbucks for exercising its constitutional rights—precisely the sort of "abuse of the

subpoena power" that Article III "protects against." *Interbake Foods*, 637 F.3d at 498.

## II.    STARBUCKS DID NOT CREATE AN UNLAWFUL IMPRESSION OF SURVEILLANCE

### A.    Starbucks Lawfully Confronted Schenk with His Offensive Messages

1.    The General Counsel incredibly asserts (at 20) that the NLRA "requires [employers] to explain, upon request, how they obtained the[] information" used "to investigate workplace misconduct" to avoid being charged with unlawful surveillance.  That position represents a remarkable intrusion into employers' disciplinary investigations.  Nothing in the NLRA's text requires that bright-line rule.

The implications of the General Counsel's proposed rule are staggering.  If the NLRA requires employers to divulge the sources of misconduct investigations whenever union activity is afoot, employees will be unable to complain anonymously and accusers will be exposed to retaliation.  Despite the General Counsel's protestations, investigating workplace misconduct will be far more difficult.  Under the guise of protecting labor, the General Counsel would have this Court make workers less safe.

As the ALJ rightly found after hearing all the evidence, it was "obvious" that another member of the group chat shared Schenk's offensive messages with management. RE20. Kuhnle-Hambster and Cain showed no awareness of any other messages in the chat, let alone those concerning union activities. And the photographs of Schenk's tirade showed the names of each chat member except for "Me"—Mahoney, who reported Schenk's messages. ROA.796-797, 799.

The General Counsel (at 21) asserts that if the messages' source was obvious, then Schenk would not have asked. But the relevant question is what a reasonable employee would have understood—not whether Schenck himself immediately came to the obvious conclusion. *See Intertape Polymer Corp. v. NLRB*, 801 F.3d 224, 236 (4th Cir. 2015). No reasonable employee would conclude that Starbucks hacked employees' private chat messages.

The General Counsel (at 21) speculates that Mahoney reported Schenk's messages because she was spying for Starbucks; the Union (at 39) speculates that she may have been forced to do so. But the General Counsel had the burden to *prove*, not hypothesize, that Starbucks' conduct would cause a reasonable employee to believe union activities were being surveilled. Here, "the only surveillance and impression of surveillance … was in the mind of"

the Board, "without any adequate support in the record as a whole." *Fed.-Mogul Corp. v. NLRB*, 566 F.2d 1245, 1252 (5th Cir. 1978).

2.    Even *actual* surveillance of union activities is lawful absent "a tendency to coerce," because an employer has a "right to non-coercively gather information, even about union activities." *Greater Omaha Packing Co. v. NLRB*, 790 F.3d 816, 823 (8th Cir. 2015) (citation omitted).    There is no evidence that Starbucks' confronting Schenk with his offensive messages would tend to coerce *union activity*.

The General Counsel (at 20) invokes the Board's reliance on another partner's testimony that employees stopped using the group chat because they feared discipline.    Yet that partner never suggested that partners feared discipline *for protected activities*.    Nor did the Board find that any such fear was reasonable.

The General Counsel dodges this requirement by relying on decisions in which employers confronted employees *about their union activities* without revealing their sources.    *E.g.*, *800 River Rd. Operating Co. v. NLRB*, 784 F.3d 902, 917 (3d Cir. 2015) (employee told "watch [your] back" and "keep your views about the Union 'under wraps'"); *NLRB v. Ky. Tenn. Clay Co.*, 179 F. App'x 153, 157-58, 161 (4th Cir. 2006) (supervisor told employee he "had heard

that [employee] was trying to change the way [supervisor] was doing things" and "did not like [employee's] interference"); *see also* Starbucks Br. 49 (collecting additional cases). "In that context … it is often reasonable to infer" coercion. *Greater Omaha*, 790 F.3d at 824. Not so here, where Starbucks confronted Schenk only about his offensive messages.

### B. Starbucks Lawfully Increased Management Presence at the Stuyvesant Store

1. "The key" to a conclusion of unlawful surveillance "is the employer's reason for being in a particular place at a particular time." *NCRNC, LLC v. NLRB*, 94 F.4th 67, 75 (D.C. Cir. 2024) (citation omitted). Kuhnle-Hambster's reason for increasing her presence at the Stuyvesant store was to support (1) its troubled former manager, Hedge; and (2) the store's new manager, Barkman—particularly when Barkman went on vacation, leaving the store without a manager. Starbucks Br. 52-53. Any increased presence was not "unexplained and unjustified," and so lawful. *NCRNC*, 94 F.4th at 75.

The General Counsel (at 16-17) argues that Starbucks cannot rely on this explanation because the ALJ found Kuhnle-Hambster less credible than other witnesses. But the ALJ did not discount *Barkman's* testimony offering the same explanation. ROA.325-329. The ALJ, Board, General Counsel, and Union all conspicuously ignore(d) Barkman's testimony that Kuhnle-

Hambster again increased her presence when Barkman was absent in April 2023, long after the Union campaign.[7]   ROA.329.   The General Counsel's failure to address this conflicting evidence is particularly striking given that the General Counsel never alleged any increased management presence at the nearby Latham store where Schenk worked, despite the union campaign at that store that same spring.   ROA.35; *see Apple*, 143 F.4th at 300.

The General Counsel also defends the unlawful surveillance conclusion with another proposed bright-line rule, insisting (at 18 n.4) that Starbucks needed to explain the reason for Kuhnle-Hambster's increased presence to its partners.   That intrudes on employers' lawful management decisions; the NLRA does not require employers to tell employees that a store manager is struggling and needs extra help.   At any rate, a reasonable employee would know their manager was away on vacation and see Kuhnle-Hambster's temporary presence "as a stopgap assignment … of a sorely needed manager rather than as an effort to surveill [sic] their union activity." *Wal-Mart Stores, Inc.*, 352 NLRB 815, 817 (2008).

---

[7] The General Counsel asserts (at 18) there is no evidence that Kuhnle-Hambster's presence continued after the election on June 7.  But Barkman returned from vacation on June 5.  ROA.328.

2. Separately, the General Counsel failed to prove coercion, and its belated attempts here are unpersuasive. Starbucks did not "nitpick[]" the Board's use of "restrain" instead of "coerce." *Contra* NLRB Br. 19. Rather, Starbucks observed that the only evidence related in any way to coercion was the vague testimony of two partners that they felt "uncomfortable" discussing the Union in Kuhnle-Hambster's presence. ROA.53, 270.

Their testimony does not prove that Kuhnle-Hambster's increased presence *coerced* these employees—just that they, like many employees, felt uncomfortable discussing union issues in front of management. "If a union wishes to organize in public it cannot demand that management must hide." *NCRNC*, 94 F.4th at 73 (citation omitted). An employer's "ability to observe employees[']" union activities "is insufficient to render" the employer's conduct coercive. *Intertape Polymer*, 801 F.3d at 239. One partner's subjective belief that the Union was "nothing you really wanted to discuss with your manager," ROA.270, does not require Starbucks to cede the workplace.

The General Counsel (at 16, 18) hints at more detailed findings of coercion, suggesting that Kuhnle-Hambster made veiled threats to these two partners about the effects of unionizing. ROA.53-57, 270-271. But the ALJ concluded—and the Board affirmed—that Kuhnle-Hambster did *not* coerce

employees or threaten a loss of benefits in these conversations. RE1 n.2, 15-16, 20-21. The General Counsel's resort to rejected allegations betrays the lack of evidence supporting the Board's surveillance conclusion.

## III. THE BOARD'S DAMAGES REMEDY IS UNLAWFUL

The Board's damages remedy exceeds its statutory authority and violates the Constitution, and Section 10(e) does not bar review.

### A. The *Thryv* Remedy Is Legal Relief

The General Counsel insists that *Thryv* relief is "equitable" because it is "analogous to 'a backpay order.'" NLRB Br. 54 (quoting *Int'l Union of Operating Eng'rs v. NLRB* (*Macy's*), 127 F.4th 58, 83 n.12 (9th Cir. 2025), *reh'g denied*, --- F.4th ---, 2025 WL 2963359 (9th Cir. 2025)). But the NLRA authorizes courts to award backpay alongside reinstatement only because the former is "based on what an employer has wrongfully withheld from an employee," and so is "an integral part of an equitable remedy, a form of restitution." *NLRB v. Starbucks Corp.*, 125 F.4th 78, 96 (3d Cir. 2024) (citation omitted); *see also Macy's*, 2025 WL 2963359, at *34-36 (R. Nelson, J., dissenting from denial of reh'g en banc) (endorsing *Starbucks*). By contrast, payment for "direct or foreseeable pecuniary harms" is "compensation for loss or injury." *Damages*, Black's Law Dictionary (12th ed. 2024); RE10.

The General Counsel (at 51-55) responds that the "purpose" of both remedies is to "restore the status quo." Not so. Whereas restitution remedies like backpay "measure[] the remedy by the defendant's [unjust] gain," damages "measure[] the remedy by the plaintiff's loss and seek[] to provide compensation for that loss." 1 Dan B. Dobbs, Law of Remedies: Damages—Equity—Restitution 369 (2d ed. 1993). Backpay is restitutionary—it prevents an employer from profiting from the unlawful discharge—and thus equitable. *See Starbucks*, 125 F.4th at 96. Compensatory damages are not.

Nor does the *Thryv* remedy differ from damages because it "vindicate[s] public, not private rights." NLRB Br. 54 (quoting *Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 543 (1943)). In *Virginia Electric*, the Supreme Court approved a refund of mandatory union dues *deducted from employee wages*. 319 U.S. at 537-42. The refund was "a form of restitution" that "provided workers with the benefits of their employment contacts in a way that likely fell under the umbrella of a backpay award." *Starbucks*, 125 F.4th at 96 (cleaned up). And *Amalgamated Utility Workers v. Consolidated Edison Co.* held only that the NLRA provides no private right of action to enforce a Board order through contempt proceedings. 309 U.S. 261, 266 (1940).

### B.    The NLRA Does Not Authorize Compensatory Damages

The NLRA's text limits the Board to equitable remedies, not legal remedies like compensatory damages.   Section 10(c)'s lone example of "affirmative action"—"reinstatement of employees with or without backpay"—is classic equitable relief.

The General Counsel (at 46-48) asserts that the NLRA authorizes virtually *any* remedy the Board believes would "effectuate the policies of the Act." That is plainly wrong:  The NLRA does "not establish a general scheme authorizing the Board to award full compensatory damages." *UAW-CIO v. Russell*, 356 U.S. 634, 643 (1958); *see also Agwilines, Inc. v. NLRB*, 87 F.2d 146, 151 (5th Cir. 1936) (NLRA "may not be construed as establishing" a "right to damages").   Section 10(c) limits the Board to "*affirmative action* … as will effectuate the policies of [the NLRA]."  29 U.S.C. § 160(c) (emphasis added). Compensatory damages are not "affirmative action."

The phrase "affirmative action" is not, as the General Counsel (at 50) puts it, a mere "label."  It is a statutory limitation on the Board's authority. The NLRA gives the Board discretion only with respect to remedies "within the scope of its authority."  *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 348 (1953); *accord NLRB v. Strong*, 393 U.S. 357, 358 (1969) (discretion where

NLRB acts "within its powers"). Nothing in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024), requires deference to the Board's sweeping view of its remedial power. *Contra* NLRB Br. 46 n.17. Rather, this Court interprets the NLRA "independently," with no deference to the Board's legal conclusions. *Hudson Inst. of Process Rsch. Inc. v. NLRB*, 117 F.4th 692, 700 (5th Cir. 2024) (citation omitted).

Cases cited by the General Counsel are not to the contrary. *Phelps Dodge v. NLRB* recognized the Board's discretion to select *equitable* relief even if unavailable "in ordinary private controversies." 313 U.S. 177, 188 (1941). Other authorities (at 50-51) merely observed that the Board's power is not unlimited or involved disputes over the calculation of backpay. And contrary to the General Counsel's insistence (at 52), *NLRB v. Jones & Laughlin Steel Corp.* held only that backpay was "incident[al]" to equitable reinstatement—unsurprising, since backpay involves returning what employers improperly withheld. 301 U.S. 1, 48 (1937).

The General Counsel's claim (at 47-48) that courts have approved "[m]yriad forms of make-whole relief beyond backpay" is not supported by its citations. In *NLRB v. Laborers' International Union*, the employer *stipulated* that certain medical expenses would be covered as part of a backpay

27

award.  748 F.2d 1001, 1005-06 (5th Cir. 1984).  *NLRB v. Miami Coca-Cola Bottling Co.* was about deducting interim earnings from a backpay award.  360 F.2d 569, 573 (5th Cir. 1966).  And *Bill Johnson's Restaurants v. NLRB* spoke in dicta about reimbursing employees for defending a lawsuit later enjoined as an unfair labor practice, not a freestanding right to compensation.  461 U.S. 731, 747 (1983).

Finally, Title VII decisions underscore Section 10(c)'s limitation to equitable relief.  Starbucks Br. 58-59; *accord Macy's*, 2025 WL 2963359, at *37-38 (R. Nelson, J., dissenting from denial of reh'g en banc).  The General Counsel (at 49) argues that Title VII and Section 10(c) are not "similarly constrained" because Title VII, unlike Section 10(c), permits "other equitable relief."  By authorizing "*other* equitable relief," however, Congress signaled that the preceding relief—"such affirmative action as may be appropriate"— is also equitable.  *See* 42 U.S.C. § 2000e-5(g)(1) (emphasis added).  And although the General Counsel (at 50) observes that few cases invoke Title VII to interpret the NLRA, courts routinely read "parallel text" "consistently" across statutes.  *E.g.*, *Lawson v. FMR LLC*, 571 U.S. 429, 459 (2014).

### C.    The Board's Reading Poses Serious Constitutional Concerns

Constitutional-avoidance principles counsel strongly against *Thryv*. Starbucks Br. 59-60; *accord Macy's*, 2025 WL 2963359, at *38-41 (R. Nelson, J., dissenting from denial of reh'g en banc).  The General Counsel (at 56-59) argues that, because the Board adjudicates rights created by statute, its proceedings involve public rights no matter the relief at issue.  That is doubly incorrect.  *First*, congressionally created rights are not exempt from the Seventh Amendment.  Courts still must examine the "nature" of the proceeding to determine whether agencies are impermissibly adjudicating private rights. *Oil States Energy Servs. v. Greene's Energy Grp.*, 584 U.S. 325, 340 (2018) (citation omitted); *see also Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 52 (1989).

*Second*, the General Counsel (at 59) sidesteps "the type of relief at issue," arguing incorrectly that *Jones & Laughlin* exempted Board orders from the Seventh Amendment.  *Jones & Laughlin* held only that a specific case involving reinstatement with backpay was "not a suit at common law or in the nature of such a suit." 301 U.S. at 48.  It did not authorize the Board to adjudicate other types of relief, and the Court consistently looks to the type of relief at issue to determine whether the jury-trial right is implicated. *See, e.g.*,

*Oil States*, 584 U.S. at 341 (revoking patents); *SEC v. Jarkesy*, 603 U.S. 109, 123-25 (2024) (SEC civil penalties akin to legal damages); *Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 362-63 (1940) (NLRB cease-and-desist orders or "affirmative remedial action"). *Thryv* requires employers to pay damages—a quintessential legal remedy that is the province of Article III courts and juries.

### D.     This Court Should Reach the *Thryv* Issue

Extraordinary circumstances justify reaching the *Thryv* issue.

1.   It would have been futile to raise *Thryv* before the Board.  The General Counsel (at 43-44) contends that *United States v. L. A. Tucker Truck Lines, Inc.*, 344 U.S. 33 (1952), forecloses a futility exception to Section 10(e). But *L. A. Tucker* "stands for the proposition that a party may not consider it to be futile to lodge an objection before an administrative body *simply because the body has precedent which contradicts the party's position*." *Tinker Air Force Base v. FLRA*, 321 F.3d 1242, 1248 (10th Cir. 2002) (emphasis added) (cited at NLRB Br. 44 n.16); *accord Power Plant Div., Brown & Root, Inc. v. OSHRC*, 673 F.2d 111, 115 (5th Cir. 1982).

Starbucks' futility argument is not based just on the adverse *Thryv* precedent, but on the Board's consistent, repeated refusal to reconsider *Thryv*. *See W&M Props., Inc. v. NLRB*, 514 F.3d 1341, 1346 (D.C. Cir. 2008);

30

*Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351, 357-58 (6th Cir. 1983). The Board preemptively declared that *Thryv* "remains valid precedent" "[f]or the reasons set forth in" *Airgas USA, LLC*, 373 NLRB No. 102 (Sept. 18, 2024). RE10 n.47. In *Airgas*, the Board proclaimed that it will continue to apply *Thryv*—even if "specifically rejected" by "the Fifth Circuit"—due to "the Board's long-established policy of nonacquiescence in adverse appellate court decisions." 373 NLRB No. 102, slip op. at 1 n.2.

The Board could not have been clearer: It would not reconsider *Thryv*, no matter how many "circuits have condemned" it. *Kitchen Fresh*, 716 F.2d at 357; *see also* Starbucks Br. 62 nn.6-7. Any motion to reconsider "would be an empty formality." *Indep. Elec. Contractors of Hous., Inc. v. NLRB*, 720 F.3d 543, 551 (5th Cir. 2013).

At a minimum, it would have been futile for Starbucks to raise its constitutional challenges. Questions of "administrative and constitutional law," about which the Board knows "nothing special," are "detached from considerations of agency policy." *Space Expl. Tech. Corp. v. NLRB*, 151 F.4th 761, 771-72 (5th Cir. 2025) (citation omitted). Such "constitutional questions lie outside the agency's core competence—and squarely within the judiciary's." *Id.*

2.   Alternatively, this Court should reach the *Thryv* issue because the Board "patently travelled outside the orbit of its authority." *Indep. Elec.*, 720 F.3d at 559.   A claim that the Board lacked authority to act "is not one to 'review' … a decision of the Board" but "to strike down an order of the Board made in excess of its delegated powers." *Leedom v. Kyne*, 358 U.S. 184, 188 (1958).   If *Thryv* "exceeded the Board's statutory authority," this Court may review it. *3484, Inc. v. NLRB*, 137 F.4th 1093, 1118-21 (10th Cir. 2025) (Eid, J., concurring in part and dissenting in part).

The General Counsel's authorities do not hold otherwise.   Those cases held that the Board's composition was not "patently" unlawful under the Recess Appointments Clause where its "validity" had been accepted for "over forty years." *NLRB v. RELCO Locomotives, Inc.*, 734 F.3d 764, 797 (8th Cir. 2013); *D.R. Horton, Inc. v. NLRB*, 737 F.3d 344, 351 n.5 (5th Cir. 2013) (agreeing).   By contrast, *Thryv* is a recent, "novel, consequential-damages-like" remedy. *Thryv, Inc. v. NLRB*, 102 F.4th 727, 737 (5th Cir. 2024).

Finally, it is immaterial that the Board did not order a sum of damages. NLRB Br. 44.   Starbucks' "problem with the Board's remedy is not its *amount*, but rather its *form*." *3484, Inc.*, 137 F.4th at 1121 n.3 (Eid, J., concurring in part and dissenting in part).

## CONCLUSION

This Court should deny enforcement.

Dated:  October 24, 2025                  Respectfully submitted,

                                          /s/ Lisa S. Blatt
JEFFREY S. HILLER                         LISA S. BLATT
LITTLER MENDELSON, P.C.                       Counsel of Record
    41 S. High St., Ste. 3250             AMY MASON SAHARIA
    Columbus, OH 43215                    CLAIRE R. CAHILL
                                          JASON HOWELL CLAYTON
JONATHAN O. LEVINE                        WILLIAMS & CONNOLLY LLP
LITTLER MENDELSON, P.C.                       680 Maine Avenue, S.W.
    1111 E. Kilbourn Ave., Ste. 1000          Washington, DC 20024
    Milwaukee, WI 53202                       (202) 434-5000
                                              lblatt@wc.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 24, 2025, I electronically filed the foregoing document with the United States Court of Appeals for the Fifth Circuit by using the appellate NextGen system. I certify that all participants in the case are registered NextGen users and that service will be accomplished by the appellate NextGen system.

Dated: October 24, 2025          /s/ *Lisa S. Blatt*
                                 LISA S. BLATT

## CERTIFICATE OF COMPLIANCE

I certify, pursuant to Rule 32 of the Federal Rules of Appellate Procedure, that the attached Brief of Petitioner/Cross-Respondent contains 6,493 words and complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word 2019, in 14-point CenturyExpd BT.

Dated:  October 24, 2025                    /s/ *Lisa S. Blatt*
                                            LISA S. BLATT